1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name  BRODSKY          CLIFFORD
          (Last)           (First)              (Initial)

3    Prisoner Number   H-07665

4    Institutional Address  CTF Soledad, P.O. Box 689, Soledad, CA 93__

5

6

7               **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

8    CLIFFORD BRODSKY
     _____          )
9    (Enter the full name of plaintiff in this action.)     )
                                                  )
          vs.                                     )   Case No. _____
10                                                )   (To be provided by the clerk of court)
     B. CURRY, Warden (A)                         )
11   _____          )   **PETITION FOR A WRIT**
     BOARD OF PAROLE HEARINGS                     )   **OF HABEAS CORPUS**
12   _____          )
                                                  )
13   _____          )
                                                  )
14   (Enter the full name of respondent(s) or jailor in this action)     )
                                                  )
15

16               Read Comments Carefully Before Filling In

17   When and Where to File

18          You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1    <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3   jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10   <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12           (a)   Name and location of court that imposed sentence (for example; Alameda

13               County Superior Court, Oakland):

14          Los Angeles County Superior Court     Los Angeles, CA

15               Court                     Location

16           (b)   Case number, if known   BA 000576

17           (c)   Date and terms of sentence   August 23, 1991 / 15 Years to Life

18           (d)   Are you now in custody serving this term? (Custody means being in jail, on

19               parole or probation, etc.)       Yes _X_    No _____

20               Where?

21               Name of Institution: _CTF Soledad_

22               Address: P.O. Box 689, Soledad, CA 93960-0689

23        2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   Conspiracy to Commit Murder of the Second Degree

27   Penal Code § 182 / § 187

28

PET. FOR WRIT OF HAB. CORPUS     - 2 -

1    3. Did you have any of the following?

2        Arraignment:                                    Yes __X__    No _____

3        Preliminary Hearing:                            Yes __X__    No _____

4        Motion to Suppress:                             Yes __X__    No _____

5    4. How did you plead?

6        Guilty __X__    Not Guilty _____    Nolo Contendere __X__

7        Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9        Jury _____    Judge alone_____    Judge alone on a transcript _____

10   6. Did you testify at your trial?                   Yes __X__    No _____

11   7. Did you have an attorney at the following proceedings:

12       (a)    Arraignment                              Yes __X__    No _____

13       (b)    Preliminary hearing                      Yes __X__    No _____

14       (c)    Time of plea                             Yes __X__    No _____

15       (d)    Trial                                    Yes _N/A_    No _____

16       (e)    Sentencing                               Yes __X__    No _____

17       (f)    Appeal                                   Yes __X__    No _____

18       (g)    Other post-conviction proceeding         Yes _N/A_    No _____

19   8. Did you appeal your conviction?                  Yes __X__    No _____

20       (a)    If you did, to what court(s) did you appeal?

21              Court of Appeal                          Yes __X__    No _____

22              Year: 1993        Result: DENIED _____

23              Supreme Court of California      Yes __X__    No _____

24              Year: 1993        Result: DENIED _____

25              Any other court                          Yes _____    No _____

26              Year: _____    Result: _____

27

28       (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition? Different Matter    Yes _____    No _x__

2    (c)    Was there an opinion?    Yes _X__    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4    Yes _____    No _X__

5    If you did, give the name of the court and the result:

6    N/A _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes _____    No _X__

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: Los Angeles County Superior Court

19    Type of Proceeding: Habeas Corpus

20    Grounds raised (Be brief but specific):

21    a.No reliable evidence supports parole denial decision.

22    b.No reliable evidence shows Petitioner is currently a threat to society.

23    c.District Attorney failed to provide Petitioner owed benefit.

24    d._____

25    Result: Denied _____ Date of Result: 9/13/07

26    II.    Name of Court: California Court of Appeals

27    Type of Proceeding: Habeas Corpus

28    Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS    - 4 -

1            a. Same as in Superior Court _____

2            b._____

3            c._____

4            d._____

5            Result: Denied _____ Date of Result: 12/07/07 ___

6     III.    Name of Court: _____

7           Type of Proceeding: _California Supreme Court_____

8           Grounds raised (Be brief but specific):

9            a. Same as in Superior Court _____

10           b._____

11           c._____

12           d._____

13           Result: Denied _____ Date of Result:_____

14     IV.    Name of Court: _____

15           Type of Proceeding: _____

16           Grounds raised (Be brief but specific):

17            a._____

18           b._____

19           c._____

20           d._____

21           Result: _____ Date of Result:_____

22     (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                     Yes _____    No_____

24          Name and location of court: _____

25 B. GROUNDS FOR RELIEF

26       State briefly every reason that you believe you are being confined unlawfully. Give facts to

27 support each claim. For example, what legal right or privilege were you denied? What happened?

28 Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS      - 5 -

1   need more space. Answer the same questions for each claim.

2   [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One: The parole board's decision to deny parole based on the nature of Petitioner's 1989 inchoate conspiracy to commit a second degree murder 15+

6   years after his imprisonment, despite his exemplary prison record and lack of any prior criminality, deprived him of his federally protected right to due process.

7   Supporting Facts: On November 6, 2006, subsequent to serving his minimum 15 year term,

8   Petitioner, for the fifth time, was found unsuitable for parole (Exhibits A and B)

9   solely on the basis of his inchoate conspiracy to commit second degree murder

10   offense. (Cont'd, on page 8.)

11   Claim Two: No (federally required) reliable evidence demonstrates Petitioner would

12   currently pose an unreasonable threat to public safety, if released to parole.

13   Supporting Facts: Same as Claim One.

14

15

16

17   Claim Three: With or without prejudicial impact, the district attorney's failure on

18   November 6, 2006, to provide Petitioner expressly promised benefits requires he be granted relief.

19   Supporting Facts: At plea, the prosecutor expressly promised that when Petitioner

20   appeared before the parole board, his office would not oppose his release and would

21   represent the disposition of this case to the parole authorities at that time, which

22   they failed to do. (See paragraph 13, et. al.)

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   Not Applicable

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:

4       See Supporting Facts and Memorandum of Points and Authorities.

5   _____

6   _____

7   Do you have an attorney for this petition?                          Yes_____        No  X____

8   If you do, give the name and address of your attorney:

9   _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _____M/de 18, 2008_____            _____

14              Date                                         Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

1

### INTRODUCTION

2

## A. The Offense and Conviction

3     In August 1988, Petitioner and two others who managed or invested in several businesses sold

4 their 50% interest in one of those companies to Robert Krugman, who owned the other 50% of that

5 enterprise. In return for acquiring their fifty percent, his company was to repay, on an installment

6 basis, the approximately $1.1 million funding Petitioner and others had arranged for that company's

7 start-up financing. As the viability of that company now depended on Mr. Krugman's skills, he

8 provided a keyman life insurance policy for payment to the lending company of any outstanding debt

9 in the event of his death. After making some payments he refused to make others, alleging

10 improprieties in the deal. Unable to resolve this impasse, and becoming increasingly angry due to the

11 large amount of unpaid dept, between March and July 1989, Petitioner and several others concocted a

12 scheme to obtain repayment of that debt from the life insurance policy by hiring two hit-men to murder

13 Mr. Krugman. The scheme was foiled when a plot participant, a security guard from the business,

14 notified the police who disrupted the plot and intercepted the hit-men prior to the murder.

15     On July 10, 1991, after having been free on bail for two years, Petitioner pled guilty and was

16 accordingly convicted, and on August 23, 1991, was sentenced to 15 years to life. (Exhibit C.) On

17 August 30, 1991, as arranged by the court, Petitioner surrendered from bail directly to the Department

18 of Corrections at their CIM Chino Reception Center to begin serving his life sentence .

19

## B. Prior History and Post-Offense Record

20     Other than his commitment offense Petitioner has no criminal history whatsoever and had a

21 stable social history. (Exhibit A, p. 52.) After earning his B.S. Degree in 1965, Petitioner served as a

22 Naval Officer for several years (Exhibit D), then spent two decades managing the development of

23 complex business computer software systems. Subsequently, Petitioner and others invested in several

24 businesses. As evidenced in the transcript, and Exhibit L, his letters of support show Petitioner's ties

25 to his family and the community remain strong, resulting in his having offers of residence,

26 employment in a family business, and other support when released. As also noted by the panel he has

27 remained totally disciplinary free in prison, completed three vocational programs, and attended

28 numerous self-help groups. The CDCR psychological reports prepared to evaluate Petitioner support

his parole, including the last two specially requested by the Board. Evaluations which found that given his prior history, crime facts, understanding of its causes, his exemplary prison record and his parole plans, his release would pose no more of a threat to the public then the average citizen, and he would be more successful on parole than almost every other inmate. (See Exhibit E.)

## C. The Board's Decision[1]

The Board's fifth decision to deny parole rested solely on their characterization of the crime as carried out in an especially cruel and very callous manner (Exhibit A, p. 51) and in a dispassionate and calculated manner (Id. at pp. 51-52), as having a motive which was inexplicable and very trivial (Id. at 52), and because the prisoner conspired with another person to murder [the intended victim] (Id. at 52).

First, especially cruel or callous crimes are those wherein the offender subjected the victim to prolonged torturous pain, contrary to the instant offense where the victim was neither injured or killed. Second, a crime motivated by a desire (however wrong) to recover $1.1 million cannot be inexplicable and trivial. Further, as the record shows (Exh. B, Exh. E) Petitioner's actions were driven by his anger "over the large sum of unpaid dept withheld by the intended victim[2], and when the motivation for the crime is anger, it is not a passionless crime. (Arave v. Creech (1993) 507 U.S. 463, 472, 113 S.Ct. 1534, 1541, 1543; In re Weider (2006) 145 Cal.App.4th 570, 588; In re Grey (2007) 151 Cal.App.4th 379, 406-407.) In addition, addressing the nature of all conspiracies to murder, the State Supreme Court held in In People v. Cortez (1998) 18 Cal.4th 1226, 1233, that regardless of the alleged target offense degree, "that where two or more people conspire to commit murder – intend to agree or conspire, [and] further intend to commit the target offense of murder – and perform one or more overt acts in furtherance of the planned murder – each acted with a state of mind functionally indistinguishable from the mental state of premeditating the target offense – murder (citation)."

---

[1] Petitioner was previously denied parole for a period of one year in 2001, 2002, 2003, and 2005. His 2001 and 2005 hearings were held over a year late. Copies of the decision from those hearings are included as Exhibit B merely to demonstrate their occurrences. Furthermore, Petitioner made his sixth appearance before the Board on November 5, 2007, and was again denied parole despite his "exemplary" and disciplinary free record and parole supportive psychological reports. See Exhibit G, included only to demonstrate the futility of Petitioner's Board appearances, as that matter is still before the state court.

[2] While the core underlying force driving Petitioner's reaction in this matter was his anger over the very large amount of money being withheld by the intended victim, as Petitioner has repeatedly explained, and the CDCR psychologists analyzed, his actions were also driven by his then competitive tendencies and its rigid application. Completion tendencies and anger he has learned to control as demonstrated by his remaining disciplinary free in the competitive turmoil of a prison environment for his entire (now) 16½ years of imprisonment.

9

1    Since all conspiracies to murder are at a minimum calculated, i.e., intended and/or

2   premeditated, in nature the presence of calculation is the minimum necessary to sustain a conviction

3   for that offense, and thus its use to support parole denial offends due process under the standards of In

4   re Rosenkrantz (2002) 29 4th 616, 683. Further, given Petitioner's prior crime free history and post-

5   conviction exemplary record, the value of his now 18½ years old offense facts as a measure for

6   predicting future criminal acts is at best nil and thus no longer constitute some evidence. (In re Lee

7   (2006) 143 Cal.App.4th 1400, 1408 [review denied].)[3]

8                           **STATEMENT OF THE FACTS**

9    1. After the intended victim refused to repay a $1.1 million business debt owed the company

10   they managed and controlled, Petitioner and several others concocted a scheme to obtain proceeds

11   from a life insurance policy the intended victim had taken it out to repay any outstanding debt in the

12   event of his death. The plot was foiled when interrupted by the police.

13    2. While free on bail, Petitioner admitted responsibility for his role in the offense, as described

14   above in the introduction, pleading guilty on July 10, 1991, to the offense of conspiracy to commit a

15   second-degree murder, as stipulated by the People and approved by trial court. After pleading guilty

16   Petitioner remained free on bail without stated restrictions or monitoring, other than being required to

17   appear in court for sentencing. (Exhibit C.)

18    3. On August 23, 1991, Petitioner was sentenced to 15 years to life, then again released on

19   bail, and with the prosecutor's agreement, self-surrendered from bail to the Department of Corrections

20   on August 30, 1991, to begin serving his sentence. (Exhibit C.)

21    4. Statutory law (Penal Code § 1272.1) prohibits release of an offender on post-conviction bail

22   if the crime or other facts indicate they would be a threat to society or any person, and requires the

23   court to make that consideration prior to their release. Post-sentencing bail release, again without

24   stated restrictions or monitoring, is so unusual for someone sentenced to a years to life indeterminate

25   term, it must demonstrate the court and prosecutor understood Petitioner had accepted responsibility

26   for his criminal acts and was demonstrating his remorse by being willing to be (in the prosecutor's

27

28   [3] This holding of In re Lee 143 Cal.App.4th at 1408 was recently adopted (relied upon) by the Ninth Circuit in Hayward v. Marshall (9th Cir. 2008) 2008 U.S. App. LEXIS 40, *17 - *19. Also see In re Hofferber (1980) 28 Cal.3d 161, 177 ("the passage of time itself diminishes the validity of an assumption [a prisoner's] dangerousness remains unabated.

1    words) "fairly punished." A situational bail release which also shows the neither the court nor the

2    prosecutor found Petitioner to be a threat to society or to any person.

3         5. On November 6, 2006, 15+ years after his imprisonment and 17+ years after committing his

4    crime[4], Petitioner appeared before the Board for the fifth time and was again denied parole for a one-

5    year period. (See Exh. A, Decision pages.)

6         6. During the decision, the Board carefully delineated each non-offense factor and found none

7    to support parole denial. Specially, the panel noted, "The prisoner does come from a stable on all

8    counts, a very stable social background with no criminal history...With regards to institutional

9    behavior, the Petitioner participated in beneficial self-help therapy and programs...I would like to note

10   that he lacks misconduct while incarcerated. He does not have any 128 counseling chrono's or serious

11   115 disciplinary reports. The psychology report dated August 25th of 2006, authored by Dr. Marak is

12   supportive for release. In regard to your parole plans, you do have solid parole plans...[T]he prisoner

13   is to be commended for his earning multiple vocations as well as his excellent work ratings,

14   participation in self-help group(s), as well as remaining disciplinary free throughout his incarceration."

15   (Exh. A, pp. 52:20-26, 54:1.)[5]

16        7. As phrased by the Board, their decision to deny parole in this case was "based on the

17   commitment offense." As noted both ante and below, the Board's supporting characterizations were

18   either contrary to case factors or law, or constituted the minimum necessary factual elements to sustain

19   conviction for a conspiracy to commit murder, and thus were not available as reasons supporting a

20   parole denial. (Exh. A, pp. 51-53.)

21        8. To be factually supported, the Board's finding "the offense [in this case] was carried out in a

22   manner which demonstrated an exceptionally callous disregard for human suffering" requires that

23   Petitioner had intended the infliction of prolonged torturous pain on the victim (In re Rosenkrantz

24

25   [4] The court in In re Lee, 143 Cal.App.4th at 1412, notes it is the passing of time since a prisoner "committed" their crime
     that reduces it predictive value, not just the amount of time a prisoner has been incarcerated. Similarly, see In re
26   Hofferber(1980) 28 Cal.3d 161, 177 ("the passage of time itself diminishes the validity of an assumption of dangerousness
     continues unabated").
27   [5] Somehow, the Superior Court, after reading the decision, unreasonably decided that given the Board's discretion, a
     Deputy Commissioner's suggestive statement to the effect that, "I'm going to make a suggestion, I'm not saying you have
28   to do this...I'm going to suggest you might want to do some self-reading...I'm not saying you have to do that..." (Exh. A,
     pp. 55:13-56:14) constitutes evidence supporting parole denial. (See Exh. F, p. 2.)

1    (2000) 80 Cal.4th 409, fn. 7 at 419-420; In re Smith (2003) 114 Cal.Ap.4th 343, 365-366), or that he
2    would not necessarily have committed the crime in a more aggravated manner then that ordinarily
3    shown in a conspiracy to commit murder offense. (In re Scott (2004) 199 Cal.App.4th 871, 891
4    [Review denied].) Additionally, an especially callous crime must have involved acts of "gratuitous"
5    cruelty such as those reflected by the offense events in In re Van Houten (2004) 6 Cal.App.4th 339,
6    351, acts which far exceed the minimum necessary to kill. Not only was the victim in this case neither
7    killed nor injured, and thus could not have suffered from prolonged tortuous infliction of pain, there is
8    absolutely "no evidence" such was the intention of the conspirators.

9        9. The Board panel finding that the parole denial was supported because the "motive was
10   inexplicable and very trivial in relation to the offense," followed by their list of motives for
11   the…crime, is illogical and obviously contrary to fact. Facts which show Petitioner's motivation for
12   the crime was his desire to recoup the unpaid $1.1 million. While it was carried out in an illegal
13   manner, it was certainly not an inexplicable or trivial motive, as the Board effectively noted on p.
14   52:16-17 of Exh. A.

15       10. As recognized in the considered evidence, Petitioner's impulse to commit the crime
16   resulted in part from his 1989 anger over the intended victim's refusal to repay the $1.1 million owed
17   to the company Petitioner and his partners managed and controlled. (See e.g. Exh. E, April 16, 2005,
18   psychological evaluation, page two, Review of Life Crime.) Numerous case decisions hold that an
19   offense motivated by anger, revenge, jealousy, etc. cannot be considered either dispassionate or cold
20   blooded, contrary to the Board's (Exh. A, p. 51:20-24) declaration otherwise. (See Arave v. Creech
21   (1993) 507 U.S. 463, 472; In re Gray (2007) 151 Cal.App.4th 379, 406-407; In re Weider (2006) 146
22   Cal.App.4th 570, 588.) These last two cases directly address the Board's misapplication of the Cal.
23   Code Regs., tit. 15 § 2402(c)(1)(B) dispassionate factor, when the offense (in part) was motivated by
24   anger. Arave similarly defines permissible application of cold-blooded to characterize crime facts.

25       11. All conspiracies to murder, regardless of their target offense degree, are at a minimum a
26   premeditated and/or intended offense, i.e. a calculated or planned offense. (See People v. Cortez
27   (1998) 12 Cal.4th 1226, 1233.) Even the Board itself held, "[T]he offense was a situation where the
28   crime was a planned crime, conspiracy with another person to murder the victim." Accordingly, these

elements which are minimally necessary to sustain a conviction for conspiracy to murder cannot support a parole denial decision under the standard of In re Rosenkrantz (2002) 29 Cal.4th 616, 683. Further, unless a conspiracy's plan to murder involves the intent to inflict prolonged torturous pain, not present in this case, it is simply not more cold-blooded than any other conspiracy to murder plan, precluding use of this reasoning to deny parole. To permit otherwise, for an ordinary plan to murder, would permit the Board to so characterize any conspiracy to murder and thus to blanket deny parole to any prisoner having been convicted of conspiracy to murder, regardless of the years served in prison and despite their exemplary prison record.

12. At plea, the People stipulated the target offense of Petitioner's conspiracy to commit murder was second-degree [murder], which under then governing law reduced his sentence to 15 years to life rather than the originally contemplated 25 years to life. (Exh. C, plea transcript, p. 14:6-12.) As of his November 6, 2006, fifth appearance before the Board, Petitioner has been imprisoned in CDCR custody for over 15 years and repeatedly denied parole based solely on the crime. (Exh. A, p. 51:16-17.) Given his stable and crime free prior history, exemplary and disciplinary free prison record, and the lack of actual violence in a crime wherein the victim was neither injured or killed, "the parole Board's decision to deem [this] prisoner unsuitable for parole solely on the basis of his commitment offense [no longer] comports with due process, [as] the decision was made [after] th[is] inmate served the minimum number of years required by his sentence." (Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 665.)

13. In their decision, the Board noted, "In regards to the District Attorney's Office of Los Angeles County, they take opposition at this time." (Exh. A, p. 53:13-15.) At plea and sentencing the District Attorney promised to have no opposition to [Petitioner] being paroled..." (See Exh. C, plea transcript, p. 14:17-28; sentencing transcript, p. 10:23-27.) A commitment that prosecutor explained meant the deputy district attorney attending Petitioner's parole hearing "would not oppose [Petitioner's] release at the first available opportunity upon [i.e. during] consideration and after consideration by the Board of Prison Terms..." (Exh. C, sentencing transcript, p. 10:25-27.) The Board's notation of an opposition to parole confirms the attending district attorney's representation to the parole authorities was contrary to the prosecutor's express promise at time of plea.

14. At plea, the prosecutor promised their office would "represent" to the parole authorities the disposition of this case as represented in the record (Exh. C, plea transcripts), however, that office in the form of the appearing Deputy District Attorney made no representation of that nature, thereby failing to fulfill his office's express promise to represent, i.e. to advocate, the disposition of this case to the parole authority.

15. California law, as decided by the State Supreme Court, requires the court enforce all terms of a plea agreement without regard to their apparent value, while precluding a failure to enforce based on harmless error analysis. See People v. Mancheno (1982) 32 Cal.3d 855, 860, 187 Cal.Rptr. 441, holding that, "Constitutional due process is implicated by a failure to implement a plea bargain according to its terms. For that reason [a] violation of a plea bargain is not subject to harmless error analysis." Also see People v. Walker (1991) 54 Cal.3d 1013, 1026, 1 Cal.Rptr.2d 902, 910, holding that, "It necessarily follows that violation of the plea bargain by an officer of the state raises a constitutional right some remedy. (Santabello, supra, 404 U.S. 259, 266-267, 30 L.Ed.2d 427, 435-436; People v. Calloway (1981) 29 Cal.3d 666, 668.)"

16. Denying parole relief in this case using application of the In re Dannenberg (2005) 34 Cal.4th 1061, 1098, minimally necessary to convict standard, to find Petitioner's offense circumstances were more than necessary to convict for conspiracy to commit a second-degree murder, would produce that In re Lee (2006) 143 Cal.App. 1400, 1413, "a absurd result" of punishing an offender solely because he accepted the State's supposedly beneficial offer to plead guilty to a lesser serious target offense, even though all parties were aware of the acts of the crime. An offer and stipulation by the People in this case of the offense type and target offense degree (Exh. C) which if used to deny parole would punish Petitioner by applying a more harsh standard than if he had been convicted of the conspiracy to commit first-degree murder target offense charge, originally contemplated. (Lee, Id.)

17. Petitioner appeared before the Parole Board and was found unsuitable for parole on November 6, 2006. That decision became final on March 6, 2007. On April 25, 2007, Petitioner's writ appealing that decision was filed in the State Superior Court (Case No. BH004628) and subsequently summarily denied on September 13, 2007. (See Exh. F.) On October 27, 2007, Petitioner filed his writ in the Appellate Court (Case No. B202907) which was similarly denied on

14

December 7, 2007. (Exh. H.)[6] A Petition for Review, Case No. S159107, was filed in the State Supreme Court on December 17, 2007. On that date the Supreme Court requested the Appellate Court record in this matter – which they received the following day. Accordingly, the record reviewed by the State Supreme Court included the writ filed in the Appellate Court, both lower court decisions, and the Petition for Review.

18. At each of Petitioner's prior hearings, after noting they accept the trial court's findings as true, the Board, as in this instance, failed to note in its decision why they found Petitioner would pose a threat to public safety, if released, contrary to the trial court which released Petitioner multiple times on post-conviction bail under their Penal Code § 1272.1 authority, which statute required release be denied if the court determined an offender would pose a threat to society, or to any person, based in part on a court examination of the seriousness and facts of the offender's crimes.

19. Petitioner's exemplary prison record gives a clear appearance of rehabilitation.

20. No relevant evidence concerning his 18+ year old offense circumstances or any other matter was considered by the Board which demonstrates Petitioner currently poses a threat to public safety if released. (In re Lee, supra, 143 Cal.4th at 1408.)

## PRAYER

WHEREFORE, PETITIONER requests this court:

1. Issue an Order to Show Cause requiring the state to show how in accordance with fact and governing law Petitioner's record shows he is currently a threat to public safety and why Petitoner should not obtain relief given the District Attorney's failure to provide him benefits expressly promised at plea;

2. After consideration, grant relief by ordering Petitioner's release or by vacating the parole denial in this case, instructing the Board hold a new hearing within 45 days at which they comport with due process by finding that neither Petitioner's prior history, nor his exemplary prison record, nor his almost 19 year old conspiracy to commit a second-degree murder, without victim injury or death, provide a factual basis supporting parole denial, and accordingly set his term and release him; and

3. Find that the District Attorney's office failed to not oppose parole or represent the

---

[6] In its denial decision the Appellate Court relied on In re Dannenberg (2005) 34 Cal.4th to find 'some evidence' supports the decision, without noting the evidence, therefore, presumably concurring with the Superior Court decision . Oddly, that court also noted without clarification, but with reference to its previous decision that in Case No. B183409 (Exh. 1), that Petitioner raised an argument rejected in a previous petition. To the extent the court is referring to his appeal of the Board's decision, Petitioner simply has the due process right to appeal each Board decision. However, to the extent the Appellate Court was referring to Petitioner's claims vis-à-vis the terms of his plead agreement, in this writ Petitioner raised none of the issues rejected by the Appellate Court in its 2005 decision.

15

disposition of this case to the parole authorities, and accordingly compel specific performance of Petitioner's plea agreement.

Dated: March __/8__, 2008                                    Respectfully submitted,


Clifford Brodsky
Petitioner, In pro per

## MEMORANDUM OF POINTS AND AUTHORITIES
## INTRODUCTION

This case arises from decisions made by the Board of Parole Hearings and state courts 18+ years after the occurrence of Petitioner's offense which conflict with the nature of that inchoate conspiracy to commit second-degree murder and this prisoner's exemplary prison record, lack of a prior record, and stable social history. It results from the Board's fifth decision to deny parole which was unsupported by any reliable evidence showing that Petitioner remains/would currently pose an unreasonable risk to society if released, as the nature and facts of Petitioner's now almost 19 year old offense no longer predict his potential for re-offending, given his disciplinary free and otherwise highly positive prison programming record, his pre-offense spotless history, and Board requested psychological evaluations finding no further need for self-help, no precursors for violence, a prisoner better suited for parole than almost every other inmate, etc. This is also a case where the Deputy District Attorney failed to honor a prosecutor's express promise made at time of plea that their office would not oppose parole and that a representative from their office would appear and "represent" to the parole authority the "disposition" of this case as "represented in the record." A disposition including the "People's" express stipulation that the commitment offence in this case is a conspiracy to commit a second-degree murder carrying a 15 years to life sentence, the District Attorney's promise to not oppose Petitioner's release upon and after the earliest consideration, and the prosecutor and trial court's releasing Petitioner on unmonitored and unrestricted post-conviction and post-sentencing bail after arranging for his later self-surrender to the Department of Corrections. Releases and a self-surrender that could not have occurred unless Petitioner was found by the judiciary not to be a threat to society or to any person, as mandated by California Penal Code § 1272.1.

## LEGAL ARGUMENT

### I. THE BOARD VIOLATES DUE PROCESS AND DEPRIVES AN APPEARING PRISONER OF THEIR FEDERALLY PROTECTED LIBERTY INTEREST BY IGNORING THE LESSER SERIOUS NATURE OF A COMMITMENT OFFENSE AND BY REPEATEDLY RELYING ON THE PREDICTIVE VALUE OF THE UNCHANGING FACTORS OF THE CRIME.

17

1      Both state and federal courts have found Penal Code "Section 3041 [, subd. (b)] creates in
2   every inmate a cognizable liberty in parole which is protected by the safeguards of the Due Process
3   Clause," holding that interest arises "upon the incarceration of the inmate." (Biggs v. Terhune (9th
4   Cir. 2003) 910, 914-915, relying on McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-902.)
5   Accordingly, numerous courts have repeatedly held that even in cases where offense circumstances
6   support parole denial under regulatory law, due process precludes the crime alone justifying repeated
7   parole denials in the face of a prisoner's long-term exemplary type prison record demonstrating
8   rehabilitation. (See e.g. In re Lawrence[7] (2007) 150 Cal.App.4th 1511, 1540; Biggs v. Terhune, 334
9   F.3d at 916-917; In re Scott (2005) 34 Cal.Rptr.3d 905, 919-920; In re Lee (2006) 143 Cal.App.4th
10   1400, 1412.) This Petitioner has been denied parole five times based solely on the unchanging
11   circumstances of his offense. A decision this Board panel accompanied with their notation Petitioner's
12   Psychological Evaluation results are supportive of his being released. Further, as the Board noted,
13   Petitioner has no criminal history other than his commitment offense, and prior to imprisonment he had
14   a very stable social history resulting in his now having strong community and family support expressed
15   in the form of letters of support and strong parole plans. In prison, again as the Board noted, Petitioner
16   has remained disciplinary free, completed two CDC Vocational programs (Mechanical
17   Drawing/Computer Aided Design and Textiles) and completed a private college para-legal course and
18   other educational courses including multiple accounting courses, and has positively worked at
19   assignments as a Teacher's Aide in Vocational and Academic areas, Library Clerk, Program Office
20   Clerk, etc.

21      In In re Lee 143 Cal.App.4th at 1412, the court addressed this issue, holding, "Simply from the
22   passing of time [a] crime [ ], [which occurred] almost 20 years ago ha[s] lost much of [its] usefulness
23   in foreseeing the likelihood of future offenses than if [a prisoner] had committed them five or ten year

---

[7] The State Supreme Court granted review in In re Lawrence, Case No. S154018, on September 19, 2007, to answer the
questions, "[T]o what extent should the Board of Parole Hearings, under Penal Code section 3041...consider the prisoner's
current dangerousness and at what point, if any, is the gravity of the commitment offense and prior criminality insufficient
to deny parole hen the prisoner appears otherwise rehabilitated." However, the State Supreme Court, in a 5 to 2 vote, also
lifted the stay and released petitioner Lawrence. Further, the State Supreme Court has granted review, or an O.S.C., and
returned cases to lower courts, instructing they determine why petitioner remains a danger to public safety, citing In re Lee
(2006) 143 Cal.App.4th 1400, 1408, in those orders. See e.g. In re Ronald Singler, (2007) DJDAR 5850, Case No,
S150139; In re Masoner (2007) DJDAR 12435, Case No. S144097.)

18

1  ago[,]" relying on "In re Scott (2005) 133 Cal.App.4th 573, 595, "past crimes value for predicting

2  future crimes diminished over time." (Lee, Ibid.)[8] The parole matter in question in Lee and the Board

3  hearing results being appealed in this matter occurred 17 years following the parties arrest for

4  committing their respective offenses, while similarly both crimes occurred as a result of an angry

5  response to a victim who refused to make installment payments on a large business loan, in the Lee

6  matter one victim was killed and the other survived after being shot twice. (Lee at 1404.) In

7  Petitioner's case, the intended victim was neither injured nor killed. Both Lee and Petitioner "had no

8  prior criminal history [and] acknowledged [their] guilt by entering into a plea bargain that sent [them]

9  to prison for 1[5] years to life." Lee at 1406.) Further both have "had a spotless prison discipline

10  record" with Lee having had one minor violation for smoking in 1998," and Petitioner having had no

11  violations. Both Lee and this Petitioner "improve[d themselves] by taking education[al] classes [in

12  prison.]" (Lee, Id.) Further, "Every prison psychologist [who] evaluat[ed Lee or this Petitioner] found

13  [both] posed little or no danger to public safety if released." (Lee at 1406.) While recognizing the

14  seriousness of his offense, given his disciplinary free and overall very positive prison programming

15  record, as recognized by all the experts, as in the Lee case, after 17+ years, the nature of this

16  Petitioner's offense has lost all of its usefulness as a predictor of the likelihood of his committing

17  future crimes. (Lee at 1412.)

18      Not only was the ability of the Board to predict this Petitioner's future dangerousness based

19  simply on the circumstances of his then 17+ year old commitment offense now nil, as held by In re

20  Scott, supra, 133 Cal.App.4th at 595, 34 Cal.3d 905, "The commitment offense can negate suitability

21  only if the circumstances of the crime reliably established by evidence in the record rationally indicate

22

23  [8] As noted in fn. 3, these state case decisions (and others of a similar nature) were adapted as a federal standard by the
24  Ninth Circuit in Hayward v. Marshal, 2008 U.S. App.LEXIS 40. Hayward at *26-*27 also relied on Rosenkrantz v.
    Marshall (C.D. 2006) 444 F.Supp.2d 1063, 1084 ("while relying upon petitioner's crime as an indicator for his
25  dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging
    circumstances – after nearly two decades of incarceration and half a dozen parole suitability hearings – violates due process
26  because petitioner's commitment offense has become such an unreliable predictor of his present and future that it does not
    satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation the ability to predict a prisoner's future
27  dangerousness based simply on the circumstances of his or her crime is nil.") "The facts of this petitioner's offense shows
    a crime far less violent then the execution style murder in Rosenkrantz, accordingly requiring a lesser time period since the
28  crime, for its facts to loose their predictive value, given an exemplary prisoner record. At his parole hearing it had been
    over 17 years since Petitioner committed his crime and over 15 years since he surrendered from a crime free bail to begin
    serving his sentence, which time period he respectfully submits renders nil the predictive value of his crime facts.

19

1  the offender will present an unreasonable public safety risk if released from prison. Yet the predictive
2  value of the commitment offense may be very questionable after a long period of time." (Id., at 922.)
3  "Therefore, an unsuitability determination must be predicated on 'some evidence that the particular
4  circumstances of [the prisoner's] crime – circumstances beyond the minimum elements of his
5  conviction – indicated exceptional callousness and cruelty with trivial provocation, and thus suggests
6  he remain a danger to public safety.' (In re Dannenberg, supra, 34 Cal.4th at 1098.)" (Id., at 922.)
7  "The record [before the Board] did not provide 'a scintilla of evidence' [Petitioner] committed his
8  offense 'in such a manner.

9  　　　Further, the facts in the record and governing case law are contrary to the court's
10  characterization of the motive in this case as being trivial. See In re Scott (2004) 119 Cal.App.4th 871,
11  894, fn. 13, wherein the court identified that "Murdering someone for 40 cents was certainly ... very
12  trivial in relationship to the offense," a sum and standard significantly less than the $1,000,000.00 at
13  stake herein.  Scott also noted that "to fit the regulatory description, the motive must be materially less
14  significant (or 'more trivial') than those that which conventionally drive people to commit the offense
15  in question and therefore more indicative of a risk of danger to society if the prisoner is released than is
16  ordinary, belying the State's claim otherwise. Additionally, unsupported is the Superior Court's
17  finding Petitioner was denied parole due to a need for additional self-help. The Board found precisely
18  the opposite, commending Petitioner for his self-help participation, noted he had done quite a bit, and
19  should continue on his course. They did not deny parole because Petitioner needed to prepare book
20  reports, or even require such actions.

21  　　　　　　　**II. APPLICATION OF THE MINIMALLY NECESSARY TO**
22  　　　　　　　**CONVICT STANDARD EFFECTED BY COMPARING**
23  　　　　　　　**ACTUAL OFFENSE FACTUAL ELEMENTS VERSUS**
24  　　　　　　　**THOSE LEGALLY ASSOCIATED WITH A PLED TO**
25  　　　　　　　**LESSER  TARGET OFFENSE PRODUCES "ABSURD**
26  　　　　　　　**RESULTS" CONFLICTING WITH OWED DUE PROCESS.**

25  　　　Disregarding that the factual elements underlying Petitioner's target crime were of a planned,
26  i.e. premeditated, nature, the trial court approved the People's stipulation the target offense was the
27  lesser conspiracy to commit an [unpremeditated] second-degree murder. However, the target offense
28  in this case was never effected. Reducing the target offense in this case had the sole effect and benefit

20

1    to Petitioner of reducing his minimum term to 15 years of imprisonment. Petitioner was, however, still

2    convicted of committing a Penal Code § 182, conspiracy to murder. Determining whether or not there

3    were degrees of conspiracy to murder, the State Supreme Court held that:

4            "Consequently, it logically follows that where two or more persons conspire
             to commit murder – i.e. intend to agree or conspire, [and] further intend to
5            commit the target offense of murder and perform one or more overt acts in
             furtherance of the planned murder – each has acted with a state of mind
6            'functionally indistinguishable from the mental state of premeditating the
             target offense of murder.' ([People v.] Swain, supra, 12 Cal.4th [893,] 608-
7            609.) [Accordingly,] [t]he mental state required for convicting of
             conspiracy to commit murder necessarily establishes premeditation and
8            deliberation of the target offense of murder -- (People v. Cortez (1998) 12
             Cal.4th 1226, 1233.)
9

10        Disregarding that all conspiracy to murder offenses are at a minimum "premeditated" crimes,

11    the Board denied parole finding Petitioner's crime was planned, i.e. premeditated, effectively

12    disregarding the greater than minimally necessary actual elements required to convict test to deny

13    parole. (See In re Rosenkrantz (2002) 29 Cal.4th 616, 683; In re Dannenberg (2005) 34 Cal.4th 1061,

14    1071.) However, if that test is applied to a never carried out second-degree murder target offense, it

15    will always provide support for parole denial when the Petitioner pled guilty to the lesser degree crime

16    expressly stipulated by the People. But, would not apply if a Petitioner had been convicted of the

17    higher degree crime, thus producing the "absurd results" noted in Lee at 1413, effectively punishing

18    only those who plea by using a harsher standard for testing their case facts than for those convicted by

19    trial. The court in Lee at 1412-1413 rejected this absurd result and held that the minimally necessary

20    standard must be applied to the offense and degree originally contemplated pre-plea, and by that

21    standard found Lee's acts were not more than the minimum necessary for his offense and thus

22    unavailable to support parole denial. The state appealed to the State Supreme Court which denied

23    review, thus sustaining the appellate court decision.

24                    **III. PLEA AGREEMENTS AND STIPULATIONS ARE
                      CONTRACTUAL AGREEMENTS GOVERNED BY
25                    CONTRACT LAW STANDARDS.**

26        Plea bargains and stipulations in California are contractual in nature and interpreted according

27    to contract law principles. (People v. Shelton (2006) 37 Cal.4th 759, 767; Wooley v. Turkus (1958)

28    51 Cal.2d 408.) To construe the terms of a plea and/or stipulations, courts look to the express language

of the agreement, then give consideration to the law underlying an agreement. See Alpha Beta Food
Mkts. Inc. v. Retail Clerks (1955) 45 Cal.2d 764, 771, holding that under California law all applicable
laws in existence when an agreement is made necessarily enter such contract and form part of it,
without any stipulation to that effect, as if they were expressly referred to and incorporated into its
terms. Similarly holding, Farmers Bank v. Fed. Reserve Bank, (1922) 262 U.S. 638 660. Under
existing law at the time of plea, as noted ante in paragraph 15 of the Statement of Facts, harmless error
analysis may not be applied to failures to enforce terms of a plea when violated, requiring some
remedy be provided for any violation.

### IV. THE DISTRICT ATTORNEY'S INTENTIONAL FAILURE TO REPRESENT THE DISPOSITION OF THIS CASE TO THE BOARD AS PROMISED AT PLEA, VIOLATED THE TERMS OF THAT CONTRACT.

At time of plea, the prosecutor detailed the disposition of this case. Included among those
details were the People's stipulation of the target offense type and degree and the prosecutor's promise
his office would have no opposition to the Petitioner's release at the first date the Board determines
him to be suitable. He had also pledged that, "some years hence when a district attorney attends that
lifer hearing, that this disposition as represented by the record is known and can be represented to the
appropriate authorities at that time." (Exh. C, Plea Transcript, p. 14.)

Disposition" means the nature, the character, the outlook of the agreement, while "represent"
means to stand for, to symbolize, to embody that disposition. However, instead of representing this
disposition (outlook) to the authority, the attending Deputy District Attorney elected to sit silent on this
matter throughout the hearing. That silence did not represent the nature, the disposition, of the
agreement. A violation by the government of an express term of a plea renders the defendant's
acceptance of that agreement involuntary, requiring specific performance be ordered in a manner
beneficial to the aggrieved party, without any need to show prejudice. See People v. Mancheno (1982)
32 Cal.3d 855, 865, directly addressing this issue holding, "[T]he harmless error test is inapplicable to
a situation involving failure to fulfill the terms of a plea bargain. Defendant's entitlement to the
benefit of his bargain cannot be predicated on some measurable detriment. Because a Court can only
speculate when a defendant would negotiate for a particular term of a bargain, implementation should

1    not be contingent on other's assessment of the value of the term to defendant." Also see Gunn v.

2    Ignacio (9th Cir. 2001) 263 F.3d 965, 970. Further, "When the government agrees … to make

3    re[presentation] with respect to a [disposition], it must carry out its part of the bargain by making the

4    promised re[presentation]" (United States v. Benchimol (1985) 471 U.S. 453, 456, 105 S.Ct. 2103,

5    2105, 85 L.Ed.2d 462), else those failures, as in this case, will render acceptance of a plea involuntary,

6    as it will have been entered into under false premises. (Maybry v. Johnson (1984) 467 U.S. 504, 509.)

7                                    **CONCLUSION**

8         The underlying basis for the state's decision to deny Petitioner parole disregarded the years

9    passed since the crime occurred and his exemplary prison record, were otherwise factually unsupported

10   or contrary to law, thus arbitrary. Further, as explicitly stated by the Board, the District Attorney,

11   contrary to their promise at time of plea, opposed parole, rendering Petitioner's acceptance of that

12   agreement involuntary. Petitioner, therefore, respectfully requests his writ be granted.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )        CDC Number H-07665
Hearing of:               )
                          )
CLIFFORD BRODSKY          )
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 6, 2006

12:56 P.M.

PANEL PRESENT:

Edward Martinez, PRESIDING COMMISSIONER MARTINEZ
Joseph Muga, Deputy Commissioner

OTHERS PRESENT:

Clifford Brodsky, Inmate
Attorney for Inmate
Stephen Defilippis, Deputy District Attorney
Victim
Wife of Victim
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

**Kerry Viens**
**Northern California Court Reporters**

ii

## INDEX

Page

Proceedings ........................................ 1

Case Factors ..................................... 10

Pre-Commitment Factors ........................... 10

Post-Commitment Factors .......................... 27

Parole Plans ..................................... 32

Closing Statements ............................... 36

Recess ........................................... 49

Decision ......................................... 50

Adjournment ...................................... 58

Transcriber Certification ........................ 59

--oOo--

1

1        **P R O C E E D I N G S**

2            **PRESIDING COMMISSIONER MARTINEZ:**   Today's

3     date is November the 6th of 2006.   The time is

4     12:56 p.m.   We are located at CTF Soledad.   The

5     inmate was received on August 30th of 1991 from

6     Los Angeles County.   The life term began on

7     August 30th of 1991.   The minimum eligible parole

8     date is August 15th of 2001.   The controlling

9     offense for which the inmate has been committed

10    is conspiracy to commit murder in the second

11    degree under case number A, Adam 000576, Count 1

12    under Penal Code Section 187.   The inmate

13    received a term of 15 years to life.   This

14    hearing is being tape recorded, and for the

15    purposes of voice identification, each spelling

16    our last name, when it comes to you, your CDC

17    number.   I'm going to start with myself

18    (inaudible).

19            **INMATE BRODSKY:**   Triple CMS is a program

20    or receiving psychological help or (inaudible)

21    medicine, and EOP is extended outpatient program.

22            **PRESIDING COMMISSIONER MARTINEZ:**   All

23    right.   (Inaudible).

24            **INMATE BRODSKY:**   No.

25            **PRESIDING COMMISSIONER MARTINEZ:**

26    (Inaudible).

27            **INMATE BRODSKY:**   No.

2

1       **PRESIDING COMMISSIONER MARTINEZ:**

2   (Inaudible).

3       **INMATE BRODSKY:**   (Inaudible).

4       **PRESIDING COMMISSIONER MARTINEZ:**

5   (Inaudible) suffer from any disability that would

6   prevent you from Participating in today's

7   hearing?

8       **INMATE BRODSKY:**   No.

9       **PRESIDING COMMISSIONER MARTINEZ:**   Okay.

10  Counsel, have we met all of Mr. Brodsky's ADA

11  rights?

12      **ATTORNEY:**   Yes.

13      **PRESIDING COMMISSIONER MARTINEZ:**   Move

14  forward.   This hearing is being conducted

15  pursuant to Penal Code Sections 3041 and 3042 and

16  the rules and regulations of the Board of Prison

17  Terms governing Parole Consideration Hearings for

18  life inmates.   The purpose of today's hearing is

19  to once again to consider the number and the

20  nature of the crimes that you were committed for,

21  your prior criminal, your social history, and

22  your behavior and programming since your

23  commitment.   We've had the opportunity to review

24  your Central File and your prior transcript, and

25  you will be given the opportunity to correct or

26  clarify that record.   We will reach a decision

27  today and inform you whether or not we find you

3

1    suitable for parole and the reasons for our
2    decision.  If you are found suitable for parole,
3    the length of your confinement will be explained
4    to you.  Again, nothing that happens here today
5    will change the findings of the court.  The Panel
6    is not here to retry your case.  The Panel is
7    here for the sole purpose of determining your
8    suitability for parole.  Do you understand that,
9    Mr. Brodsky?

10           **INMATE BRODSKY:**  Yes.

11           **PRESIDING COMMISSIONER MARTINEZ:**  The
12   Panel, again, this hearing is going to be
13   conducted in two phases.  I will discuss with us
14   the crime for which you were committed for, your
15   prior criminal and social history.  Commissioner
16   Muga is going to discuss with you your progress
17   since your commitment, your counselor's reports,
18   your psychological evaluation and your parole
19   plans as well as any letters of support that you
20   may have and also letters of opposition that may
21   appear.  (Inaudible) and your attorney will be
22   given the opportunity to ask you questions.
23   Questions from the District Attorney shall be
24   asked through the chair, and you will direct your
25   answers to the Panel.  Next, the District
26   Attorney then your attorney will be given an
27   opportunity to give a final closing statement

4

1    regarding your parole suitability.  Your

2    statement should address why you feel you are

3    suitable for parole.  (Inaudible) and we'll then

4    also have an opportunity to give a statement

5    regarding the crime and the responsibility.  The

6    Panel will then recess, clear the room,

7    deliberate, and once the deliberations are

8    completed, the Panel will resume the hearing and

9    announce its decision.  The California Code of

10   Regulations states that regardless of time

11   served, the life inmate shall be found unsuitable

12   for and denied parole if, in the judgment of the

13   Panel, the inmate would pose an unreasonable risk

14   of danger to society if released from prison.

15   You have certain rights, and those rights include

16   the timely notice of this hearing, the right to

17   review your Central File, and the right to

18   present relevant documents.  Counsel, have those

19   rights been met?

20          **ATTORNEY:**  Yes, they have.

21          **PRESIDING COMMISSIONER MARTINEZ:**  All

22   right.  You have an additional right to be heard

23   by an impartial Panel, Mr. Brodsky.  Do you have

24   any objections to the Panel that sits before you

25   here today?

26          **INMATE BRODSKY:**  No.

27          **PRESIDING COMMISSIONER MARTINEZ:**  Counsel?

5

1          **ATTORNEY:** No.

2          **PRESIDING COMMISSIONER MARTINEZ:** You will

3    receive a written copy of our tentative decision

4    today, and that decision becomes effective within

5    120 days.  A copy of that decision and a copy of

6    the transcript will be sent to you.  Now, the

7    Board has eliminated its appeal process.  So,

8    therefore, if you disagree with anything in

9    today's hearing, you have the right to go

10   directly to the court with your complaint.  I'd

11   also like to note that you are not required to

12   admit your offense or discuss your offense today.

13   However, the Panel does accept the findings of

14   the court to be true.  Do you understand that,

15   Mr. Brodsky?

16         **INMATE BRODSKY:** Yes.

17         **PRESIDING COMMISSIONER MARTINEZ:** All

18   right.  Commissioner Muga, will there be any

19   confidential material used today?

20         **DEPUTY COMMISSIONER MUGA:** No, there will

21   be not be.

22         **PRESIDING COMMISSIONER MARTINEZ:** All

23   right.  I'm going to go ahead and pass the

24   checklist, make sure that we're operating on the

25   same documents.  Counsel?

26         **ATTORNEY:** Although I'm seeing that there

27   appears to be another document.  Is there an

6

1    update?

2         **PRESIDING COMMISSIONER MARTINEZ:** Yeah,

3    there is (inaudible).

4         **ATTORNEY:** I have not received it.

5         **PRESIDING COMMISSIONER MARTINEZ:**

6    (Inaudible).

7         **ATTORNEY:** There's nothing over here.

8    Now, did you get one of these?

9         **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** No,

10   I did not.

11        **ATTORNEY:** LAPD?  Thank you.

12        **PRESIDING COMMISSIONER MARTINEZ:** Do you

13   have the recent psych?

14        **ATTORNEY:** I have the recent psych report.

15        **PRESIDING COMMISSIONER MARTINEZ:** Yes.

16        **DEPUTY COMMISSIONER MUGA:** (Inaudible).

17        **ATTORNEY:** Yeah.

18        **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

19   I have everything on the checklist.

20        **PRESIDING COMMISSIONER MARTINEZ:** All

21   right.  We'll mark that Exhibit 1.  Will there be

22   any additional documents, Counsel, submitted?

23        **ATTORNEY:** The only one that potentially

24   may not have reached his C-File was an October 5

25   Cage Your Rage chrono.

26        **DEPUTY COMMISSIONER MUGA:** I have it.

27   (Inaudible).

7

1      **ATTORNEY:**  You have it?  Then the

2  documents (inaudible).

3      **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

4  Good.  All right.  Any preliminary objections,

5  sir?

6      **ATTORNEY:**  Yes.  I object to the letter

7  from the Los Angeles Police Department on several

8  grounds.

9      **PRESIDING COMMISSIONER MARTINEZ:**  Are you

10  going to list your grounds, sir?

11      **ATTORNEY:**  Yes.  I thought you were

12  discussing (inaudible).

13      **PRESIDING COMMISSIONER MARTINEZ:**  Go

14  ahead.

15      **ATTORNEY:**  The letter appears to be dated

16  October 13th, 2006.  I've been Mr. Brodsky's

17  attorney of record since prior to the September

18  2002 hearing and the Board has been aware of my

19  role.  This was not provided to me.  It certainly

20  was not in the lifer hearing packet provided by

21  the institution.  Furthermore, the Los Angeles

22  Police Department was the investigating agency

23  for the District Attorney office.  The District

24  Attorney office entered into a stipulation

25  regarding the nature of this offense and entered

26  into an agreement whereby they would not oppose

27  parole at the earliest possible time.  This

8

1   document from the Los Angeles Police Department
2   as the investigating agency for the District
3   Attorney's office violates that (inaudible) so I
4   would object to its consideration and it
5   certainly violates the ten-day rule regarding
6   providing documents (inaudible).

7   **PRESIDING COMMISSIONER MARTINEZ:**  I know
8   that was addressed last year, the issue regarding
9   this letter, and there was a letter from the Los
10  Angeles Police Department that was submitted last
11  year in the 2005 (inaudible) 2005 hearing, and
12  comments on that was that the Los Angeles Police
13  Department were not bound by anything that the
14  District Attorney's office in Los Angeles, any
15  agreements or anything like that were made, but
16  they're not bound by that, and, again, based on
17  the fact (inaudible).

18  **ATTORNEY:**  And I would just note for the
19  record that the last year's position regarding
20  admissibility of the letter for that hearing, you
21  know, certainly is not binding on this Panel.
22  This is the investigating agency for the District
23  Attorney's office.  They are certainly bound by
24  the representation (inaudible) this was an
25  express stipulation and an express term of the
26  plea agreement, and if nothing else, it violates
27  the spirit of the agreement by attempting to

1    undermine the agreement by having your

2    investigator oppose parole when you can't do

3    that.  You being the District Attorney's office.

4    The District Attorney's office and dealing

5    (inaudible) opposing parole by having the

6    investigating agencies do what they have been

7    contractually precluded from doing, so I would

8    consider that a violation of the plea agreement.

9    The plea agreement, of course, does bind the

10   entire state of California.  This was a

11   stipulation that was entered into by the District

12   Attorney on behalf of the people of the state of

13   California, and as a result under all the

14   relevant authorities (inaudible).

15            **PRESIDING COMMISSIONER MARTINEZ:**

16   (Inaudible) all right.  Will Mr. Brodsky be

17   speaking to the Panel today, sir?

18            **ATTORNEY:**  He will be speaking with the

19   Panel.  However, he will not be discussing the

20   commitment offense.  And, again, opposition is

21   that the commitment offense, the facts and

22   circumstances of that have been established by

23   the stipulation entered into between Mr. Brodsky

24   and the District Attorney's office that was

25   agreed to by the court, and we expect that

26   stipulation to (inaudible).

27            **PRESIDING COMMISSIONER MARTINEZ:**  All

10

1    right.   In this case, Mr. Brodsky, please raise

2    your right hand.  Do you solemnly swear or affirm

3    that the testimony you will give at this hearing

4    will the truth and nothing but the truth?

5         **INMATE BRODSKY:**  Yes.

6         **PRESIDING COMMISSIONER MARTINEZ:**   Thank

7    you very much.  Counsel, no objections again, I'm

8    going to incorporate the statement of facts

9    referenced, incorporate them again.  (Inaudible)

10   regarding the use of the probation officer's

11   report as well as the appellant decision, so

12   rather than go through all of that again, I'm

13   going to basically (inaudible) incorporate by

14   reference in regards to the statement of facts.

15   However, I will enter the prisoner version

16   (inaudible) and I'm taking that from the November

17   2000 --

18        **ATTORNEY:**   There is just -- and just for

19   the record, I do have the same objections

20   regarding reading in the statement of facts that

21   I had at last year's hearing.  I won't restate

22   those since (inaudible).

23        **PRESIDING COMMISSIONER MARTINEZ:**   Very

24   well (inaudible) overrule the (inaudible) and, in

25   regards to just going through entering the

26   prisoner's and just so you're aware, again, you

27   have the August 2006 calendar Board, and it is

11

1   referenced to the November 2004 calendar in

2   regards to the prisoner's version (inaudible).

3   Mr. Brodsky admitted guilt (inaudible) remorse.

4   He stated I should have stopped it quote end

5   quote.  (Inaudible) let's talk about your

6   personal history, Mr. Brodsky.  It states here

7   that you were born in New Jersey on August 13th

8   of 1943 and that you came to California from

9   Florida in 1965.  You resided in Los Angeles

10  after being stationed in Long Beach with the

11  United States Navy.  At the time of your arrest,

12  you were residing with your daughter part-time

13  and your (inaudible) part-time.  And that you

14  were married in 1969 to -- help me out with that

15  name -- Maureen.

16           **INMATE BRODSKY:**  Maureen.

17           **PRESIDING COMMISSIONER MARTINEZ:**  Maureen?

18           **ATTORNEY:**  I think that's a typo.

19           **PRESIDING COMMISSIONER MARTINEZ:**  So it's

20  Maureen.  Okay.  Thank you.  McLaughlin.

21  (Inaudible) you divorced in 1980, and (inaudible)

22  irreconcilable differences, and you have one

23  daughter (inaudible) you then married Maria Isaac

24  in 1991, and you have a son from this union.  You

25  graduated from high school at the age of 17.  At

26  the age of 21, you graduated from Penn State with

27  a Bachelor of Science degree in physical

12

1    education.  And this is you, is that correct?  Or
2    is this is about your son.
3              **INMATE BRODSKY:**  That's me.
4              **PRESIDING COMMISSIONER MARTINEZ:**  This is
5    you.  Okay.  Because it kind of sounds like we're
6    talking about your son.  So you graduated from
7    Penn State; is that correct?
8              **INMATE BRODSKY:**  Yes.
9              **PRESIDING COMMISSIONER MARTINEZ:**  Okay.
10   With a Bachelor of Science degree, history
11   education.  You earned your master's degree in
12   administration from Cal State Dominguez Hills at
13   the age of 37 years old.  You're employed as a
14   vice president for BBL Sewing California,
15   Incorporated, at the time of his arrest.  He
16   admittedly had started drinking beer at the age
17   of 18, but your only (inaudible) other than
18   alcoholic beverages.  You never experimented with
19   controlled substances, and you have no history of
20   physical, mental, or emotional health problems.
21   So, with that, in regards to your family, let's
22   go there.  Your daughter is how old now?
23             **INMATE BRODSKY:**  34 years old.
24             **PRESIDING COMMISSIONER MARTINEZ:**  34 years
25   old?  And where does she live?
26             **INMATE BRODSKY:**  She lives in Torrance,
27   California.

13

1       **PRESIDING COMMISSIONER MARTINEZ:** In

2    Torrance.  Is she married?

3       **INMATE BRODSKY:** She's married and has a

4    daughter.

5       **PRESIDING COMMISSIONER MARTINEZ:** Do you

6    keep in touch with her?  Does she come to visit

7    you?

8       **INMATE BRODSKY:** (Inaudible).

9       **PRESIDING COMMISSIONER MARTINEZ:** Okay.

10   And what about your son?

11      **INMATE BRODSKY:** (Inaudible).

12      **PRESIDING COMMISSIONER MARTINEZ:** And

13   where is he at in --

14      **INMATE BRODSKY:** He and his mother live in

15   Los Angeles County (inaudible).

16      **PRESIDING COMMISSIONER MARTINEZ:**

17   (Inaudible).

18      **INMATE BRODSKY:** (Inaudible).

19      **PRESIDING COMMISSIONER MARTINEZ:** Okay.

20   Now, are you still involved with your fiancée or

21   are you married now?  Is she wife your now?

22   You're married now?

23      **INMATE BRODSKY:** Yes, we're married.

24      **PRESIDING COMMISSIONER MARTINEZ:** And your

25   wife is -- who are we talking about?

26      **INMATE BRODSKY:** Maria.  Maria Isaac.

27      **PRESIDING COMMISSIONER MARTINEZ:** We're

14

1    talking about Maria Isaac.  You were married in

2    1991?

3              **INMATE BRODSKY:**  Right.

4              **PRESIDING COMMISSIONER MARTINEZ:**  That

5    marriage is still intact; is that correct?

6              **INMATE BRODSKY:**  Yes.

7              **PRESIDING COMMISSIONER MARTINEZ:**  And

8    where does she live?

9              **INMATE BRODSKY:**  In Canyon Country.

10             **PRESIDING COMMISSIONER MARTINEZ:**  Canyon

11   Country?

12             **INMATE BRODSKY:**  Yes.

13             **PRESIDING COMMISSIONER MARTINEZ:**  And

14   where is that in respect to the LA area?

15             **INMATE BRODSKY:**  It's -- I don't know if

16   you know Los Angeles or not, but it's up -- it's

17   off the 5 to the 14 freeway, and then you go

18   north, and it's about half way to Palmdale.

19             **PRESIDING COMMISSIONER MARTINEZ:**

20   (Inaudible) and what does your wife do?

21             **INMATE BRODSKY:**  (Inaudible).

22             **PRESIDING COMMISSIONER MARTINEZ:**  She's

23   still employed?

24             **INMATE BRODSKY:**  Yes.

25             **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

26   Military background, how long were you in the

27   navy?

15

1      **INMATE BRODSKY:** (Inaudible) four years.

2      **PRESIDING COMMISSIONER MARTINEZ:**

3      (Inaudible).

4      **INMATE BRODSKY:** I completed my college

5      and I finished my academics and I --

6      **PRESIDING COMMISSIONER MARTINEZ:** This was

7      an honorable discharge?

8      **INMATE BRODSKY:** Yes.

9      **PRESIDING COMMISSIONER MARTINEZ:** While in

10     the navy in the military, did you have any

11     problems, any problems at all?

12     **INMATE BRODSKY:** No.

13     **PRESIDING COMMISSIONER MARTINEZ:** No. It

14     indicates that educationally your (inaudible) how

15     about as far as growing up in Jersey, in New

16     Jersey, how would you describe your home life?

17     **INMATE BRODSKY:** (Inaudible) my home life

18     was fine.

19     **PRESIDING COMMISSIONER MARTINEZ:** You grew

20     up in Philadelphia? I'm sorry. It indicates you

21     were born in New Jersey, but you grew up in

22     Philadelphia and then in Florida.

23     **INMATE BRODSKY:** (Inaudible) Florida

24     (inaudible).

25     **PRESIDING COMMISSIONER MARTINEZ:** What

26     kind of family life did you have?

27     **INMATE BRODSKY:** It was a fine family.

16

1       **PRESIDING COMMISSIONER MARTINEZ:** Your

2   father, what did he do?

3       **INMATE BRODSKY:** My father (inaudible) in

4   the navy, chief petty officer.

5       **PRESIDING COMMISSIONER MARTINEZ:** What

6   about your mother?

7       **INMATE BRODSKY:** She stayed at home.

8       **PRESIDING COMMISSIONER MARTINEZ:** Did you

9   have any siblings?

10      **INMATE BRODSKY:** One sister. (Inaudible).

11      **PRESIDING COMMISSIONER MARTINEZ:**

12  (Inaudible) solid?

13      **INMATE BRODSKY:** Yup.

14      **PRESIDING COMMISSIONER MARTINEZ:** No

15  problem?

16      **INMATE BRODSKY:** No.

17      **PRESIDING COMMISSIONER MARTINEZ:** Okay.

18  You indicated no real problems with alcohol,

19  drugs, or anything like that growing up or even

20  in your later years?

21      **INMATE BRODSKY:** None at all.

22      **PRESIDING COMMISSIONER MARTINEZ:** Okay.

23  Is there anything, Mr. Brodsky, that you'd like

24  to add to the record regarding your personal

25  history?  That you'd like to share?

26      **INMATE BRODSKY:** No (inaudible).

27      **PRESIDING COMMISSIONER MARTINEZ:** Does

17

1    that about cover everything?

2         **INMATE BRODSKY:** (Inaudible).

3         **PRESIDING COMMISSIONER MARTINEZ:** All

4    right.  Now, Commissioner Muga's going to be

5    addressing your parole plans, and letters and so

6    forth, but I show here that you plan to reside

7    with your daughter or is that --

8         **INMATE BRODSKY:** Yes (inaudible).

9         **PRESIDING COMMISSIONER MARTINEZ:** What's

10   the situation with your current wife then?

11        **INMATE BRODSKY:** I've just been here for a

12   long time (inaudible).

13        **PRESIDING COMMISSIONER MARTINEZ:** And this

14   is okay with your wife?

15        **INMATE BRODSKY:** Yeah.

16        **PRESIDING COMMISSIONER MARTINEZ:**

17   (Inaudible).

18        **INMATE BRODSKY:** Yes (inaudible) and my

19   daughter and I have always been close, and it's

20   (inaudible).

21        **PRESIDING COMMISSIONER MARTINEZ:** All

22   right.  Very well.  I'll turn it over to

23   Commissioner Muga to discuss your post-conviction

24   (inaudible).

25        **DEPUTY COMMISSIONER MUGA:** I have just

26   some minor questions.  Who's in the home there

27   with your daughter?

18

1        **INMATE BRODSKY:** With who?  My daughter?

2        **DEPUTY COMMISSIONER MUGA:** Yeah.  Who

3    lives there?

4        **INMATE BRODSKY:** Her husband and daughter.

5        **DEPUTY COMMISSIONER MUGA:** Okay.  If I

6    recall, is it her two-year-old daughter.

7        **INMATE BRODSKY:** Her daughter?  My

8    granddaughter?

9        **DEPUTY COMMISSIONER MUGA:** Yeah.

10        **INMATE BRODSKY:** She'll be three in April.

11        **DEPUTY COMMISSIONER MUGA:** Okay.  So it's

12    a two- year-old daughter and her husband, and

13    this is a single-family dwelling in Canyon

14    Country you said?

15        **INMATE BRODSKY:** No.  She lives in

16    Torrance.

17        **DEPUTY COMMISSIONER MUGA:** Oh.  I'm sorry.

18    (Inaudible).  So the plan would be, Plan A would

19    be to live with your daughter.  Is there a Plan B

20    just in case something happens there and that

21    falls through.

22        **INMATE BRODSKY:** I'd live with my wife.

23        **DEPUTY COMMISSIONER MUGA:** Okay.  And

24    she's the one that lives in Canyon Country?

25        **INMATE BRODSKY:** (Inaudible).

26        **DEPUTY COMMISSIONER MUGA:** Okay.  And

27    who's in that household right now?

19

1        **INMATE BRODSKY:**  My wife and son.

2   (Inaudible).

3        **DEPUTY COMMISSIONER MUGA:**  Plan A, Plan B.

4   As far as work, what's your plan there.

5        **INMATE BRODSKY:**  (Inaudible) sister-in-law

6   who own a retail business.

7        **DEPUTY COMMISSIONER MUGA:**  And that's the

8   Sea Horse Apparel?

9        **INMATE BRODSKY:**  Yes.

10       **DEPUTY COMMISSIONER MUGA:**  Business in

11  Venice.

12       **INMATE BRODSKY:**  (Inaudible).

13       **DEPUTY COMMISSIONER MUGA:**  What kind of

14  store is that?

15       **INMATE BRODSKY:**  (Inaudible).

16       **DEPUTY COMMISSIONER MUGA:**  On the

17  boardwalk situation there in Venice or --

18       **INMATE BRODSKY:**  (Inaudible) on the

19  boardwalk.

20       **DEPUTY COMMISSIONER MUGA:**  And what would

21  you be doing there (inaudible)?

22       **INMATE BRODSKY:**  Well (inaudible) clothing

23  on the internet and also (inaudible).

24       **DEPUTY COMMISSIONER MUGA:**  Going to your

25  letters, I'll go over all of them, but I want to

26  make sure there was (inaudible) and I saw there

27  was a letter from your daughter actually, but I

1  just want to note it for the record today,

2  Anastasia, right?.

3        **INMATE BRODSKY:**  Anastasia

4        **DEPUTY COMMISSIONER MUGA:**  Anastasia

5  Hasara, is that her last name?  H-A-R-A-S-A is

6  her last name, and she has a letter dated July

7  1st of '06 stating that she is your 34-year-old

8  daughter and she says I am a stay at home mother

9  of a two year old, and I live in the Los Angeles

10  area.  We live in a two-bedroom home.  I want my

11  father to come and live with me in the Torrance

12  area after his release.  Your sister-in-law's

13  name is what?  The one (inaudible).

14        **INMATE BRODSKY:**  Barbara (inaudible).

15        **DEPUTY COMMISSIONER MUGA:**  Barbara

16  (inaudible).  She has a letter dated July 1st of

17  '06, and she is writing and says I am the sister-

18  in-law of Clifford Brodsky and known him for over

19  30 years.  I will provide him with employment --

20  I'm sorry.  I'll provide him with employment

21  helping to operate my retail business, one which

22  is very familiar and that is in an industry that

23  he has had considerable previous business

24  experience.  Clifford is very close to all the

25  members of his family and has a relationship with

26  all of our members.  He has helped many of us in

27  the past in our lives.  (Inaudible) you have Plan

21

1  A, how about a Plan B as far as work if for some

2  reason that does not pan out?

3      **INMATE BRODSKY:** (Inaudible) it will pan

4  out.

5      **DEPUTY COMMISSIONER MUGA:** If it doesn't,

6  though, what would you do?  Look for employment

7  using your already earned skills?

8      **INMATE BRODSKY:** (Inaudible) me and my

9  wife (inaudible).

10     **DEPUTY COMMISSIONER MUGA:** You feel pretty

11 confident today?

12     **INMATE BRODSKY:** (Inaudible).

13     **DEPUTY COMMISSIONER MUGA:** You have a

14 solid plan and confident in your skills?

15     **INMATE BRODSKY:** Yes.  (Inaudible).

16     **ATTORNEY:** I have his statement from

17 social security indicating that at age 62, and he

18 is age 63, $1109 a month.  If he retired at 66,

19 1471, at age 70, 1942.

20     **DEPUTY COMMISSIONER MUGA:** 1100 a month?

21     **ATTORNEY:** 1109 a month currently and 1471

22 if he works until 66 and if he works until 70,

23 1942 a month.

24     **DEPUTY COMMISSIONER MUGA:** Regarding

25 Barbara Duffy, what does she plan to pay you as

26 far as salary is concerned?

27     **INMATE BRODSKY:** In all honesty

22

1    (inaudible).

2         **DEPUTY COMMISSIONER MUGA:** (Inaudible)

3    that's up to you (inaudible) you should know as

4    to what she's prepared to pay you and if it's

5    going to be sufficient for you.

6         **INMATE BRODSKY:** Oh, it would be

7    (inaudible) sufficient enough for me to take care

8    of myself and (inaudible) that I do know, and I

9    do know it (inaudible).

10        **DEPUTY COMMISSIONER MUGA:** All right, as -

11        **INMATE BRODSKY:** She would be more than

12   happy (inaudible) I just wanted to do that.

13        **DEPUTY COMMISSIONER MUGA:** While I'm

14   looking at these letters, let me just go through

15   them.  There's some other letters of support that

16   I want to put on the record.  There's a letter

17   from a Maureen McLaughlin.  She was your former

18   wife, letter dated September 20th of '06.  It's a

19   general letter of support and how you have been a

20   wonderful father she says for our daughter.

21   Given guidance and direction her entire life.

22   She writes, I and the rest of my family will

23   provide him with any assistant and support

24   necessary to ensure his smooth return to society.

25   There's a letter from Mark McLaughlin, and that

26   is your ex-wife's current husband?

27        **INMATE BRODSKY:** Yes.

1     **DEPUTY COMMISSIONER MUGA:**  And that

2     letters dated September 18th of '06.  Again, a

3     general letter of support.  He writes that

4     Maureen and I will actively assist his

5     reintegration into free society by providing him

6     with any assistance he will need.  There's a

7     letter from Andrew Hasara, and that is -- this is

8     your daughter's husband.  They are the ones

9     offering you a place to live.  They're a letter

10    from a Nicholas Brodsky, he's your 17-year-old

11    son, offering a general letter of support, saying

12    that my father has demonstrated his changed

13    attitude first by pleading guilty and thereafter

14    by what he has done while in prison.  There's a

15    letter by a James Takioka (phonetic).

16            **INMATE BRODSKY:**  (Inaudible).

17            **DEPUTY COMMISSIONER MUGA:**  Okay.  That

18    letter is dated September 11th of '06.  She lives

19    in Torrance, and right, she identifies herself as

20    a friend of your daughters and has known you for

21    a long time, and she writes upon his return to

22    society, myself and the rest of his family and

23    friends will provide him with any assistance and

24    support necessary to ensure his safe return.  A

25    letter by another Lynn Takioka (phonetic),

26    another friend of your daughter's states that she

27    will help in your reintegration.  A letter from -

24

1    - oh, Talka Hendrickson, another friend of your

2    daughter's, a general letter of support.  It says

3    that she would provide help in any way possible.

4    And then Francis Duffy, who is your brother-in-

5    law.  He actually lives in Maryland, a letter

6    dated August 25th of '06, a general letter of

7    support.  A Paul Frankovich, a letter dated 17

8    August of '06.  He lives in La Quinta,

9    California.  He says he's known you for over ten

10   years, both personal friend and as family.  A

11   general letter of support.  And Richard Nutting,

12   August 16th of '06, the letter's dated.  It says

13   he's known you for over 30 years and is a close

14   friend of the family, and he writes I will

15   support Clifford upon his release in any way that

16   I can, knowing that he does have the capabilities

17   to being a well adjusted and successful person.

18   And a letter by Joan Roberts in Redondo Beach, a

19   letter dated August 16th of '06, a close friend

20   of yours for over 30 years, also willing to

21   support you in any way she can.  And a letter by

22   Rabbi Sommer, Jewish chaplain at Salinas Valley

23   State Prison (inaudible) dated May 21st of '05.

24        **INMATE BRODSKY:**  It's actually a typo.  It

25   should be '06.  I don't know if you know him

26   personally, but I believe they're a CC on it, but

27   CC1 to a (inaudible) is not in that position

25

1    until '06.

2        **DEPUTY COMMISSIONER MUGA:**  Yeah, I know

3    (inaudible).  But the rabbi is, again, a general

4    letter of support.  The last part of the letter

5    reads, above all, Mr. Brodsky has expressed great

6    remorse for his past (inaudible) and

7    responsibility for his actions.  There is little

8    doubt that within the CDCR, he is a model inmate

9    who appears to be de facto rehabilitated and has

10   sustained an exemplary level of conduct.  If

11   paroled, I (inaudible) what a remarkable success

12   (inaudible).

13       **ATTORNEY:**  There's a few letters.  Do you

14   have the letter from Maria Isaac?

15       **DEPUTY COMMISSIONER MUGA:**  That's what I

16   was just going to ask if there's a letter from

17   his wife.  I don't think there's one in my file.

18       **ATTORNEY:**  There's at least one

19   (inaudible) two letters.

20       **DEPUTY COMMISSIONER MUGA:**  A letter from

21   Maria Isaac I-S-A-A-C, that lives in Canyon

22   Country, California.  That is your current wife?

23       **INMATE BRODSKY:**  Yes.

24       **DEPUTY COMMISSIONER MUGA:**  And mother of

25   your 17-year-old son?

26       **INMATE BRODSKY:**  Yes.

27       **DEPUTY COMMISSIONER MUGA:**  Let me just

26

1    read, I have lived in the Los Angeles area for

2    almost 40 years and have been professionally

3    employed as a computer programmer for over 20 of

4    those years, and I've known Cliff Brodsky for

5    most of that time.  I know that Cliff deeply

6    regrets the offense he admits committing and that

7    mental anguish has (inaudible) the victim's

8    family and our family.  He has accepted      •

9    responsibility for his actions, repeatedly

10    expressed remorse (inaudible) prosecutor

11    (inaudible) given the nature of his offense as

12    stipulated in a plea, his stellar prison record

13    and prior crime free prior life, it is

14    parenthesis close parenthesis (inaudible) close

15    parenthesis, it is time for him to be released

16    from prison and come home and me and all other

17    members of his family will provide all of the

18    necessary support to ensure his successful

19    reintegration back into society.  And a letter by

20    Salwa Jasis, J-A-S-I-S, a letter dated August

21    30th of '06.  This is your mother-in-law?

22         **INMATE BRODSKY:**  Yes.

23         **DEPUTY COMMISSIONER MUGA:**  In conclusion,

24    I know Cliff will never commit another criminal

25    offense.  His only wish is to be able to timely

26    return to his family and help provide for them.

27    We will provide him the necessary support to

27

1    ensure his smooth return to be an on-hand parent
2    and economically productive member of society.
3    Okay.  Anything else as far as parole plans,
4    letters of support?

5        **INMATE BRODSKY:**  No, nothing that I can
6    (inaudible).

7        **DEPUTY COMMISSIONER MUGA:**  Let me move on
8    to your institutional programming up to this
9    point.  My focus is going to be since the last
10   hearing.  The last hearing was August 23rd of
11   '05, as you know.  If there's any other
12   information, new information that hasn't been put
13   in the C-File, let me know as we are doing this.
14   Your current classification score is 19.  Your
15   custody level is Medium-A.  Your current work
16   status, I believe you are the captain's clerk.
17   Is that still correct?

18       **INMATE BRODSKY:**  (Inaudible).

19       **DEPUTY COMMISSIONER MUGA:**  Okay.  How, how
20   long have you been doing that?  Because I found
21   in one file that (inaudible).

22       **INMATE BRODSKY:**  (Inaudible).

23       **DEPUTY COMMISSIONER MUGA:**  (Inaudible).
24   Captain's clerk comes with a supervisor's rating,
25   but it is documented that you had excellent work
26   supervisor's rating, so you've been do it the
27   last 22 months.  As far as since the last

28

1    hearing, as far as academic programming, you

2    haven't been involved in any kind of academic

3    programs, have you?

4        **INMATE BRODSKY:**  No, no academic programs.

5        **DEPUTY COMMISSIONER MUGA:**  As far as

6    vocation, have you been involved in any vocation

7    program since your last hearing?

8        **INMATE BRODSKY:**  No.  (Inaudible).

9        **DEPUTY COMMISSIONER MUGA:**  Now, you did

10   complete mechanical drafting.

11       **INMATE BRODSKY:**  (Inaudible).

12       **DEPUTY COMMISSIONER MUGA:**  Okay.  And then

13   there was a paralegal course that you had,

14   correspondence course that you had completed; is

15   that correct?

16       **INMATE BRODSKY:**  (Inaudible).

17       **DEPUTY COMMISSIONER MUGA:**  Any other ones

18   that you completed?

19       **INMATE BRODSKY:**  I completed the

20   vocational textile program 10 or 12 years ago.

21       **DEPUTY COMMISSIONER MUGA:**  As far as self-

22   help activity since the last hearing, there's a

23   Cage Your Rage chrono dated 10/5 of '06 by

24   Protestant chaplain Lindsay, L-I-N-D-S-A-Y, that

25   is a 12-session program, anger management

26   program?

27       **INMATE BRODSKY:**  Yes.

29

1        **DEPUTY COMMISSIONER MUGA:**  Correct.  Okay.

2    Have you completed it?

3        **INMATE BRODSKY:**  (Inaudible).

4        **DEPUTY COMMISSIONER MUGA:**  There was a --

5    you were involved in the central facility

6    veteran's self-help group which meets on a

7    regular basis.  There's a chrono dated 8/17/06

8    documenting that.  Also a 6/9/06 chrono

9    documenting participation in that group.  You

10   completed AA healing -- excuse me healing for the

11   angry heart video series?

12       **INMATE BRODSKY:**  Yes.

13       **DEPUTY COMMISSIONER MUGA:**  In a chrono

14   dated February 23rd of '06.  You participated in

15   a Jewish ritual practice?

16       **INMATE BRODSKY:**  Yes.

17       **DEPUTY COMMISSIONER MUGA:**  That's

18   documented by Chaplin Sommer in a chrono dated

19   1/31 of '06.  That's also a 12-week anger

20   management course put on by the Muslim

21   Development Center, which you completed in a

22   chrono dated 11/19 of '05.  Any other self-help

23   activity that you've been involved in

24   specifically since your last hearing.

25       **INMATE BRODSKY:**  (Inaudible).

26       **DEPUTY COMMISSIONER MUGA:**  (Inaudible) as

27   far as your disciplinary history, I could not

30

1   find any documentation of any negative 128's or
2   115's, is that to the best of your recollection
3   you don't have any write ups?
4          **INMATE BRODSKY:** (Inaudible).
5          **DEPUTY COMMISSIONER MUGA:** Before I move
6   on to psych evaluation, let me read the excerpt
7   from the notices, the 3042 notices of the LAPD
8   that was referred to previously. In a letter
9   dated October 13th of '06, Kyle Jackson, captain,
10  J-A-C-K-S-O-N, commanding officer for robbery and
11  homicide division, LAPD writes, I'm just going to
12  read from his letter. It's two paragraphs. In
13  1989, Clifford Brodsky along with an accomplice
14  hired a hit man to murder Mr. Brodsky's business
15  partner. This was purely a murder for profit as
16  Mr. Brodsky was the beneficiary of his partner's
17  life insurance policy. Although Mr. Brodsky did
18  not admit to the crime, the hit man did.
19  Evidence included taped telephone conversations
20  of Mr. Brodsky admitting involvement in other
21  hits. The facts of this case clearly indicate
22  that Mr. Brodsky is a cold blooded individual who
23  is willing to murder for financial gain. The
24  motive and the method of his crime indicates that
25  Mr. Brodsky is not the type of individual likely
26  to be rehabilitated merely by the passage of
27  time. His presence in the community would pose a

```
 1   threat to public safety.  On behalf of the
 2   citizens of Los Angeles, it is the request of the
 3   Los Angeles Police Department that Mr. Clifford
 4   Brodsky be denied parole.  As far as your last
 5   most recent (inaudible) Dr. Marek, M-A-R-E-K,
 6   psychologist, first initial is W. middle initial
 7   is K.  What I'm going to do on this, I'm just
 8   going to hit some high points or highlights after
 9   reading through the psych report.  They always
10   give some kind of diagnostic impression.  What
11   this doctor did on, on Axis I, the doctor writes,
12   adult anti-social behavior, Axis II, none, Axis
13   III, none, on Axis IV, incarceration, on Axis V,
14   GAF is 90.  That's on a scale from zero to 100,
15   with 100 being very good, but that's pretty high.
16   Under the doctor's section of assessment of
17   dangerousness, I'm just going to again read from
18   the doctor's report.  Within a controlled
19   setting, his violence potential is obviously
20   lower than average due to his clean disciplinary
21   record.  If released to the community, his
22   violence potential is lower than average due to
23   his excellent institutional adjustment, long past
24   history of pro-social behavior, the fact that his
25   sentencing judge released a man facing life in
26   prison out on bail without restrictions and a
27   lack of drug slash alcohol problem.  The last
```

1   paragraph on that page reads, a 2005 BPT decision
2   requests that the next psychological evaluator
3   address issues regarding the statement quotes
4   made in 1991 in that psych evaluation that was
5   related to post traumatic stress disorder,
6   parenthesis sic close parenthesis because those
7   issues just sort of went away without really
8   being addressed.  And, in particular, the fact
9   that the doctor at the time indicated that he
10  felt that Mr. Brodsky was a ticking time bomb.
11  There was a lot of stuff going on in that report
12  and just got ignored in the future end of quotes.
13  In 1994 BPT psychological evaluator twice noted
14  that she believed Brodsky was not experiencing
15  current symptoms of post traumatic stress
16  disorder and that the instant offense was an
17  isolated incident.  That BPT evaluator also
18  believed that Brodsky quotes seems to have
19  explored the committed offense and has come to
20  terms in part with its underlying causes close
21  quotes.  The 1991 evaluation was completed at the
22  request of Brodsky's attorney and was submitted
23  in an attempt at mitigation.  With all due
24  respect to Mr. Brodsky's 1991 evaluator, even if
25  Brodsky's symptoms at the time rose to the level
26  of being diagnose able, it is not true that quote
27  full recovery from PTSD is possible only when the

33

1   patient receives intensive treatment close

2   quotes.  Brodsky has never received such

3   treatment, and there's no evidence whatsoever if

4   his file that he has ever again displayed PTSD

5   like symptoms.  Also, after all this time, it is

6   clear that Mr. Brodsky is not a quote ticking

7   time bomb close quotes.  He has a better

8   candidate for parole than almost all inmates.

9   There are no obvious or subtle significant risk

10  factors and precursors to violence.  And those

11  are my highlights.  Mr. Martinez?

12      **PRESIDING COMMISSIONER MARTINEZ:**  All

13  right.  Thank you.  I'm going it go to questions

14  (inaudible) as to now where you're at as you sit

15  here today.  How do you feel about this?

16  (Inaudible).

17      **DEPUTY COMMISSIONER MUGA:**  Go ahead, sir.

18      **INMATE BRODSKY:**  I certainly feel bad

19  about what I did at the time, and I was wrong.

20  (Inaudible) the anguish that it caused people

21  (inaudible) there was children involved

22  (inaudible) accepted my responsibility.  I am

23  responsible (inaudible) what I did and why I did

24  it (inaudible).

25      **PRESIDING COMMISSIONER MARTINEZ:**

26  (Inaudible) serious thing?

27      **INMATE BRODSKY:**  (Inaudible) families

1  involved (inaudible) my family (inaudible).

2      **PRESIDING COMMISSIONER MARTINEZ:** I don't

3  have any further questions. (Inaudible).

4      **DEPUTY COMMISSIONER MUGA:** No.

5      **PRESIDING COMMISSIONER MARTINEZ:** Counsel?

6      **ATTORNEY:** I have no questions.

7      **PRESIDING COMMISSIONER MARTINEZ:** No

8  questions.

9      **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** I

10  have no questions.

11     **PRESIDING COMMISSIONER MARTINEZ:** All

12  right. (Inaudible) closing statement.

13     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:**

14  Actually, I do have a couple. I'm sorry. Mr.

15  Brodsky there's an indication in the report of

16  the psychologist it talks about the fact that you

17  were released on bail (inaudible) following your

18  conviction. Is that accurate?

19     **INMATE BRODSKY:** Yes.

20     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** You

21  were out on bail from the time of the offense in

22  1989 until the time of your conviction in 1991,

23  correct?

24     **INMATE BRODSKY:** Yes.

25     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

26  following the conviction, you actually pled

27  guilty; is that correct?

35

1      **INMATE BRODSKY:** (Inaudible).

2      **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

3    at that time, there was a determination made by

4    the court (inaudible) you're not familiar with

5    Penal Code Section 1270 (inaudible), correct?

6      **INMATE BRODSKY:** Yes.

7      **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

8    the standard that has to be met in order to

9    receive post-conviction bail?

10     **INMATE BRODSKY:** Yes.

11     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

12   the judge at that time made a comment based upon

13   your (inaudible) District Attorney stipulation

14   that you would not pose a risk to the public if

15   released on bail; is that correct?

16     **INMATE BRODSKY:** Yes.

17     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

18   you understood that was a finding that had to be

19   made based upon (inaudible) evidence, correct?

20     **INMATE BRODSKY:** Yes.

21     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** And

22   you actually turned yourself in to the prison in

23   Chino, correct?

24     **INMATE BRODSKY:** Yeah, the sentencing

25   clerk (inaudible).

26     **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** So

27   following your conviction, (inaudible) imposed

36

1    the sentence of 15 years to life, correct?

2        **INMATE BRODSKY:**  Yes.

3        **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:**  And

4    knowing that that was your sentence, you turned

5    yourself in to Chino directly?

6        **INMATE BRODSKY:**  Yes.

7        **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:**  And

8    in the interim time between that, you were out on

9    the streets?

10       **INMATE BRODSKY:**  Right.

11       **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:**  And

12   when you turned yourself in, understand there was

13   a situation involving your wife at that time.

14   Can you explain what happened?

15       **INMATE BRODSKY:**  (Inaudible) never seen

16   anything like that before, and (inaudible) my

17   wife was very upset, obviously, and she was

18   crying and (inaudible) back out in the parking

19   lot and talked to her and calmed her down.

20   (Inaudible) went back out in the parking lot and

21   talk to her about a half hour or so and then

22   returned.

23       **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:**

24   (Inaudible).

25       **INMATE BRODSKY:**  Yes.

26       **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:**  I

27   have nothing further.

1         **PRESIDING COMMISSIONER MARTINEZ:**

2   (Inaudible).

3         **DEPUTY DISTRICT ATTORNEY DEFILIPPIS:** I'd

4   just like to believe and I'd like to correct the

5   record and say that there were a few times that

6   the District Attorney's office would not oppose

7   Mr. Brodsky being paroled at the earliest

8   possible time.  That's incorrect.  (Inaudible)

9   the agreement was that when the Board of Prison

10   Terms sees fit to parole Mr. Brodsky, I would,

11   meaning Mr. (Inaudible) representative of the

12   DA's office, I would agree with that

13   determination in that I would have no opposition

14   to Mr. Brodsky being paroled at the first date

15   that the Board of Prison Terms deems would be

16   suitable.  In conformity with that agreement

17   (inaudible) people at this time (inaudible).

18         **PRESIDING COMMISSIONER MARTINEZ:** All

19   right.  Thank you very much, sir.  Counsel?

20         **ATTORNEY:** I would submit that the

21   District Attorney has a moral obligation -- the

22   District Attorney has an obligation in this case

23   (inaudible) represent to this Panel the actual

24   nature of the conviction and the actual agreement

25   that was reached, and if you look at the

26   sentencing transcript, it's in the Central File,

27   Page 10.  (Inaudible) quote, I think Mr. Brodsky

```
 1   should be fairly punished for what he has done,
 2   and I would state as I did once before that I
 3   would not oppose his release at the first
 4   available opportunity.  That is exactly what I
 5   said at the beginning of this, and that's what
 6   we've been saying all along, at the first
 7   available opportunity.  That was his initial
 8   parole hearing, and the District Attorney's
 9   obligation is to not have any objection, not
10   simply not take a position, not remain neutral.
11   They were obligated to actually come in here and
12   represent that they had no objection to the
13   parole.  At the time of the plea, Mr. Hodgeman, a
14   very seasoned prosecutor back at the time,
15   actually stated that he would place a memo in my
16   file so that some years hence when the District
17   Attorney, if not myself, defends that lifer
18   hearing, that this disposition is represented by
19   the record as no (inaudible) represented to the
20   appropriate author its at this time.  This is a
21   very serious agreement that was entered into
22   between the prosecutor and Mr. Brodsky and the
23   court.  It was based upon a lot of different
24   factors, and what you see here is some of those
25   factors that led to Mr. Hodgeman and the court
26   entered into that agreement, one of which is this
27   issue of post-conviction bail.  In the years I've
```

1    been doing this, I've yet to see that. There has

2    not been an individual that I have seen other

3    than Mr. Brodsky who has received a 15 to life

4    sentence and turned himself directly in to state

5    prison. That is just a very unique situation.

6    There is a requirement under Penal Code Section

7    1272.1, and that requirement is (inaudible) on a

8    motion for post-conviction bail to hold a hearing

9    (inaudible) special findings. It was indicated

10   at the beginning of this proceeding that the

11   Board was bound by the decisions made by the

12   trial court. This is one of the decisions that

13   was made by the trial court, and it was made with

14   the stipulation of the District Attorney's

15   office, and that stipulation was that by clear

16   and convincing evidence, it has been shown that

17   Mr. Brodsky did not present an unreasonable risk

18   of danger to society if released on parole. If

19   you look at 2402A, it's the same standard, does

20   Mr. Brodsky currently present an unreasonable

21   risk of danger to society if paroled. It's the

22   same thing. If you release him out to society,

23   does he present an unreasonable risk of danger.

24   It's the same finding that the Board made back

25   in -- excuse me, that the court made back in

26   1991, at the time of the conviction. That

27   finding is binding on this Board. That finding

40

1    is a finding that Mr. Brodsky did not at that
2    time present an unreasonable risk of danger if
3    released.  Now, play that forward.  What's
4    happened in the years since then?  Everything
5    that you can see is good.  We didn't really talk
6    about it much.  Mr. Brodsky has no 115's.  He has
7    no 128's.  No one has even saw fit to write him
8    up for being out of bounds, being disrespectful
9    to staff, on following inspections.  He has, now,
10   for 15 plus years conducted himself in an
11   exemplary fashion.  Doing that in a prison is
12   something that (inaudible).  Most of the guys
13   have had a few 128's and a 115.  But seeing
14   somebody who has no 115's, no 128's, literally
15   perfect programming in prison.  What else has he
16   done?  He came here, he had a bachelor's degree,
17   he had a master's degree.  He had a long history
18   of significant success in the business world, but
19   did he just leave that alone?  No.  He completed
20   essentially three trades, made himself even more
21   marketable when released.  What's he done in
22   terms of self-help?  His self-help programming
23   has been, again, another area that you would look
24   at and you would say not only has he done the
25   things we would expect of him, but he's gone way
26   up to the distance.  He's gone an extra mile.
27   Back in '93, he does a codependency workshop.

41

 1    Mr. Brodsky doesn't come from a home broken by
 2    alcoholism, but he used that as something where
 3    he could learn about ways to improve yourself.
 4    He then goes into addiction recovery workshop.
 5    He learns about the 12 steps.  He goes through a
 6    substance abuse program in 1999.  He attends
 7    Alcoholics Anonymous and Narcotics Anonymous in
 8    '98 and '99 (inaudible).  These are all things
 9    that there's no motive for him to do this.  He's
10    doing it because he's looking for ways to improve
11    himself.  He doesn't have an alcohol problem.  He
12    doesn't have a drug problem, but what he's doing
13    is he's used the ability to essentially see
14    something that's available to him, take it,
15    participate in it, and take from it the things
16    that he can (inaudible).  As we all know, if you
17    look at any type of, you know, there's so many
18    different types of self-help programs that base
19    themselves upon the basic 12 step approach of
20    Alcoholics Anonymous, and he's able to use that
21    in his life to improve himself, which no one
22    asked him to do, no one suggested to him that he
23    needed it, but he did it.  And then we look at
24    the psychological reports and right from the get
25    go, you start off in this case who admits
26    responsibility.  He's taken full responsibility
27    for what he did.  He not only pled guilty, but he

42

1    walked down to the prison halls and turned
2    himself in, you know, facing a 15 to life
3    sentence.  He's out on the streets.  He walked
4    himself in and took care of his responsibility.
5    He showed up, and starting with the psychological
6    report in 1994, which shows that he's got good
7    insight.  He's explored the commitment offense
8    and come to terms with some of the causes of the
9    commitment offense.  And as you come forward and
10   look at the subsequent evaluations, it just keeps
11   getting better.  He's got much more insight.
12   He's got a far greater understanding of the
13   ·circumstances that led to the commitment offense.
14   Dr. Turini's (phonetic) report is extremely
15   telling.  He talks about, you know, significantly
16   below average relative to this (inaudible) inmate
17   population in terms of violence potential.
18   Normal violence potential than the average
19   citizen.  There are no significant risk factors.
20   We also have the fact that he does not have a
21   mental health disorder.  He does not need
22   treatment.  He's never had a significant drug or
23   alcohol problem.  And he concludes with saying
24   that Mr. Brodsky is quote an excellent candidate
25   for parole consideration.  This is back in 1999,
26   and coming forward since that time, you'll see
27   that his next see evaluation, I believe it was

43

```
 1    for the '05 hearing, if I'm not mistaken, yes,
 2    April of '05, my Dr. Macomber.  Again, we've got
 3    a GAF score of 90, which, anybody that, you guys
 4    see GAF scores all the time in these cases, and a
 5    90 is probably, you know, it's a better
 6    functioning than many of us, so it's a very
 7    strong GAF score, and he's had that consistently.
 8    He had it back in the '99 hearing, I'm sorry, the
 9    '99 evaluation by Dr. Torini, had it with Dr.
10    Macomber, had it again this year with Dr. Marek.
11    And each of those doctors along the way has said
12    his prognosis for being able to maintain his
13    current excellent adjustment in self-control if
14    released from the community is good.  So he's
15    always had a strong prognosis from each of these
16    doctors.  And he talks about in each of these
17    evaluations the irrationality with which he was
18    acting and the extremely poor judgment that he
19    was using (inaudible) how he was functioning
20    beyond his capacities and out of his experience
21    zone, but he has never at any time denied
22    responsibility or attempted to mitigate the
23    criminal act that he committed.  (Inaudible) is
24    to reevaluate what's important in life, and the
25    things that were key issues to him back at the
26    time that the crime was committed was (inaudible)
27    position of being CEO of a company, of being
```

1   successful in life, of not being able to tolerate

2   people that failed, not being able to tolerate

3   people that he perceived as having betrayed them,

4   and you look at those things and how he's taken

5   care of that.  Now, living a simpler life is

6   something that appeals to him, and he talks about

7   that in various psychological reports, how, you

8   know, being that CEO of a company is not what

9   he's seeking to do.  He's seeking to do something

10  earning a decent living and be able to, you know,

11  conduct himself appropriately out on the streets.

12  You know, he's learned not to hold feelings of

13  anger or resentment.  We've seen some very

14  excellent programming in terms of the self-help

15  and all the anger management classes that he's

16  taken, so he's learned all of these things that

17  he needs in order to be safely released out in

18  the streets.  And then we have the current

19  psychological evaluation.  There really isn't a

20  whole lot that's new in the current psychological

21  evaluation because it simply carries forward all

22  of these same good, positive, strong findings

23  that we see, you know, really starting in '99,

24  showing themselves early in '94, but becoming

25  real solid by 1999, and then in 2005 and in 2006

26  reports, what this doctor does, Dr. Marek is he

27  talks about some concerns that were raised at the

45

1    2003 and 2005 Board decisions, and it's Page 3
2    where he goes into essentially an evaluation of
3    each of those points and why those don't create
4    any type of concern over Mr. Brodsky, and part of
5    that was read, the 2003 report that talks about
6    the extent to which the person has explored the
7    commitment offense and come to terms with the
8    underlying cause, and the doctor goes and in and
9    gives a very good description of why the
10   underlying offense took place and what it is
11   that's different Mr. Brodsky and how these
12   generally pro-social values that he had that went
13   awry back in the past are not going to turn into
14   something that creates him having a -- presenting
15   a danger at this time.  And so I would urge you
16   to take a good close look at what Dr. Marek says
17   on Pages 3 to 4.  And then there was that issue
18   about the post traumatic stress disorder, and,
19   you know, again, look back to the '94 record
20   because that's had the doctor first starts to
21   talk about the fact that he doesn't have any
22   symptoms at that time.  So, even though he did in
23   1991, by 1994, that issue was resolved.  It
24   carries forward to '99, 2005, 2006, so the
25   consistency since that time has shown that that
26   issue has been resolved and resolved favorably.
27   There are no adverse marks on Mr. Brodsky's

46

1    record.  If you look at this case, this is not a
2    crime that should preclude the setting of a
3    parole date.  This is not a particularly
4    egregious offense in a legal sense (inaudible).
5    It's certainly a serious offense, but when you
6    talk about the (inaudible) that are required
7    here, this is not an offense that should bar Mr.
8    Brodsky from receiving a parole date.  You should
9    also, when looking at Mr. Brodsky, consider the
10   fact that although this has technically been
11   referred to as his fourth subsequent parole
12   hearing, his initial hearing was actually 14
13   months late.  His second hearing was an
14   additional ten months late.  His first subsequent
15   was two months late.  The first one was ten
16   months, the second two months, the third nine
17   months, fourth, three months.  He's actually had
18   three years two months of additional delays
19   beyond the normal denial period.  So, had these
20   hearings been conducted in a timely fashion, this
21   would actually be his seventh time that he'd be
22   due to come up for hearing.  You know, the
23   denials in this case previously have only been
24   for one year because he comes back with the
25   expectation that he should be suitable the next
26   time he arrives, and each time he's been sent off
27   to do certain tasks.  Each time you have asked

47

1   him to do certain things, he's (inaudible).  Each
2   time he's still disciplinary free.  Each time
3   he's upgraded himself.  Each time he's come back
4   with more self-help programming.  So, at this
5   point, the only appropriate action to take would
6   be to set a parole date.  I think that under the,
7   even a completed second degree murder matrix,
8   that would fall in the 17 to 19 year range.  With
9   his credits right now (inaudible) and another 16
10  months of (inaudible) so he's already exceeded
11  the period of time that would be appropriate
12  under the high end of the matrix.  So I would
13  urge you to set a date at this time.

14      **PRESIDING COMMISSIONER MARTINEZ:**  Thank
15  you, Counsel.  Mr. Brodsky, this is now the
16  opportunity if you'd like to address the Panel as
17  to why you feel you are suitable for parole.

18      **INMATE BRODSKY:**  In 1989, I committed a
19  crime, a crime that impacted (inaudible) if I
20  could, I'd unwind it, but I can't.  Nobody can
21  (inaudible) but what I did do (inaudible) plead
22  guilty (inaudible) accepted my responsibility,
23  and I still accept my responsibility.  Nobody can
24  change what I did.  What I did was wrong.
25  (Inaudible) my responsibility.  I owe that to
26  society to pay (inaudible) and my way to pay for
27  what I did.  And while I've been in prison, I

48

1    have tried to look at myself, see why I did what

2    I did, understand it (inaudible) attending all

3    the self-help that I possibly could do and at the

4    same tame (inaudible) and, again, cannot unwind

5    the past. I simply can't erase what I did. All

6    I can do is what I have done (inaudible) I had my

7    parole plans if I get out. I'm very fortunate.

8    I'm older (inaudible) but I'm fortunate in that I

9    come from a very close-knit family who are

10   (inaudible) my family (inaudible) my family takes

11   care of its own (inaudible) in that respect.

12   But, again, (inaudible) and all I can do is

13   (inaudible).

14        **PRESIDING COMMISSIONER MARTINEZ:** Okay.

15   Thank you very much, sir. At this point

16   (inaudible) I'd like your full name and.

17        **INAUDIBLE VICTIM NAME:** It's very

18   interesting because Mr. (Inaudible) says this is

19   not (inaudible). However, my entire family, my

20   wife is still terrified. My two daughters, it

21   has affected them since it all happened. I had a

22   break down a year ago, and the therapist said

23   that she believes why it took so long (inaudible)

24   was done to me. I was -- I was a very successful

25   business person. That's why Mr. Brodsky came to

26   me, and in the last 15 years, I've had to file

27   bankruptcy twice because that same person who was

49

1   successful has been damaged to that degree.   And

2   I just would like to know what (inaudible)

3   constitute something he (inaudible).   My wife, at

4   every other hearing she's gone onto (inaudible)

5   today as well.

6        **ATTORNEY**:   I would object to that.   There

7   should not -- this is not a homicide case.

8        **PRESIDING COMMISSIONER MARTINEZ**:

9   (Inaudible).

10        **ATTORNEY**:   I think the regulations are

11   clear that the victim is allowed to speak, and

12   he's been allowed to speak.   There is no other

13   victim in this case.

14        **PRESIDING COMMISSIONER MARTINEZ**:   All

15   right.   Thank you.   (Inaudible) as well

16   (inaudible).

17        **MARY (INAUDIBLE)**:   My name is Mary

18   (inaudible), and what my husband neglected,

19   because of Mr. Brodsky's actions, we lost our

20   home.   The breakdown that my husband had, I came

21   very, very close to having him committed, and we

22   now have one daughter who is in very serious

23   therapy.   Obviously, it has affected me

24   tremendously.   There is no doubt in my mind that

25   Mr. Brodsky has not been a perfect inmate doing

26   absolutely everything that he seen fit to do to

27   have a perfect record.   His education, everything

1    that goes for him, he's a distinguished naval

2    officer, all of those things, he had a high

3    position in a company and knew exactly what he

4    was doing, and he made a comment about revenge,

5    which is still the thing that will never leave my

6    mind, that revenge is like leftovers, you take

7    them the next day, and you eat them cold, and

8    this is something that (inaudible) and I'm sorry.

9    Again, all the records everything show that my

10   children, his children, I'm deeply sorry for them

11   too, but what has happened, I don't -- I'm not

12   comfortable and I am, grateful that LAPD

13   (inaudible) the same way I do, and they were

14   there for us, thank God for them or my husband

15   and perhaps I would have been dead because the

16   hit man was at the hotel when we arrived, and

17   it's only the grace of God that one of his

18   employees went to their attorney and the DA, and

19   that's why we're alive.  That's the only reason.

20   And (inaudible).

21        **PRESIDING COMMISSIONER MARTINEZ:**  All

22   right.  We're going to go ahead now and recess

23   for deliberations.

24                    **R E C E S S**

25                      --oOo--

26

27

59

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KERRY VIENS, a duly designated
transcriber, NORTHERN CALIFORNIA COURT REPORTERS,
do hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total two in number and cover a total of pages
numbered 1 - 58, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of
CLIFFORD BRODSKY, CDC No. H-07665, on NOVEMBER 6,
2006, and that the foregoing pages constitute a
true, complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated JANUARY 18, 2007 at Sacramento
County, California.

*Kerry L. Viens*

_____
Kerry Viens
Transcriber
**Northern California Court Reporters**

51

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3      **DEPUTY COMMISSIONER MUGA:**  Okay.  We're back

4      on the record.

5      **PRESIDING COMMISSIONER MARTINEZ:**  All right.

6      Everyone that was previously identified has now

7      returned in the matter of Clifford Brodsky, CDC

8      number H as in Henry, 07665.  The Panel reviewed

9      all information received from the public and

10     relied on the following circumstances in

11     concluding that the prisoner is not suitable for

12     parole and would pose an unreasonable risk of

13     danger to society and threat to public safety if

14     released from prison.  Now, Mr. Brodsky, I'm

15     going to tell you this is a one-year denial right

16     off the get go.  Again, it's based on the

17     commitment offense.  It was carried out in an

18     especially cruel and very callous manner.  Again,

19     the offense was a situation where the crime was a

20     planned crime, conspiracy with another, a very

21     cold blooded plan to murder the victim, Robert

22     (inaudible).  Again, you had been planning to

23     kill Mr. (Inaudible).  The offense was carried

24     out in a dispassionate and calculated manner.

25     The offense was carried out in a manner which

26     demonstrates an exceptionally callous disregard

27     **CLIFFORD BRODSKY  H-07665  DECISION PAGE 1  11/06/2006**

52

1    for human suffering.  Again, the prisoner did not
2    take into consideration the impact it had on all
3    parties involved in the situation.  The motive
4    for the crime was inexplicable and very trivial
5    in relation to the offense.  And, again,
6    (inaudible) greed, financial gain (inaudible) by
7    the prisoner that it was out of fear for looking
8    incompetent if the deal failed, and, so, again, a
9    number of different motives for involving
10   (inaudible) the crime.  Again, the conclusions
11   are drawn from the statement of facts wherein the
12   prisoner again on March the 1st of 1989 and July
13   the 11th of 1989, the prisoner conspired with
14   another person to murder Robert Klugman.  In
15   March of 1989, two hit men were hired to kill Mr.
16   Klugman in order to get paid the proceeds of a
17   $1.25 million life insurance policy.  Security
18   officers were alerted at the Los Angeles Police
19   Department in regards to the murder of Robert
20   Klugman, and it was averted.  The prisoner does
21   come from a stable, on all counts, a very stable
22   social background with no criminal history.
23   Again, with regards to institutional behavior,
24   the prisoner has actively participated in
25   beneficial self-help and therapy programs.  I
26   would like to note that he lacks misconduct while
27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 2   11/06/2006**

53

1    incarcerated.  He does not have any 128

2    counseling chronos or serious 115 disciplinary

3    reports.  The psychological report dated August

4    25th of 2006 authored by Dr. Marek is supportive

5    for release.  In regards to your parole plans,

6    sir, you do have solid parole plans.  And

7    concerning the PC 3042 responses, again, the

8    hearing Panel notes that the responses to PC 3042

9    notices indicate opposition to a finding of

10   parole suitability, specifically from the Los

11   Angeles Police Department, which, again, is the

12   law enforcement agency investigating the case,

13   and again, they are in opposition.  In regards to

14   the District Attorney's office of Los Angeles

15   County, they take opposition at this time.  I'd

16   like to note that the Deputy District Attorney

17   from Los Angeles County is present and indicated

18   that, again, they do not (inaudible) at this time

19   regarding Mr. Brodsky's parole suitability.

20   Nevertheless, the prisoner is to be commended for

21   his earning (inaudible) vocations as well as his

22   excellent work rating, participation in self-help

23   in regards to the 12-week anger management

24   course, six-week Cage Your Rage course, as well

25   as the video (inaudible) and the veteran's self-

26   help group as well as remaining disciplinary free

27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 3   11/06/2006**

54

1    throughout his incarceration.  However, those

2    positive aspects of your behavior do not outweigh

3    the factors of unsuitability.  The Panel

4    recommends that the prisoner remain disciplinary

5    free, if available, continue participation in

6    self-help and therapy programs, and, again, Mr.

7    Brodsky, in regards to (inaudible) looking into

8    prior transcripts as to some of, again, I note

9    you elected not to speak today regarding the

10   commitment offense, and that certainly is your

11   right.  There were some things that were of

12   concern to the Panel, specifically your role.  We

13   felt again that there was some minimization in

14   that that was addressed at previous hearings.  I

15   want to say those are the 2001 (inaudible).  In

16   regards to the 2001, December the 5th of 2001,

17   (inaudible) need to be following, hearing

18   September 27th, 2002 and then November 19th, 2003

19   where, again, regarding your role in what you'd

20   told the Panel as to what you were doing as far

21   as your, again, role as to whether you were the

22   person that actually controlled this and planned

23   it all out or not.  And, again, there were some

24   issues there where you indicated that you did

25   not, that you were not the main player in this

26   particular crime and that there was another

27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 4   11/06/2006**

55

1   individual that's been named.  And, again, I'll

2   indicate (inaudible) based on reports that were

3   you the person that was calling the shots on this

4   and (inaudible) the main player.  So that is,

5   again, a concern, something that you might want

6   to look into.  Commissioner, do you have any

7   comments?

8        **DEPUTY COMMISSIONER MUGA:**  Yeah.  Here's

9   some thoughts from you, Mr. Brodsky.  You know, I

10  went over the types of self-help courses that you

11  participated in during the last 12-month period,

12  and I'm really glad that you participated in

13  those, but I'm going to make a suggestion.  I'm

14  not saying you have to do this, but what you

15  might want to do is, of a man of your intellect,

16  I guess that's a good way (inaudible) without a

17  doubt.  I'm going to suggest that you might want

18  to be doing some self-readings, and I can

19  (inaudible) where I've taught (inaudible).  I

20  guess what I'd like to hear from you is something

21  more in depth, and that's why I'm suggesting

22  maybe some self- reading, some, just, write a

23  paragraph or two summary and just showing the

24  next Panel that you come before that you've read

25  this material and kind of (inaudible) on what

26  you've learned from it.  I guess I'm looking for

27  **CLIFFORD BRODSKY  H-07665  DECISION PAGE 5   11/06/2006**

56

1    something more in depth, so, you know.  I went
2    through your C-File again, combed through it, and
3    I didn't see a lot of laudatory chronos.  You're
4    doing what you need to be doing.  You're on that
5    track, but I didn't see something that's going to
6    show some more deeper understanding.  I guess
7    that's what I'm looking for.  It's clear that you
8    can do that (inaudible).  I'm not saying you have
9    to do that.  I'm just putting that out there for
10   you, okay, as a suggestion.

11   **PRESIDING COMMISSIONER MARTINEZ:**  Mr.
12   Brodsky, again, we're not taking away from these
13   other things that you've done.  You've certainly
14   done quite a bit, and again, we highly commend
15   you for it, remaining disciplinary free.  I think
16   you should continue on as you are in your course,
17   and again (inaudible) so with that, this will
18   conclude this hearing.

19   **ATTORNEY:**  If I could just --

20   **PRESIDING COMMISSIONER MARTINEZ:**  It is 3:15
21   p.m.

22   **ATTORNEY:**  Could I just ask one question for
23   clarification.  I'm just a little confused as to
24   what exactly you're asking him to do.

25   **PRESIDING COMMISSIONER MARTINEZ:**  We've
26   already stated that, sir.  This hearing is now
27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 6   11/06/2006**

57

1    concluded and it's 3:15 p.m.

2        **ATTORNEY:**  I'm just looking for

3    clarification.  I need to be able to get, to tell

4    me client what he should or shouldn't be doing

5    in --

6        **PRESIDING COMMISSIONER MARTINEZ:**  As I said,

7    the hearing is now concluded, sir.  All right.

8        **ATTORNEY:**  Are you kidding around?

9        **PRESIDING COMMISSIONER MARTINEZ:**  This

10   hearing is now concluded.

11       **ATTORNEY:**  I can't ask a question of

12   clarification to determine --

13       **PRESIDING COMMISSIONER MARTINEZ:**  I think

14   we've already stated on record exactly what our

15   (inaudible) are.

16       **ATTORNEY:**  You haven't put exactly on record

17   that you've indicated he needs therapy --

18       **PRESIDING COMMISSIONER MARTINEZ:**  Sir --

19       **ATTORNEY:**  And --

20       **PRESIDING COMMISSIONER MARTINEZ:**  I'm not

21   going to sit here and go through, going back and

22   forth and argue about this (inaudible).

23   ///

24   ///

25   ///

26   ///

27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 7  11/06/2006**

58

1      **ATTORNEY:** I'm not going back and forth and

2   arguing, Mr. Commissioner.  I'm asking of

3   clarification of what type of therapy you expect

4   him to get --

5                    **A D J O U R N M E N T**

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   **PAROLE DENIED ONE YEAR.**

23   **THIS DECISION WILL BE FINAL ON:   MAR 0 6 2007**

24   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

25   **DATE, THE DECISION IS MODIFIED.**

26   **CLIFFORD BRODSKY  H-07665 DECISION PG 8  11/06/06**

59

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KERRY VIENS, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 58, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CLIFFORD BRODSKY, CDC No. H-07665, on NOVEMBER 6, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JANUARY 18, 2007 at Sacramento County, California.

*Kerry L. Viens*

_____
Kerry Viens
Transcriber
**Northern California Court Reporters**

Exhibit "B"

69

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                        **D E C I S I O N**

3      **PRESIDING COMMISSIONER FISHER:**   All right.   I

4      want to note for the record that everyone who was

5      previously in the room and identified themselves have

6      returned to the room. Mr. Brodsky, the panel relies on

7      the information (indiscernible) and relied on the

8      following circumstances in concluding that you're not

9      yet suitable for parole and would pose an unreasonable

10     risk of danger to society or a threat to public safety

11     if released from prison.   Essentially what it comes

12     down to, Mr. Brodsky, is that we are denying your

13     parole for another year, and it's based on the

14     commitment offense.   This was certainly -- this was a

15     callous offense.   This was a situation where for

16     money, a victim was picked and plans were made, and a

17     killer was hired, and taking into no consideration at

18     all what the impact of this action would be.   Had --

19     had things gone forward, certainly the impact would

20     have been greater, but -- but clearly, and listening

21     to Mr. Krugman speak today and also his wife about the

22     impact of the crime on their lives, and this was just

23     a very cold-blooded plan to take someone's life.   This

24     panel is concerned with that -- the ability to so

25     coldly plan something like that.   Also, there just are

26     some questions that we haven't had answered, and in

27     **CLIFFORD BRODSKY H-07665 DECISION PAGE 1 8/23/05**

70

1  order to address some of those questions, I am asking

2  for -- I know you just recently had a psych evaluation

3  -- I'm not asking for another full one. But what I am

4  going to ask for is that you be evaluated regarding

5  the statements that were made in 1991 in that psych

6  evaluation that was related to post-traumatic stress

7  order, because those issues just sort of went away

8  without really being addressed. And in particular,

9  the fact that the doctor at the time indicated that he

10  felt that Mr. Brodsky was a ticking time bomb. And he

11  also noted that Mr. Brodsky likened the victim to

12  President Johnson, in that he felt they both had

13  betrayed his trust. There was a lot of stuff going on

14  in that report that just got ignored in the future.

15  And so I'm just going to ask that those issues you

16  could take care of so that it's not a question in the

17  future. We don't really know, and in part because we

18  -- we didn't ask Mr. Brodsky questions today -- but we

19  don't really know why Mr. Brodsky is capable or was

20  capable at that time of being involved in something

21  that -- that was so cold-blooded, and was capable of

22  being part of a plan to kill a man for an insurance

23  policy. So I think it's important those issues be

24  addressed. And that's the bottom line, Mr. Brodsky.

25  You're doing a good job with your parole hearing. I

26  want to note that the psych report's current

27  **CLIFFORD BRODSKY H-07665 DECISION PAGE 2 8/23/05**

1    (indiscernible) about 1994 have been positive.  The
2    1994 report addresses the post-traumatic stress
3    disorder and the fact that it was raised, but simply
4    states that the doctors didn't feel that Mr. Brodsky
5    was experiencing PTSD at that time, and never -- and
6    never went into anything about why -- if those issues
7    were resolved, how they were resolved, when the '91
8    report said that he needed intensive treatment.  So we
9    need to get that question answered.  I want to note
10   that Mr. Brodsky has good family support, that he has
11   parole plans, that he has a job offer, and that in
12   general he is programming well.  So once again, the
13   one-year denial is based on the commitment offense.

14        **ATTORNEY DEFILIPPIS:**  Just -- just for the
15   record, I would note that the 1991 report, we talked
16   about the fact that psychological reports were in the
17   file at the inception of this hearing; however, I do
18   not have the 1991 report.  That is not contained in
19   the hearing packet.  It should be noted for the record
20   that is not a CDC report.  That was done by an outside
21   psychologist.  It is not part of the materials that
22   were provided for consideration at this hearing.  I
23   would like a copy of it before I leave here today,
24   since I've never -- I've never seen it before, and it
25   apparently is being used in conjunction with denying
26   parole to Mr. Brodsky.

27   **CLIFFORD BRODSKY H-07665 DECISION PAGE 3 8/23/05**

72

1        **DEPUTY COMMISSIONER HARMON:**   Excuse me,
2   counselor, you did have access to the C File in
3   preparation of the hearing, didn't you?
4        **ATTORNEY DEFILIPPIS:**   I've never seen that
5   report.
6        **DEPUTY COMMISSIONER HARMON:**   It was -- it was
7   in --
8        **PRESIDING COMMISSIONER FISHER:**   It's in the
9   Central File.
10       **ATTORNEY DEFILIPPIS:**   I assume -- I assume
11  when I receive a Lifer hearing packet from CDC that
12  I'm being provided with all of the psychological
13  reports that are contained within the file.  I think
14  I'm entitled to that presumption, as a long history of
15  dealing with CDC on getting Lifer hearing packets.
16  The Lifer hearing packet is expected to contain all of
17  the psychological reports.  It did not in this case.
18       **PRESIDING COMMISSIONER FISHER:**   Thank you.  Do
19  you have any comments?
20       **DEPUTY DISTRICT ATTORNEY DELADIGNE:**   Nothing
21  further.
22  //
23  //
24  //
25  //
26  //
27  **CLIFFORD BRODSKY H-07665 DECISION PAGE 4 8/23/05**

73

1          **ATTORNEY DEFILIPPIS:**    Can I have somebody copy

2    that?

3          **DEPUTY DISTRICT ATTORNEY FISHER:**    Yeah.

4    (indiscernible).

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:**_____

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **CLIFFORD BRODSKY H-07665 DECISION PAGE 5 8/23/05**

57

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER LOPEZ:** We are back on

4    record.

5    **PRESIDING COMMISSIONER WELCH:** Okay.

6    Mr. Brodsky, we do have a decision. By the way,

7    everyone that was here before have returned. The

8    Panel reviewed all information received from the

9    public and relied on the following circumstances

10   in concluding that the prisoner would be an

11   unreasonable risk of danger to society or a threat

12   to public safety if released from prison. One, we

13   do feel that the crime was especially coldhearted.

14   The offense was carried out in a dispassionate and

15   calculated manner. The offense was carried out in

16   a manner that demonstrated a disregard for the

17   suffering of another human being. And the motive

18   for the crime was trivial and explicable. The

19   conclusion was drawn from the Statement of Facts

20   wherein on and between -- March 1, 1989 the

21   prisoner conspired with another party to murder

22   Mr. Krugman. In March of 1989 two hit men was

23   hired to kill Mr. Krugman in order to obtain the

24   proceeds of a one point 25 million dollar life

25   insurance policy. The security officer for the

26   Mary Jane Company alerted the Los Angeles Police

27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 1  11/19/03**

58

1    Department to the plot and on July 5, 1989 the
2    murder of Robert Krugman was averted.  The
3    prisoner have no prior criminal history.  There's
4    no indication that the prisoner had an unstable
5    social history.  It's quite the contrary.  He
6    served honorably in the United States Navy as an
7    officer, well educated, has a Masters Degree.  So
8    there's no indications whatsoever he had an
9    unstable social history.  While in prison -- while
10   in -- While in prison, the prisoner has
11   programmed.  A recent psychological report shows
12   that the prisoner is making progress, shows --
13   that his level of dangerousness both in and out of
14   the structured environment shows that it's
15   reduced, shows that he's on the right track, that
16   he's making a lot of progress.  It says he doesn't
17   have a mental disorder.  It says if released to
18   the community his violence is -- potential is
19   estimated to be no more than the average citizen
20   in the community.  They say there's no significant
21   risk factors.  The prisoner does have parole
22   plans.  He have a place to live with his wife, I
23   mean with his daughter.  He have a job offer.  The
24   hearing Panel notes that in opposition to a
25   finding of suitability the District Attorney did
26   not make a statement in opposition, one way or the
27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 2  11/19/03**

59

1    other.   We do note that there are two victims here
2    and they voiced strong opposition to a finding of
3    suitability.  We also note that there are several
4    victim letters in the file voicing strong
5    opposition to a finding of suitability.   The
6    victim's childrens wrote a heart-wrenching letter
7    in terms of opposition to suitability.  The Panel
8    makes the following findings:  The prisoner needs
9    to continue on the road that he's on, continue to
10   participate in positive programs, continue to
11   participate in programs that will enable him to be
12   able to face stressful situations like the instant
13   offense and be able to face, discuss and
14   understand and cope with those situations in a
15   nondestructive manner.  Until enough -- Until
16   enough progress is made, the Board still have
17   concerns about the prisoner's threat to the
18   public.  Nevertheless, there are a lot of things
19   we need to commend him for also.  The prisoner
20   have been a very good prisoner so to speak.   No
21   disciplinaries, good work reports, the prisoner
22   have a solid educational background, a solid work
23   background prior to coming to prison.   So
24   certainly the prisoner is on the right track.
25   However, those positive aspects of the -- of his
26   behavior does not outweigh the factors of
27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 3  11/19/03**

60

1    unsuitability.  So the prisoner's parole is going

2    to be denied for one year.  Certainly a factor

3    (inaudible) is a crime, and not only a crime but

4    the crime in terms of how it impacted the lives of

5    the victim.  Apparently it had a devastating

6    affect on them so certainly the Board had to weigh

7    -- that weighed heavily on the Board's mind when

8    we was deliberating and coming to the decision in

9    terms of (inaudible).  However, the Board

10   recommend that the prisoner remain

11   disciplinary-free.  We recommend that you continue

12   in the positive program that you're on, continue

13   on the track that you're on, continue to

14   participate in whatever types of programs that may

15   be available to you, whether it's self-help or

16   reading books or other types of -- other types of

17   activity that would give you insight into the

18   crime and help you be able to face stressful

19   situations on the outside in a nondestructive

20   manner.  We're also requesting a new psychological

21   evaluation be completed.  We're requesting that

22   the prisoner's violence potential in the free

23   community be explored, the extent to which the

24   prisoner have explored his commitment offense and

25   whether or not there's any need for any further

26   treatment while in prison or self-help programs

27   **CLIFFORD BRODSKY   H-07665   DECISION PAGE 4   11/19/03**

61

1  while in prison.  That concludes the reading of

2  the decision.  Commissioner, comments?

3      **DEPUTY COMMISSIONER LOPEZ:**  No comments.

4      **PRESIDING COMMISSIONER WELCH:**  Okay.  This

5  hearing is concluded at approximately 1645.  Good

6  luck to you, Mr. Brodsky.

7                    --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  **PAROLE DENIED ONE YEAR**

26  **FINAL DATE OF DECISION** _____ FEB 17 2004 _____

27  **CLIFFORD BRODSKY  H-07665  DECISION PAGE 5  11/19/03**

80

1    **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3        **DEPUTY COMMISSIONER LEHMAN:**  We're back on

4    the record.

5        **PRESIDING COMMISSIONER MUNOZ:**  All right.

6    Thank you.  It's about 22 minutes after one p.m.

7    And the parole consideration hearing for Inmate

8    Clifford Brodsky has resumed with all parties

9    having returned to the hearing room.  And

10   Mr. Brodsky, this Panel reviewed all information

11   received from the public and relied on the

12   following circumstances in concluding that you are

13   not suitable for parole and that you would pose an

14   unreasonable risk of danger to society if released

15   from prison.  And my colleague and I agreed on a

16   one-year denial in your case.  We considered many

17   factors.  First and foremost was the commitment

18   offense and its nature.  This offense was carried

19   out in a cruel manner with a disregard for human

20   suffering, and also this offense, commission for

21   conspiracy to commit murder, was obviously carried

22   out in a calculated manner.  These conclusions are

23   drawn from the Statement of Facts wherein the

24   prisoner, according to the documents before us and

25   the police investigation and in spite of the

26   inmate's denial, he, the inmate, led a conspiracy

27   **CLIFFORD BRODSKY   H-07665    DECISION PAGE 1 9/27/02**

00284

81

1    to kill the victim in this crime for a one and a

2    quarter million dollar insurance policy.  If not

3    for the fact that the hired hit man in this case

4    notified the police, the victim in this particular

5    crime would have been shot and killed.  The inmate

6    has done well while incarcerated.  However, this

7    Panel feels he has not sufficiently participated in

8    beneficial self-help and therapy programming.  And

9    the -- He has a good psychiatric evaluation.  And

10   the parole plans appear to be in order.  We note

11   that the District Attorney from the county of Los

12   Angeles -- I just drew a mental block here.  Did

13   you oppose parole suitability?  You did not.

14       **DEPUTY DISTRICT ATTORNEY KRAUT:**  Absolutely

15   not.

16       **PRESIDING COMMISSIONER MUNOZ:**  You did not.

17       **DEPUTY DISTRICT ATTORNEY KRAUT:**  We have no

18   -- We did not oppose parole.

19       **PRESIDING COMMISSIONER MUNOZ:**  Okay.  All

20   right.  You did not oppose.  And that

21   (indiscernible) back to the agreement that was made

22   during the plea bargain.

23       **DEPUTY DISTRICT ATTORNEY KRAUT:**  Absolutely.

24       **PRESIDING COMMISSIONER MUNOZ:**  Okay.  Right.

25   We do note that the next of kin, the victim and his

26   wife, they are present here today, both oppose

27   **CLIFFORD BRODSKY  H-07665   DECISION PAGE 2 9/27/02**

82

1    parole suitability for this inmate. And we do make

2    the following findings, that the inmate does need

3    to participate in any and all self-help and therapy

4    programming that may become available in order to

5    face, discuss, understand, and cope with stress in

6    a nondestructive manner. We appreciate the

7    inmate's behavior while incarcerated. We also hope

8    he stays on that path. He should be commended for

9    some of the things that he's accomplished. I think

10   he completed a vocational textile. He's also

11   received certificates from Blackstone Legal School,

12   or whatever it was, (inaudible) -- excuse me,

13   paralegal. And again, his behavior has been

14   exemplary. The positive aspects of his behavior do

15   not outweigh the factors of unsuitability. As I

16   indicated, we recommend that you remain

17   disciplinary-free, that you take part in any and

18   all self-help and therapy programs that may become

19   available. Any comments you care to make,

20   Mr. Lehman?

21        **DEPUTY COMMISSIONER LEHMAN:** I have nothing

22   further.

23        **PRESIDING COMMISSIONER MUNOZ:** All right.

24   It's 1:26 p.m. And that concludes the hearing for

25   Inmate Brodsky.

26        **ATTORNEY DEFILIPPIS:** Excuse me. Before we

27   **CLIFFORD BRODSKY   H-07665   DECISION PAGE 3 9/27/02**

                                        - 00285

83

1    go off the record, there was one question I had of

2    you, Mr. Commissioner.  You mentioned that he needs

3    some additional self-help and therapy.  And I was

4    just wondering if you could give some guidance as

5    to what types of things the Board is --

6        **PRESIDING COMMISSIONER MUNOZ:**  Well, I

7    mentioned whatever may come his way.  Whatever

8    becomes available, he should take part in.  It

9    would -- Participation or completion in any self-

10   help programming, any self-help and therapy

11   programming that may become available.  I

12   understand therapy is not available at the present

13   time.  But if it should become available, he should

14   participate.  It would only enhance his chances to

15   gain parole suitability.

16       **ATTORNEY DEFILIPPIS:**  The concern I have is

17   that here at CTF there is not a lot of self-help

18   and therapy available.

19       **PRESIDING COMMISSIONER MUNOZ:**  Right.

20       **ATTORNEY DEFILIPPIS:**  And it appears to me

21   from my experience with inmates around here that he

22   has done pretty much everything that's available to

23   him.

24       **PRESIDING COMMISSIONER MUNOZ:**  Well, one of

25   the other things we suggest at times is that the

26   inmate become involved in a self-help or cell study

27   **CLIFFORD BRODSKY   H-07665   DECISION PAGE 4 9/27/02**

00287

84

1    program.  He may consider reading various

2    motivational or inspirational books that may assist

3    him not only in coping with his incarceration, with

4    his culpability with the crime, with his

5    readjustment to society, any books of that type

6    that could help him out would be appreciated by any

7    Panel that he comes before.  He should consider

8    maintaining a list of those types of books and

9    bringing that list with him to his next parole

10   consideration hearing.  I think I saw in the

11   initial psychiatric evaluation that your client

12   wanted to study the Hebrew language or something.

13   I think I read -- I recall something like that, I

14   believe.  And if he does get involved in that, that

15   would certainly show that he's spending his time

16   wisely, things of that nature.  That's all I can

17   say.  Anything you want to say other than that?

18        **DEPUTY COMMISSIONER LEHMAN:**  I have nothing

19   further.

20        **PRESIDING COMMISSIONER MUNOZ:**  Okay.  And

21   that's about it, sir.  All right.  That concludes

22   the hearing.  It's 28 minutes after one p.m.

23                        --oOo--

24

25   **PAROLE DENIED ONE YEAR**
                                        OCT 1 8 2002
26   **EFFECTIVE DATE OF THIS DECISION**_____

27   **CLIFFORD BRODSKY  H-07665   DECISION PAGE 5 9/27/02**

00288

54

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **PRESIDING COMMISSIONER WELCH:**  The Panel

4    reviewed all information received from the public

5    and relied on the following circumstances in

6    concluding that the prisoner is not suitable for

7    parole and would pose an unreasonable risk of

8    danger to society or a threat to public safety if

9    released from prison.  The offense was carried out

10   in an especially cruel and callous manner.  The

11   offense was carried out in a dispassionate and

12   calculated manner.  The offense was carried out in

13   a manner which demonstrates an exceptionally

14   callous disregard for human suffering.  The motive

15   for the crime was inexplicable or very trivial in

16   relationship to the offense.  The conclusions are

17   drawn from the Statement of Facts [recorder

18   malfunction].  In March of 1989, two hit men were

19   hired to kill the victim in order to obtain

20   proceeds from a 1.5 million dollar life insurance

21   policy.  The Security Officer of the Mary Jane

22   Company alerted Los Angeles Police Department of

23   the plot on July 5th, 1989.  [Recorder

24   malfunction] -- discuss, understand and cope with

25   stress in a nondestructive manner.  Until progress

26   is made, the prisoner continues to be unpredictable

27   **CLIFFORD BRODSKY  H-07665  DECISION PAGE 1  12/5/01**

55

1   and a threat to others.  However, there are things

2   that the prisoner should be commended for.

3                   (Thereupon, the remainder of

4                    the hearing proceeded during

5                    recorder malfunction.)

6                           --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED _____

26   EFFECTIVE DATE OF THIS DECISION_____

27   CLIFFORD BRODSKY   H-07665   DECISION PAGE 2   12/5/01

BOARD OF PRISON TERMS                                           STATE OF CALIFORNIA    CTC

## BOARD REVIEW COMMITTEE REVIEW OF PROPOSED DECISION

INMATE:  **BRODSKY, Clifford**                    CDC NUMBER: H-07665

TYPE OF HEARING:  Initial parole consideration         DATE OF HEARING:  12/05/01

☐ Affirm original decision        ☐ Schedule new hearing        ☐ Modify decision

Disapprove the proposed December 5, 2001 hearing decision and schedule a rehearing of the prisoner's initial parole consideration hearing on the next available calendar.

SUPPORTIVE REASONING FOR DECISION:  *See attached BPT form 1138*

| COMMISSIONER SIGNATURE | DATE | | ☒ CONCUR | ☐ DISSENT |
| | 02/05/02 | | | |
| COMMISSIONER SIGNATURE | DATE | | ☒ CONCUR | ☐ DISSENT |
| *Sharon Lawin* | 2/5/02 | | | |
| COMMISSIONER SIGNATURE | DATE | | ☒ CONCUR | ☐ DISSENT |
| | 2 5-02 | | | |

I dissent from the majority for the following reasons:

SIGNATURE _____                    DATE _____

BPT 1139 (4/87)

FROM

(MON) 02. 11' 02 09   ˙. 09:08/NO. 3560208513 P   4

STATE OF CALIFORNIA

**REVIEW OF PROPOSED** ı     ĬON

☐ APPROVED ☐ REFER TO BOARD REVIEW COMMITTEE   ☐ REFER TO RECONSIDERATION PANEL  ·

| INMATE: **BRODSKY, Clifford** | CDC NUMBER: **H-07665** |
|---|---|

| TYPE OF HEARING:  · Initial parole consideration | DATE OF HEARING:  12/05/01 |
|---|---|

The Decision Review Unit has completed a review of the above hearing and has identified the following issue which needs further review:

Review by the Decision Review Unit of the initial parole consideration hearing dated December 5, 2001, has disclosed that due to an apparent malfunction of the recording equipment, significant portions of the hearing, including the decision, are not transcribable.

Since a complete record of the hearing is not only required by law, but is also necessary for a review of the hearing decision, a rehearing of the prisoner's initial parole consideration hearing will be required.

**RECOMMENDATION: Disapprove the proposed December 5, 2001 hearing decision and schedule a rehearing on the next available calendar.**

| DECISION REVIEW UNIT SIGNATURE: | DATE: 2-4-02 |
|---|---|
| REVIEWED BY LEGAL COUNSEL ☒ YES ☐ NO: | LEGAL COUNSEL INITIALS: | RESULT: ☒ CONCUR ☐ DISSENT |

LEGAL COUNSEL COMMENTS:

I have reviewed the above-referenced file and ☒ concur ☐ dissent with the Decision Review Unit.
COMMENTS:

2-4-02

EXECUTIVE OFFICER SIGNATURE:·

DATE:

000037

Exhibit "C"

1                    LOS ANGELES, CALIFORNIA

2            10:05 A.M. WEDNESDAY * JULY 10, 1991

3

4    DEPARTMENT NO. 111      HON. FREDERICK LOWER, JR., JUDGE

5

6    APPEARANCES:

7            Defendant with his counsel,

8            RICHARD CHIER, Attorney at

9            Law; WILLIAM HODGMAN, Deputy District

10           Attorney of Los Angeles County,

11           representing the People of the State of

12           California.

13

14           (Emanuel J. Sanzo, Official Reporter.)

15

16                NOLO CONTENDERE PLEA %

17

18        THE COURT:  People versus Brodsky, BA000576.

19            Mr. Brodsky is in court -- good morning,

20    Mr. Brodsky -- with Mr. Chier, C-h-i-e-r, his attorney;

21    the People are represented by Mr. Hodgman.

22            This matter is here for pretrial or plea.

23        MR. HODGMAN:  That's correct, Your Honor.

24            Today is trial setting or a date for

25    determining whether or not Mr. Brodsky wishes to enter a

26    change of plea.

27            It is my understanding Mr. Brodsky wishes

28    to enter a change of plea to the count.

1       If I may outline the general terms of the

2   agreement or the settlement, I'll do that for the court.

3       THE COURT:  All right.

4       MR. HODGMAN:  Then I'll address Mr. Brodsky.

5       THE COURT:  All right.

6       MR. HODGMAN:  I have offered to counsel and his

7   client that the defendant enter a plea to the count as

8   charged with a stipulation by the People that this would

9   be conspiracy to commit murder of the second degree,

10  which would entail a sentence of 15 years to life in

11  state prison rather than 25 to life as contemplated by

12  the present charge.

13       I have indicated a couple of other things

14  to counsel.

15       One, counsel requested August 15th as a

16  P & S date in order to facilitate the presentation to

17  this court and to later authorities within the

18  Department of Corrections and the Board of Prison Terms

19  a private probation report so that authorities on down

20  the line would have a fuller view or perception of Mr.

21  Brodsky.

22       In addition, I have told Mr. Chier, and I

23  believe he has represented to his client, that on behalf

24  of the District Attorney's Office my estimation of this

25  case as trial lawyer would be that when the Board of

26  Prison Terms sees fit to parole Mr. Brodsky I would

27  agree with that determination, and that I would have no

28  opposition to Mr. Brodsky being paroled at the first

1    date that the Board of Prison Terms determines to be

2    suitable.

3              That would be contingent on a couple of

4    things.

5              One, that Mr. Brodsky remain discipline

6    free while within the Department of Corrections.

7              Secondly, that no violence occurs to any of

8    the People's witnesses or potential witnesses that are

9    presently involved with the case.

10             And I further represented to Mr. Chier that

11   I'll place a memo in my file so that some years hence

12   when a district attorney, if not myself, attends that

13   lifer hearing, that this disposition as represented by

14   the record is known and in the file and can be

15   represented to the appropriate authorities at that time.

16        MR. CHIER:  I would like to just clarify one

17   aspect of that, Your Honor.

18        THE COURT:  Yes, Mr. Chier.

19        MR. CHIER:  With respect to the violence

20   occurring to the witnesses in this case, I think it

21   ought to be understood that violence occurring that

22   would be in some way ascribable to him.

23             Mr. Pursely, who was previously a

24   codefendant in this case and who has now found religion

25   and given the People a statement, is going to be in

26   state prison himself.

27             I don't know what jacket he's going to go

28   to state prison with.  And it may be that something

```
 1    would happen to him which is in no way ascribable to the
 2    defendant, and might happen to him merely because of the
 3    nature of the individual.
 4              And I don't want --
 5         THE COURT:  You are concerned that this
 6    stipulation is going to turn Mr. Brodsky into an insurer
 7    of the safety of certain individuals.  Is that the idea?
 8         MR. CHIER:  Yes.
 9         THE COURT:  I don't think that's your intention.
10         MR. HODGMAN:  That's not my intention.
11              I agree with Mr. Chier.  It would only be
12    any violence that through some means we can attribute to
13    Mr. Brodsky.
14              If something happens completely unrelated
15    to Mr. Brodsky or his actions, so be it, that should not
16    cause anything negative to fall back upon Mr. Brodsky.
17         THE COURT:  So there would have to be a causal
18    link to Mr. Brodsky.
19         MR. CHIER:  Yes.
20         MR. HODGMAN:  Agreed.
21              With that, Your Honor, I'll outline the
22    consequences of the plea for Mr. Brodsky and advise him
23    of his constitutional rights.
24         THE COURT:  You may take the plea.
25         MR. HODGMAN:  Thank you.
26              Mr. Brodsky, as I have just indicated, I'm
27    going to talk to you about a couple of things.
28              One is you should be fully aware of the
```

1      consequences of your plea today.

2                I know you have had lengthy discussions

3      with your attorney, but here on the record it's

4      important that we go through it once again.

5                In addition, I'm duty bound to advise you

6      of certain constitutional rights that you now possess

7      and that you will have to waive or give up so that this

8      court can accept your plea.

9                If you have any questions with anything I'm

10     about to discuss with you feel, free to interrupt me,

11     speak to your lawyer, address the court or myself, and

12     we will answer those questions for you.

13                Do you understand that, sir?

14          THE DEFENDANT:   Yes.

15          THE COURT:   Mr. Brodsky, it has been agreed

16     between your counsel, myself, and acceptable to the

17     court, that if you plead to the count of conspiracy to

18     commit murder, with the stipulation that it is murder of

19     the second degree, this carries with it a potential

20     sentence of 15 years to life in the state prison.

21                This means you will not get probation; you

22     will go to prison.

23                When you get out of prison you will be

24     placed on parole.  With an indeterminate sentence such

25     as this your parole can last up to five years.

26                If while on parole you committed an act

27     that was deemed a violation of your parole and your

28     parole was revoked you could be returned to state prison

1    for up to 12 months for each independent violation and

2    revocation of your parole.

3                Do you understand, first of all, the

4    potential sentence as well as the parole consequences of

5    this plea, sir?

6                THE DEFENDANT:  Yes, sir.

7                THE COURT:  Very well.

8                Mr. Brodsky, you should also be aware if

9    you are now on parole or if you are now on probation

10   your plea today could result in a violation or

11   revocation of your probation or parole.

12               I realize this may or may not apply -- to

13   my knowledge it does not -- but at the same time for the

14   record we should establish that you are aware that a

15   violation of parole or probation as of today is a

16   possible consequence.

17               Do you understand that, sir?

18               THE DEFENDANT:  I understand.  I'm not on parole

19   or probation.

20               MR. HODGMAN:  Very well.

21               In addition, here in California pursuant to

22   the Government Code there is what is known as a

23   government restitution fund.

24               As a consequence of your plea Judge Lower

25   will impose upon you a fine to be paid into this fund of

26   no less than $100 or more than $10,000.

27               Do you understand that as a possible

28   consequence of your plea?

1          THE DEFENDANT:  Yes.

2          MR. HODGMAN:  You should also be aware, sir --

3     and I realize this may not apply in your case -- but if

4     you are not a citizen of the United States your

5     conviction in this case could result in your deportation

6     from the United States, denial of reentry into the

7     United States or your denial of naturalization pursuant

8     to the laws of the United States.

9          Do you understand that as a possible

10    consequence?

11         THE DEFENDANT:  Yes, I understand.  I am a

12    citizen.

13         MR. HODGMAN:  Very well.

14         Lastly, sir, you should be aware that this

15    offense could be a priorable offense, meaning somewhere

16    down the line -- I hope this would not occur, but after

17    you paid your debt to society and resumed your status as

18    a citizen, if you commit a new felony this present

19    offense for which you will suffer a conviction could

20    result in a prior felony allegation, which could enhance

21    your penalty in any future case if you were convicted.

22         Do you understand that, sir?

23         THE DEFENDANT:  Yes, sir.

24         MR. HODGMAN:  Okay.

25         Realizing all these potential consequences

26    of your plea, sir, is it still your desire to enter a

27    plea of guilty to the count as we have outlined here

28    today?

1          THE DEFENDANT:  Yes, sir.

2          MR. HODGMAN:  In order to do that, sir, you have

3    to waive and give up certain constitutional rights.  I'

4    going to discuss those with you now.

5               First of all, you have a right to a jury

6    trial.

7               A jury trial is where your attorney and

8    myself would select 12 people from the community.

9               They in effect would sit in judgment upon

10   you.  They would determine whether or not you were

11   guilty of this charge.

12              Because you are pleading guilty you will

13   not have an opportunity to have a jury trial.

14              Do you understand your right to have a jury

15   trial, sir?

16         THE DEFENDANT:  Yes.

17         MR. HODGMAN:  Do you waive and give up that

18   right?

19         THE DEFENDANT:  Yes, sir.

20         MR. HODGMAN:  If your attorney and I agreed, we

21   could proceed by way of a court trial.

22              That is, instead of a jury a judge alone

23   would decide the case, he would determine whether you

24   were guilty or not.

25              Because you are pleading guilty today you

26   will not have an opportunity to have a court trial.

27              Do you understand your right to have a

28   court trial, sir?

1          THE DEFENDANT:  Yes, I do.

2          MR. HODGMAN:  And you do waive and give up that

3     right?

4          THE DEFENDANT:  Yes, sir.

5          MR. HODGMAN:  If we were to have a trial, Mr.

6     Brodsky, you would have the right to confront and

7     cross-examine witnesses.

8               This means that you would have the right to

9     be present in court and to face or confront the

10    witnesses that I would call to testify against you.

11              Through your attorney you would have the

12    right to question those witnesses.  That's known as

13    cross-examination.

14              Because you are pleading guilty today you

15    will not have an opportunity to exercise this right to

16    confront and cross-examine witnesses.

17              Do you understand that right, sir?

18          THE DEFENDANT:  Yes, sir.

19          MR. HODGMAN:  And do you waive and give up that

20    right?

21          THE DEFENDANT:  Yes, sir.

22          MR. HODGMAN:  You also have a right, Mr. Brodsky,

23    to present evidence in your own behalf.

24              This means that you can utilize the court

25    subpoena power, if you wish, to have witnesses brought

26    into court to testify for you.

27              In addition, you could testify in your own

28    behalf if you felt that was in your own best interest.

1    Because you are pleading guilty today you

2    will not have an opportunity to exercise that right.

3    Do you understand your right to present

4    evidence in your own behalf?

5    THE DEFENDANT:  Yes, I do.

6    MR. HODGMAN:  And this is specifically with

7    regard to the issue of guilt or lack thereof.

8    THE DEFENDANT:  Yes, sir.

9    MR. HODGMAN:  Do you waive and give up that

10   right, sir?

11   THE DEFENDANT:  Yes, sir.

12   MR. HODGMAN:  Lastly, Mr. Brodsky, you have a

13   right which is known as the privilege against

14   self-incrimination.

15   This means you have a right not to be a

16   witness against yourself and not to incriminate

17   yourself.

18   By virtue of your plea today in effect you

19   are incriminating yourself because Judge Lower will be

20   using this plea as a basis for sentencing you in roughly

21   one month hence.

22   Do you understand your privilege against

23   self-incrimination sir?

24   THE DEFENDANT:  Yes, I do.

25   MR. HODGMAN:  Do you waive and give up that

26   privilege?

27   THE DEFENDANT:  Yes, sir.

28   MR. HODGMAN:  Mr. Brodsky, has anybody threatened

1    you or anyone close to you to make you plead guilty

2    today?

3             THE DEFENDANT:  No, sir.

4             MR. HODGMAN:  Has anybody promised you anything

5    by way of reward, leniency, or the like, other than what

6    we have discussed here in open court by way of case

7    settlement, to make you plead guilty today?

8             THE DEFENDANT:  No, sir.

9             MR. HODGMAN:  And are you pleading guilty, then,

10   today because that's what you freely and voluntarily

11   want to do today?

12            THE DEFENDANT:  Yes, sir.

13            MR. HODGMAN:  Very well.

14            What I am going to do, Mr. Brodsky, is

15   basically sort of recite the charge and ask you whether

16   or not these circumstances are true, and then I'll ask

17   you for your plea.

18            MR. CHIER:  Could we just stipulate to a factual

19   basis rather than have some sort of specific allocution

20   in light of the fact that there are civil cases pending

21   against Mr. Brodsky, he's in litigation arising out of

22   this same incident.

23            MR. HODGMAN:  That's agreeable.

24            Counsel, do you stipulate that the

25   preliminary hearing transcript may be used as a factual

26   basis for this plea?

27            MR. CHIER:  Yes.

28            MR. HODGMAN:  Mr. Brodsky, do you join in that?

1        THE DEFENDANT:  Yes, sir.

2        MR. HODGMAN:  Very well.

3             Mr. Brodsky, to Count 1, which is charged

4   in information number BA000576, that is, conspiracy to

5   commit murder of the second degree, how do you now

6   plead?

7

8             (Counsel confers with defendant.)

9

10        THE CLERK:  182.1?

11        MR. HODGMAN:  Yes.  182.1/187 second degree would

12  be most accurate.

13        THE DEFENDANT:  No contest.

14        MR. CHIER:  Is that okay with you?

15        THE DEFENDANT:  Or guilty.

16        MR. CHIER:  It doesn't mean anything.

17        MR. HODGMAN:  A no contest plea would be

18  acceptable.

19             Let me advise you on that, though.

20             Mr. Brodsky, a no contest plea for purposes

21  of this court and for purposes of sentencing is the same

22  as a guilty plea.

23             Your attorney has discussed with you that

24  there may be some ramifications in other areas of

25  litigation, and where it might be beneficial to you.

26             That may or may not be true necessarily.

27  But for purposes of this plea the People will accept a

28  no contest plea.

```
 1              And your plea, then, to the charge as
 2    indicated is no contest, then?
 3         THE DEFENDANT:  No contest.
 4         MR. HODGMAN:  Very well.
 5              Counsel join in the plea and waivers?
 6         MR. CHIER:  Yes, counsel.
 7         THE COURT:  The court finds that the defendant
 8    has knowingly, voluntarily and with understanding given
 9    up his constitutional rights.
10              I find also that the plea is made freely
11    and voluntarily with an understanding of the nature and
12    consequences thereof.
13              I further find, having read the preliminary
14    hearing transcript, that there is a factual basis for
15    the plea.  And the court accepts the plea.
16              Now, Mr. Brodsky, you have a right to be
17    sentenced within 20 court days of today.  Your counsel
18    has asked the matter go over to August the 15th for a
19    probation and sentence hearing.
20              Do you give up your right to be sentenced
21    within 20 court days so that it can go over to August
22    15th?
23         THE DEFENDANT:  Yes, sir.
24         THE COURT:  I understand, Mr. Chier, you are
25    going to supply a private probation report.
26         MR. CHIER:  Yes, Your Honor.
27         THE COURT:  What about the regular probation and
28    sentencing report from the probation department?  Do you
```

1    waive that, or do you want me to order one of those as

2    well?

3            MR. HODGMAN:  Your Honor, the People would

4    request that one be ordered.  I know from the standpoint

5    of the Department of Corrections that --

6            THE COURT:  They want that.

7            MR. HODGMAN:  -- they desire that as well.

8            THE COURT:  All right.

9                  Then, the court will order a P & S report

10   from the probation department.

11                  And then, Mr. Chier, if you are going to

12   supply a separate one, I would ask that it be received,

13   so I can go over the material by the 5th of August.

14           MR. CHIER:  The 5th of August?

15           THE COURT:  Yes.

16           MR. CHIER:  That might be a little soon, Your

17   Honor.

18           THE COURT:  How about the 8th?

19           MR. CHIER:  The 8th would be better for us.

20           THE COURT:  All right.

21           MR. HOGMAN:  I'll ask a courtesy copy be

22   forwarded to my office as well.

23           MR. CHIER:  I will.

24           THE COURT:  Then, Mr. Brodsky, you are ordered to

25   return to this courtroom on August 15th at 8:30 without

26   a subpoena or further order of court.

27                  Do you understand?

28           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.

2          THE CLERK:  Here is a card.

3          MR. HODGMAN:  Thank you, Your Honor.

4          THE COURT:  You're welcome.

5               Mr. Brodsky, before you go you are also

6    ordered to report to the probation department for an

7    interview so they can fill out the report.

8          THE DEFENDANT:  Yes, Your Honor

9

10               (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-5-

```
 1        LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 23, 1991

 2                        10:27 A.M.

 3    DEPARTMENT 111              HON. FREDERICK J. LOWER, JUDGE

 4

 5    APPEARANCES:

 6              THE DEFENDANT BEING PRESENT AND IN COURT AND

 7              REPRESENTED BY COUNSEL, RICHARD CHIER, ESQUIRE;

 8              THE PEOPLE BEING REPRESENTED BY WILLIAM HODGMAN,

 9              DEPUTY DISTRICT ATTORNEY OF LOS ANGELES COUNTY,

10              THE FOLLOWING PROCEEDINGS WERE HELD:

11

12              (YVONNE GALLEGOS, OFFICIAL REPORTER,

13              CSR NO. 7521.)

14

15              THE COURT:  PEOPLE VERSUS BRODSKY.  BEFORE WE

16    PROCEED, MR. BRODSKY IS ON BAIL.

17              MR. CHIER:  YES, YOUR HONOR.

18              THE COURT:  AND YOU WERE SAYING THE LAST TIME

19    THIS CASE WAS HERE THAT YOU WANTED TO MAKE SOME

20    ARRANGEMENTS WITH REGARD TO A SURRENDER AT A PRISON.

21              MR. CHIER:  CHINO.  AND I HAVE --  IT IS QUITE

22    SIMPLE ACTUALLY.  MR. HODGMAN IS UNOPPOSED TO IT.

23                   IT INVOLVES -- YOUR HONOR HAS TO MAKE TWO

24    ORDERS AND A COMMITMENT ORDER AND A SURRENDER OR GATE

25    TURN-IN ORDER.

26                   THE COMMITMENT ORDER WOULD COMMIT HIM TO THE

27    DEPARTMENT OF CORRECTIONS AT CHINO.  AND THE GATE TURN-IN

28    ORDER MERELY ORDERS THE DEFENDANT TO TURN HIMSELF IN AT
```

1    10:00 A.M. ON FRIDAY OF NEXT WHICH WILL BE THE 30TH AT THE

2    CALIFORNIA INSTITUTE FOR MEN NORTH FACILITY.

3              THE COURT:   WHERE IS THAT?   CHINO?

4              MR. CHIER:   CHINO, CALIFORNIA.

5              THE COURT:   OKAY.

6              MR. CHIER:   THE CLERK IS TO SEND THE STATE PRISON

7    PACKAGE AHEAD SO THAT -- MR. BRODSKY HAS TO COME BACK

8    SOMETIME NEXT WEEK AND GET A CERTIFIED COPY OF THE MINUTE

9    ORDER AND THE COMMITMENT ORDER.   THEN THE CLERK IN THE

10   MEANTIME HAS TO SEND THE STUFF ALONG AS SHE WOULD

11   ORDINARILY DO.

12             BUT IN THIS CASE I AM ASKING THAT THE CLERK

13   INCLUDE A COPY THAT I HAVE PROVIDED HER OF THE PRIVATE

14   PRESENTENCE REPORT THAT WAS DELIVERED TO THE COURT

15   YESTERDAY.

16             THE CONTACT AT THE DEPARTMENT OF CORRECTIONS

17   FOR ALL OF THIS IS A WOMAN BY THE NAME OF PAMELA JOHNSON

18   WHO IS IN CENTRAL RECORDS AND HER EXTENSION NUMBER IS

19   2442.   AND SHE INDICATES THAT IF THE DEFENDANT HAS HIS OWN

20   COPY OF THE ORDER AND THEY HAVE ALREADY RECEIVED THIS

21   PACKAGE FROM THE COURT, THEY WILL ACCEPT HIM AT A TIME

22   DESIGNATED BY YOUR HONOR.

23             WE HAVE JUST SELECTED THAT DATE TO ALLOW

24   ENOUGH REAL TIME FOR THE PAPERS TO GET THERE AHEAD OF MR.

25   BRODSKY AND FOR MR. BRODSKY TO PROVIDE THEM WITH A COPY AS

26   HE NEEDS TO TURN IN AT THE GATE.

27             THE COURT:   DO YOU THINK REALISTICALLY THAT THEY

28   CAN GET THERE THAT FAST?

1      THE CLERK:  I DON'T.

2           MR. HODGMAN:  I HAVE THAT CONCERN AS WELL.  I WAS

3      GOING TO RECOMMEND UTILIZING OVERNIGHT MAIL IF THAT IS

4      ACCEPTABLE TO THE CLERK AND THE COURT.  I THINK THERE IS A

5      PROBLEM WITH DEFERRING THE ULTIMATE SURRENDER DATE TOO

6      LONG.

7           I THINK AS A MATTER FOR MR. BRODSKY'S OWN

8      STATE OF MIND AND IT IS JUST OUT OF A CONCERN OF DEFERRING

9      ULTIMATE SENTENCING TOO LONG ANYWAY.

10          I WISH TO ADD THAT I SPOKE WITH MR. CHIER

11     EARLIER IN THE WEEK.  HE INDICATED HE WOULD LOOK INTO THIS

12     PROCEDURE.  I ASKED HIM TO INFORM ME OF THE PROCEDURE SO

13     THAT I COULD ATTEMPT TO VERIFY IT ON MY OWN BEFORE TODAY'S

14     DATE.  I DID NOT GET THAT INFORMATION UNTIL THIS MORNING

15     AND I HAVE NOT VERIFIED IT.

16          I WILL STATE THAT I KNOW GENERALLY AND FROM

17     PAST EXPERIENCE THAT THERE IS A PROCEDURE SUCH AS MR. CHIER

18     HAS SUGGESTED.  IT SOUNDS FROM WHAT I RECALL TO THE COURT

19     PERFECTLY WITH THE PROCEDURE IN THE PAST.

20          THE COURT'S CONCERN ABOUT THE PAPER WORK

21     GETTING THERE ON TIME IS LEGITIMATE BECAUSE THE RECORD

22     KEEPING ASPECT OUT AT CHINO IS JUST A MASSIVE PROJECT.

23          I HAVE NO OBJECTION TO MR. BRODSKY

24     SURRENDERING HIMSELF AT 10 A.M. OR BEFOREHAND A WEEK FROM

25     TODAY.

26          I WOULD RECOMMEND THAT THE OVERNIGHT MAIL

27     PROCEDURE BE UTILIZED AND I WOULD FURTHER STATE THAT

28     SHORTLY AFTER 10 A.M. NEXT FRIDAY, EITHER MYSELF OR ONE OF

8

1  MY DESIGNATES WOULD BE CALLING THE PRISON TO MAKE SURE MR.

2  BRODSKY IS THERE AND SURRENDERED.  IF HE HAS NOT, HE WILL

3  BE RETURNING TO THIS COURT IMMEDIATELY TO US FOR A WARRANT

4  AND FOR BAIL TO BE FORFEITED.

5       MR. CHIER:  THERE IS A SUBSTANTIAL BAIL IN THIS

6  CASE.

7       THE COURT:  THAT IS MY NEXT QUESTION.  AT WHAT

8  PROCEEDING WOULD THE BAIL BE EXONERATED?

9       MR. CHIER:  UPON VERIFICATION THAT MR. BRODSKY IS

10  IN PRISON.

11       THE COURT:  ALL RIGHT.

12       MR. CHIER:  I DON'T WANT TO SPEAK FOR MR. HODGMAN

13  HERE.

14       MR. HODGMAN:  WE WILL NOT RELEASE THE BAIL ASPECT

15  UNTIL WE KNOW MR. BRODSKY IS WHERE HE WANTS TO BE.

16       THE COURT:  OFF THE RECORD.

17

18       (A DISCUSSION WAS HELD OFF THE RECORD.)

19

20       THE COURT:  THIS IS THE DATE FOR HEARING

21  REGARDING PROBATION AND PRONOUNCEMENT OF SENTENCE.

22       THE COURT HAS READ AND CONSIDERED THE

23  PROBATION OFFICER'S REPORT, THE DEFENDANT'S WRITTEN

24  STATEMENT, LETTERS FROM ROBERT BACK (PHONETIC), BARBARA

25  BELL (PHONETIC), ATTORNEY LAWRENCE WEISSMAN AND MOST

26  RECENTLY A PACKET OF MATERIALS SUBMITTED FROM STEPHEN

27  WISHNY, W-I-S-H-N-Y, ASSOCIATES.  IT WAS DELIVERED TO THE

28  COURT YESTERDAY.

1    ANY LEGAL CAUSE -- WAIVE ARRAIGNMENT FOR

2    JUDGMENT AND SENTENCE?

3        MR. CHIER:  YES, YOUR HONOR.

4        THE COURT:  ANY LEGAL CAUSE WHY JUDGMENT SHOULD

5    NOT NOW BE IMPOSED?

6

7            (NO RESPONSE)

8

9        THE COURT:  ANY COMMENTS FROM THE DEFENSE OR THE

10   PEOPLE?

11       MR. CHIER:  ON BEHALF OF THE DEFENDANT, UNLESS

12   YOUR HONOR IS INCLINED TO REFER THE MAN TO THE DEPARTMENT

13   OF CORRECTIONS FOR A 1203.03 WHICH I DON'T THINK YOU ARE,

14   WE WOULD SUBMIT IT.

15       THE COURT:  VERY WELL.  PEOPLE?

16       MR. HODGMAN:  OBVIOUSLY 1203.03 WAS NOT PART OF

17   THE CASE SETTLEMENT IN THIS CASE.  I WOULD DISCOURAGE

18   THAT.

19           OTHER THAN THAT, I WOULD STATE THAT I AM IN

20   RECEIPT OF THE PRIVATE PROBATION REPORT.  I DO CONCUR IN

21   ITS INCLUSION IN THE COURT'S RECORDS FOR PURPOSES OF

22   SENDING TO THE DEPARTMENT OF CORRECTIONS AND THE BOARD OF

23   PRISON TERMS.

24           I WOULD NOTE THAT THERE IS A SOME STATEMENT

25   AS TO HOW THIS ALL BEGAN OUT OF "BLACK HUMOR."

26           I WOULD STATE FOR THE RECORD AS I DID AT ONE

27   OF THE EARLIER BAIL PROCEEDINGS IN THIS CASE PRIOR TO THE

28   PRELIMINARY HEARING IS THAT BUT FOR FORTUNATE CIRCUMSTANCES

-10-

1    WE COULD BE STANDING HERE ADDRESSING SENTENCING FOR THE

2    MURDER OF A MAN WHO HAS A FAMILY AS WELL WITH SPECIAL

3    CIRCUMSTANCES.  A STATUTE IN THE SENTENCING CONSIDERATION

4    WOULD BE MORE ALONG THE LINE OF LIFE WITHOUT THE

5    POSSIBILITY OF PAROLE AND CONCEIVABLY THE DEATH PENALTY.

6    SO THIS IS A SERIOUS MATTER.

7            I NOTE AND AM ENCOURAGED FROM THE PRIVATE

8    PROBATION REPORT THAT MR. BRODSKY ACKOWLEDGED HIS GUILT;

9    THAT HE EXPRESSES REMORSE FOR WHAT HE HAS DONE.  I THINK IT

10   EXHIBITS MATURITY ON HIS PART THAT HE ACCEPTS THE NEEDS OF

11   PUNISHMENT IN LIGHT OF HIS WRONGDOING.

12           THE PRIVATE PROBATION REPORT REQUESTS ACCESS

13   TO TREATMENT.  I CAN'T SPEAK WITH CERTAINTY AS TO WHICH

14   FACILITY HE WILL END UP AT.  I WOULD SUSPECT IT MIGHT BE

15   SOMETHING ALONG THE LINES OF THE INSTITUTION AT SAN LUIS

16   OBISPO.  AND FROM HAVING PARTICIPATED, I KNOW THAT THEY

17   HAVE AN EXTENSIVE TREATMENT PROGRAM FOR A WHOLE VARIETY OF

18   THINGS AS WELL AS EDUCATIONAL PROGRAMS.  MIGHT BE A GOOD

19   PLACE FOR HIM TO GO.

20           I WOULD LASTLY STATE AS I STATED BEFORE, AND

21   WISH TO MAKE A MATTER OF RECORD, THAT WHAT THIS PRIVATE

22   PROBATION REPORT INCLUDES DOES NOT SURPRISE ME.

23           I THINK MR. BRODSKY SHOULD BE FAIRLY

24   PUNISHED FOR WHAT HE HAS DONE.  AND I WOULD STATE AS I DID

25   ONCE BEFORE THAT I WOULD NOT OPPOSE HIS RELEASE AT THE

26   FIRST AVAILABLE OPPORTUNITY UPON CONSIDERATION AND AFTER

27   CONSIDERATION BY THE BOARD OF PRISON TERMS PROVIDED THAT

28   THERE IS NO COMPETENT EVIDENCE WHICH CONNECTS MR. BRODSKY

1    WITH ANY HARM IF THAT INDEED OCCURS.   THERE HAS BEEN SOME

2    SUGGESTION OF THAT.

3              WITH THAT, YOUR HONOR, I HAVE NOTHING

4    FURTHER TO SAY.

5              THE COURT:   VERY WELL.   IS THERE ANYTHING

6    FURTHER?

7              MR. CHIER:   NO.

8              MR. HODGMAN:   NO.

9              THE COURT:   I HAVE CONSIDERED THE FACTORS

10   SPECIFIED UNDER RULE 414 OF THE CALIFORNIA RULES OF COURT.

11   AND I FIND THE FOLLOWING FACTORS SUPPORT THE DENIAL OF

12   PROBATION IN THIS MATTER.

13              FIRST OF ALL, THE AGREEMENT OF THE PARTIES

14   IN REACHING THE DISPOSITION.   BUT, SECONDLY, THE NATURE AND

15   SERIOUSNESS OF THE CRIME, MAINLY CONSPIRACY TO COMMIT

16   MURDER; THE FACT THAT THE DEFENDANT WAS AN ACTIVE

17   PARTICIPANT.

18              THE COURT HAVING DENIED PROBATION, IT IS THE

19   JUDGMENT OF THE COURT THAT MR. BRODSKY BE COMMITED TO THE

20   DEPARTMENT OF CORRECTIONS FOR THE TERM PRESCRIBED BY LAW 15

21   YEARS TO LIFE FOR VIOLATION OF PENAL CODE 182.1/187, SECOND

22   DEGREE.

23              HE IS GIVEN CREDIT FOR 25 DAYS ACTUALLY

24   SERVED AND 12 DAYS GOOD TIME WORK TIME FOR A TOTAL CREDIT

25   OF 37 DAYS.

26              THE LAW WILL PERMIT AN AWARD OF CONDUCT AND

27   WORK TIME CREDIT.   THAT WILL BE DETERMINED BY THE

28   DEPARTMENT OF CORRECTIONS.

1        MR. BRODSKY, YOU ARE ADVISED IF PAROLE IS

2   GRANTED UPON YOUR RELEASE FROM PRISON, YOU WILL BE PLACED

3   ON PAROLE FOR LIFE.

4        THE COURT ORDERS THE DEFENDANT, MR BRODSKY,

5   TO BE COMMITTED TO THE DEPARTMENT OF CORRECTIONS FACILITY

6   IN CHINO, THE CALIFORNIA INSTITUTE FOR MEN.  AND THAT HE

7   SURRENDER HIMSELF AT THE GATE NO LATER THAN 10 A.M.,

8   FRIDAY, AUGUST 30TH AT THAT LOCATION.

9        BAIL WILL STAND UNTIL THE COURT IS NOTIFIED

10  THAT MR. BRODSKY HAS APPEARED AND THEN RECEIVED AT THE

11  FACILITY.

12        MR. HODGMAN:  YOUR HONOR, IN THAT REGARD WHAT I

13  INTEND TO DO IS BY TELEPHONE EITHER PERSONALLY OR BY A

14  DESIGNATE CALL CHINO NEXT FRIDAY AND MAKE SURE MR. BRODSKY

15  IS THERE.

16        I WILL ASK THEM TO FAX A COPY TO THE LOS

17  ANGELES POLICE DEPARTMENT OF MR. BRODSKY'S FINGERPRINTS

18  WHICH THEY WILL TAKE UPON INTAKE THERE.  AND UPON BEING

19  SATISFIED THAT MR. BRODSKY IS INDEED THERE AND HAS BEEN

20  PROCESSED, I WILL NOTIFY MR. CHIER AND THE COURT FOR

21  PURPOSES OF EXONERATION OF BAIL.

22        THE COURT:  OKAY.  UPON RECEIPT OF THAT EVIDENCE

23  THEN, THE BAIL WILL BE EXONERATED.

24        MR. BRODSKY, I HAVE READ, AS I SAID AT THE

25  OUTSET, ALL THE MATERIAL THAT HAS BEEN SUBMITTED.  AND

26  OBVIOUSLY THIS HAS BEEN A VERY -- IS A VERY SERIOUS

27  AFFAIR.  HOWEVER, DESPITE WHAT YOU'RE FACING IT SEEMS TO ME

28  THAT THERE IS CONSIDERABLE CAUSE FOR HOPE THAT WITH

—13—

1    APPROPRIATE COUNSELING YOU CAN TURN THINGS AROUND AND COME

2    BACK OUT IN DUE COURSE AND BECOME A PRODUCTIVE MEMBER OF

3    SOCIETY.

4              I URGE YOU TO FOCUS ON THAT AS YOU WILL

5    EMBARK UPON THIS CASE.  I WANT TO WISH YOU THE VERY BEST OF

6    LUCK.

7              THE DEFENDANT:   THANK YOU, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

9              MR. CHIER:  NOTHING FURTHER, YOUR HONOR.

10             MR. HODGMAN:  NOTHING, YOUR HONOR.  THANK YOU.

11

12              (PROCEEDINGS CONCLUDED.)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "D"

10

BKM3375PG447

RECORDING REQUESTED BY AND MAIL TO

NAME *CLIFFORD BRODSKY*

STREET *602 HERMOSA AVE*

CITY & *HERMOSA BEACH, CAL. 90254*
STATE

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CALIF.

19 Min. Past 11 A M. DEC 26 1969

RAY E. LEE, Registrar-Recorder

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT.

FREE 1 R

| 1. LAST NAME - FIRST NAME - MIDDLE NAME | | | 2. SERVICE NUMBER | | 3. SOCIAL SECURITY NUMBER | | |
|---|---|---|---|---|---|---|---|
| BRODSKY, Clifford NMN | | | 697631 | | 197 | 32 | 5343 |

| 4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS | 5a. GRADE, RATE OR RANK | 5b. PAY GRADE | 6. DATE OF RANK | DAY | MONTH | YEAR |
|---|---|---|---|---|---|---|
| NAVY - USNR | LTJG | O-2 | | 13 | FEB | 1967 |

| 7. U. S. CITIZEN | 8. PLACE OF BIRTH (City and State or Country) | 9. DATE OF BIRTH | DAY | MONTH | YEAR |
|---|---|---|---|---|---|
| [X] YES [ ] NO | Lakehurst, New Jersey | | 13 | AUG | 1943 |

| 10a. SELECTIVE SERVICE NUMBER | | | | 10b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE | c. DATE INDUCTED | | |
|---|---|---|---|---|---|---|---|
| 36 | 127 | 43 | 539 | LB #127, Philadelphia, Pennsylvania | DAY NA | MONTH | YEAR |

| 11a. TYPE OF TRANSFER OR DISCHARGE | b. STATION OR INSTALLATION AT WHICH EFFECTED |
|---|---|
| Released from Active Duty Commitment | USS YORKTOWN (CVS-10) |

| 11c. REASON AND AUTHORITY | 11d. EFFECTIVE DATE | DAY | MONTH | YEAR |
|---|---|---|---|---|
| BUPERS Order 106884, 611, Expiration of active duty commitment. | | 15 | JULY | 1968 |

| 12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 13a. CHARACTER OF SERVICE | b. TYPE OF CERTIFICATE ISSUED |
|---|---|---|
| USSS YORKTOWN (CVS-10) | HONORABLE | SEE REMARKS |

| 14. DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED | | 15. REENLISTMENT CODE |
|---|---|---|
| Naval Reserve Manpower Center, Bainbridge, Maryland | | NA |

| 16. TERMINAL DATE OF RESERVE/UMTS OBLIGATION | | | 17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION | 18. TERM OF SERVICE (Years) | c. DATE OF ENTRY | | |
|---|---|---|---|---|---|---|---|
| DAY | MONTH | YEAR | a. SOURCE OF ENTRY: | | c. | DATE OF ENTRY | |
| NONE | | | [ ] ENLISTED (First Enlistment) [ ] ENLISTED (Prior Service) [ ] REENLISTED [X] OTHER Commissioned: 13 AUG 1965 | INDEF | DAY 13 | MONTH AUG | YEAR 1965 |

| 18. PRIOR REGULAR ENLISTMENTS | 19. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC | 20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State) |
|---|---|---|
| 1 | Ensign | Pensacola, Florida |

| 21. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County, State and ZIP Code) | 22. | STATEMENT OF SERVICE | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|
| 1249 Gilham Street | CREDITABLE FOR BASIC PAY PURPOSES | (1) NET SERVICE THIS PERIOD | 02 | 11 | 02 |
| Philadelphia, Pennsylvania | | (2) OTHER SERVICE | 03 | 04 | 22 |
| | | (3) TOTAL (Line (1) plus Line (2)) | 06 | 03 | 24 |

| 23a. SPECIALTY NUMBER & TITLE | b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER | b. TOTAL ACTIVE SERVICE | 04 | 05 | 07 |
|---|---|---|---|---|---|
| Administrative Officer | O-97.12 | c. FOREIGN AND/OR SEA SERVICE | 02 | 11 | 02 |

| 24. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED |
|---|
| National Defense Service Medal, Viet Nam Service Medal (w/3 Bronze Stars), and Republic of Viet Nam Campaign Medal (w/Device 1960-) |

| 25. EDUCATION AND TRAINING COMPLETED |
|---|
| FTC, San Diego, California, 13 NOV to 1 DEC 67; Prospective Officer of the Deck. |
| FAWTC, San Diego, California, 5 JUL to 7 JUL 67; Electronic Countermeasures. |

| 26a. NON-PAY PERIODS/TIME LOST (Preceding Two Years) | b. DAYS ACCRUED LEAVE PAID | 27a. INSURANCE IN FORCE (NSLI or USGLI) | b. AMOUNT OF ALLOTMENT | c. MONTH ALLOTMENT DISCONTINUED |
|---|---|---|---|---|
| TL-NONE EXLV-NONE | FIFTY EIGHT (58) | [ ] YES [X] NO | NA | NA |
| | 28. VA CLAIM NUMBER | 29. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE | | |
| | c. NONE | [X] $10,000 [ ] $5,000 [ ] NONE | | |

| 30. REMARKS |
|---|
| College-4 |
| Block 13b continued: No Discharge Certificate issued at time of separation. |
| X X X X X X |
| X X X X X X |
| X X X X |

| 31. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County, State and ZIP Code) | 32. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED |
|---|---|
| 1249 Gilham Street Philadelphia 11, Pennsylvania | *[signature]* |

| 33. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER | 34. SIGNATURE OF OFFICER AUTHORIZED TO SIGN |
|---|---|
| R. W. LAWTON, CWO-2, USN Ship's Secretary | *R. W. Lawton* |

DD FORM 214N   PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE. S/N 0101-800-4301   ARMED FORCES OF THE UNITED STATES   1

1031

Exhibit "E"

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
REVISED AUGUST 2006
PAROLE CONSIDERATION HEARING
SEPTEMBER 2006 LIFE TERM INMATE CALENDAR

CORRECTIONAL TRAINING FACILITY-SOLEDAD
August 25, 2006

This is the fourth psychological evaluation for the Board of Parole Hearings on inmate Clifford Brodsky, CDC# H-07665. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

Brodsky is a 63-year-old, married, white first-termer serving a 15-year-to-life sentence for Conspiracy to Commit Murder in the Second Degree. His date of birth is August 13, 1943. His stated religion is Jewish. There no unusual physical characteristics noted and he denied any history of nicknames or aliases.

## II. DEVELOPMENTAL HISTORY:

He had no prenatal or perinatal concerns, birth defects, abnormalities of developmental milestones, history of cruelty to animals, enuresis, arson or a history of physical or sexual abuse, either as a perpetrator or a victim.

## III. EDUCATION:

He has a BS degree in education with a Master's degree in Administration. In prison, he has worked in textiles and as a teacher's aide. He is currently the Captain's clerk. He receives excellent work reports. He has completed mechanical drafting. He has completed numerous workshops in recent years.

## IV. FAMILY HISTORY:

Both of his parents are deceased. He has one sister with whom he has minimal contact. He enjoyed good relationships with all of his family members. None of his family members have ever had any criminal or substance abuse problems.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He says he is a heterosexual male with no history of high-risk behavior or sexual aggression.

## VI. MARITAL HISTORY:

Brodsky is currently married to his second wife. He has a daughter from his first marriage as well as a son and stepchildren from his current marriage. He has regular contact with his children and wife.

## VII. MILITARY HISTORY:

Brodsky was in the U.S. Navy for four years. He served two terms in Vietnam and was involved in search-and-rescue. He received an Honorable Discharge.

## VIII. EMPLOYMENT/INCOME HISTORY:

He was the executive officer for a company that made ladies' undergarments and apparel. Prior to that, he worked in the information systems field. If paroled, he will work in the retail business with family members who own retail outlets.

## IX. SUBSTANCE ABUSE HISTORY:

He denied any illegal drug use. He acknowledged drinking wine and beer but said he did not have a drinking problem. He has attended AA and Millati Islami, which is the Muslim substance abuse program. At other institutions, he has attended classes on Addiction Recovery and Codependency and Addiction.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

He has a history of colitis and had a cyst removed from his leg. He currently does not have any significant medical problems and does not take any medication. He denies a history of head injuries, suicidal behavior, seizures or other neurological conditions.

## XI. PLANS IF GRANTED RELEASE:

If paroled, he plans to live with his daughter and work in a family retail business. His prognosis for successful, responsible, legal, prosocial community adjustment is excellent.

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

He exhibited no depressive or psychotic symptomatology. His intellectual functioning was estimated to be in the average range. He was calm, cooperative and alert. His mood, affect and flow of thought were all normal. His insight and judgment were good. He is not currently in need of any mental health treatment.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:       Adult Antisocial Behavior
AXIS II:      None
AXIS III:     None
AXIS IV:      Incarceration
AXIS V:       GAF=90

The prognosis for him maintaining his current mental status is good.

## XIII.  REVIEW OF LIFE CRIME:

He essentially agreed with the account of his crime as found in his central file. He takes
full responsibility for his crime, saying, "It was my fault. I should've walked away but I
didn't. I am responsible for it and believe I should be punished." He is grateful that no
physical harm occurred and acknowledges the harm he has caused the victim, his family,
and his own family. He expressed genuine remorse and regret for his crime.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, his violence potential is obviously lower than average due to
his clean disciplinary record. If released to the community, his violence potential is
lower than average due to his excellent institutional adjustment, long past history of
prosocial behavior, the fact that his sentencing judge released a man facing life in prison
out on bail without restrictions and a lack of a drug/alcohol problem.

A 2003 BPT document asks that a psychological evaluator address the question of "the
extent to which the prisoner has explored the commitment offense and come to terms
with the underlying causes." This evaluator believes the primary "underlying cause" for
the offense was greed. However, past BPT evaluations note that Brodsky may also be
driven by a fear of looking incompetent, a drive to succeed and annoyance at those who
fail. If one assumes that these values or beliefs are central to his character, these values
account for much of the responsibility and success in his life. However, if it is true that
these values led him to the commitment offense, this is an example of an otherwise
helpful belief system taken to its harmful extreme. The underlying causes of this belief
system are probably good parenting and good personal responsibility. If paroled, the
good part of these values will obviously help him. Is it likely these generally helpful,
generally prosocial values will again manifest themselves in an illegal, harmful manner?
No, based on the totality of his life.

A 2005 BPT Decision requests that the next psychological evaluator address issues
regarding the statements "made in 1991 in that psych evaluation that was related to post-
traumatic stress order (sic), because those issues just sort of went away without really
being addressed. And in particular, the fact that the doctor at the time indicated that he
felt that Mr. Brodsky was a ticking time bomb…There was a lot of stuff going on in that
report that just got ignored in the future." A 1994 BPT psychological evaluator twice

noted that she believed Brodsky was not experiencing current symptoms of Post
Traumatic Stress Disorder and that the instant offense was an isolated incident. That
BPT evaluator also believed that Brodsky "seems to have explored the committed offense
and has come to terms in part with its underlying causes."

The 1991 evaluation was completed at the request of Brodsky's attorney and was
submitted in an attempt at mitigation. With all due respect to Brodsky's 1991 evaluator,
even if Brodsky's symptoms at the time rose to the level of being diagnosable, it is not
true that "full recovery from PTSD is possible...only when the patient receives intensive
treatment." Brodsky has never received such treatment and there is no evidence
whatsoever in his file that he ever again displayed PTSD-like symptoms. Also, after all
this time, it is clear that Brodsky is not a "ticking time bomb." He is a better candidate
for parole than almost all inmates. There are no obvious or subtle significant risk factors
and precursors to violence.

## XV.  CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

He is competent and responsible for his behavior and has the capacity to abide by
institutional standards and has generally done so during his incarceration. He does not
have a mental health disorder that would necessitate treatment either while incarcerated
or on parole. Mandatory conditions of parole and recommendations include monitoring
for substance abuse, attendance in any sort of self-help or self-improvement program and,
obviously, employment. Parole decisions should be based on custody factors.

W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### APRIL 2005 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### APRIL 16, 2005

Inmate Clifford Brodsky is a 61-year-old (date of birth: 08/13/43), first term, Caucasian male who is serving his thirteenth year of a 15-year-to-life sentence for conspiracy to commit second degree murder. He pled guilty on 07/10/91. The date of the offense was in July 1989. His MEPD is 08/05/01.

This evaluation is based upon two interviews, plus review of the central file and medical file.

The previous psychosocial assessment by Dr. Terrini is still current and valid. Therefore, the psychosocial information will not be repeated at this time.

The only significant change is that inmate Brodsky's parents are both deceased.

## CLINICAL ASSESSMENT

### CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Brodsky related in a serious, business-like, calm manner. His hygiene and grooming were appropriate. His thinking was logical, coherent, and goal-oriented. His speech was soft and calm. His affect was appropriate. There was no evidence of anxiety or depression. There was no indication of antisocial thinking or values. Intellectually, he is functioning in the high average range. There is no evidence of psychopathology in this case. His judgment is intact. His self-awareness and insight into the commitment offense is good.

Inmate Brodsky has participated extensively in numerous self-help projects. He participates at least annually in anger management classes. Although he has never had a drug use or alcohol abuse problem, he has also attended Alcoholics Anonymous. He has attended rational thinking groups, ethics groups, and lifer groups.

Inmate Brodsky has remained entirely disciplinary-free. This is a significant achievement.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

| | |
|---|---|
| *AXIS I:* | No contributory clinical disorder. |
| *AXIS II:* | No contributory personality disorder. |

*BRODSKY*        *H-07665*        *CTF-CENTRAL*        *04/16/05*        *gmj*

*BRODSKY, CLIFFORD*
*CDC NUMBER: H-07665*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE TWO*

| | |
|---|---|
| *AXIS III:* | No contributory physical disorder. |
| *AXIS IV:* | Life-term incarceration. |
| *AXIS V:* | Current GAF = 90. |

The prognosis of being able to maintain current excellent adjustment and self-control if released to the community is good.

## XIII. *REVIEW OF LIFE CRIME:*

Inmate Brodsky was the CEO of a corporation that agreed to sell a subsidiary of the business to an associate if they would repay the 1.1 million dollars used to set up that company. A dispute arose, and the buyer refused to make payments. Inmate Brodsky stated that his feelings at the time were anger, despair, and fear of looking incompetent if this deal failed. He felt his status as a CEO was threatened. At that point in his life, this assault to his ego and pride caused him to react in an irrational, irresponsible manner. He admitted to attempting to recover the loan by having the victim murdered so that they could have the proceeds of a key-man life insurance policy securing that debt. This was discovered before anything happened. Inmate Brodsky stated that at that time he was irrational and was using extremely poor judgment. His actions were completely out of character. Basically, he was functioning beyond his capacities and out of his experience zone. He never denied responsibility for his wrongdoing. He accepted the district attorney's offer to plead guilty to conspiracy to commit second degree murder. He was then released on a post-conviction and post-sentencing bail without restrictions on the condition that he surrender himself to the Department of Corrections at the Chino Reception Center. This unusual action was done because the judge did not see him as a threat.

Inmate Brodsky has grown, aged, and matured over the 13 years of incarceration. His earlier feelings of ego and importance as a CEO have disappeared. He no longer holds any feelings of anger or resentment.

Inmate Brodsky has participated extensively in anger management classes. He stated that while in prison, he has learned to resolve conflicts, confrontations, and threats to himself in a rational manner. This is quite evident in that he has remained entirely disciplinary-free, something that is a significant achievement when living in a population with numbers of angry, hostile, confrontational inmates.

Inmate Brodsky repeated several times that he is totally responsible for his actions and behavior. He deeply regrets engaging in this offense and the subsequent trauma he has caused the victim and his family. He repeated several times that he is just very thankful that no one was actually hurt in a physical way. His feelings of remorse appear to be quite sincere and genuine.

*BRODSKY, CLIFFORD*
*CDC NUMBER: H-07665*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE THREE*

## XIV.  *ASSESSMENT OF DANGEROUSNESS:*

*A.*   In considering the potential for dangerous behavior within the institution, inmate Brodsky has remained disciplinary-free. He has no history of violent behavior in the community. He has matured considerably since the time of the commitment offense. It is evident that his potential for dangerousness or irresponsibility within the institutional environment is below average compared to this inmate population.

*B.*   If released to the community, his potential for violent behavior is also estimated to be no more than the average citizen in the community. Inmate Brodsky is by nature a very passive, rational, considerate individual. There is no evidence of any antisocial thinking in his behavior or values. He has maintained his marriage even while he is in prison. He has strong family support. He has received laudatory chronos for his work as a teaching assistant in education, as well as his program clerk assignment now. He has a strong work ethic, as evidenced by his strong employment history prior to the commitment offense, as well as his performance in the institutional environment. All of these factors indicate a positive adjustment on parole.

*C.*   In considering significant risk factors in this case, there are no risk factors at this time. He does not have a drug or alcohol use problem.

## XV.  *CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:*

There are no psychological factors evident in this case that would interfere with routine parole planning. Being a college graduate, he has no academic deficits. He has participated extensively in self-help groups, including anger management and rational thinking. He does have strong family support in the community. He does not have any lofty goals, ambitions, or desires to make money at this point in his life that could cloud his judgment. His understanding of the dynamics associated with his actions in the commitment offense appear to be sound. No further psychological evaluations are necessary in this case. No further therapy or self-help participation is seen as necessary.

*Melvin Macomber, Ph.D.*
*Licensed Psychologist*
*Correctional Training Facility, Soledad*

*BRODSKY*      *H-07665*      *CTF-CENTRAL*      *04/16/05*      *gmj*

*BRODSKY, CLIFFORD*
*CDC NUMBER: H-07665*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FOUR*

*B. Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*MM/gmj*

*D: 04/16/05*
*T: 04/18/05*

*D:\Word Files\BPT - 2005\BRODSKY, C.  H-07665   04-05   MACOMBER.doc*

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
DECEMBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 14, 2002

Inmate Clifford Brodsky, CDC# H-07665, was seen for a
psychological evaluation for the Board of Prison Terms by
Steven J. Terrini, Ph.D., Staff Psychologist at the
Correctional Training Facility (CTF), on 05/20/00 for the
July 2000 Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

*[signature]*

**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:  06/14/02
T:  06/14/02

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 20, 2000

This is a psychological evaluation for the Board of Prison
Terms on inmate Brodsky, CDC# H-07665. This report is the
product of a personal interview, conducted on 04/20/00, as
well as a review of his Central file and unit health record.
This interview was a single contact with this individual for
the sole purpose of preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Brodsky is a 56-year-old, married, Caucasian
      male. His date of birth is 08/13/43. He stated his
      religion is Jewish. There were no unusual physical
      characteristics noted and he denied any history of
      nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      He denied any history of birth defects or abnormalities
      of developmental milestones, a history of cruelty to
      animals, a history of arson, or a childhood history of
      physical or sexual abuse as either a perpetrator or a
      victim. He had a hernia operation during his
      childhood.

III.  EDUCATIONAL HISTORY:

      Inmate Brodsky has a BS degree in educational history.
      He also has a master's degree in administration.
      Vocationally, during his incarceration period, he has
      participated in textiles. He has worked as a teacher's
      aid and is about to complete mechanical drafting.

IV.   FAMILY HISTORY:

      Both of his parents are still alive at approximately
      age 80. He has weekly contact with them through the
      telephone and letters. He has one sister whom he has
      minimal contact with. He stated that he has had good

BRODSKY, C.
CDC NUMBER:   H-07665
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

relationships with all of his family members.   He
denied that any of his family members have ever had any
significant criminal or substance abuse problem.   In
the past, both of his parents have had problems with
depression.

## V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Brodsky stated that he is a heterosexual male.
He denied any history of sexual aggression.

## VI.   MARITAL HISTORY:

Inmate Brodsky is currently legally married and this is
his second marriage.   He has a daughter from his first
marriage, as well as a son and a stepchild from his
current marriage.   He maintains contact with his
children and has some contact with his wife.

## VII.  MILITARY HISTORY:

Inmate Brodsky was in the navy for approximately four
years.   He did two terms in Vietnam and was involved in
search and rescue.   He received an honorable discharge.

## VIII. EMPLOYMENT AND INCOME HISTORY:

Inmate Brodsky was the executive officer for a company
that made ladies' undergarments and apparel.   Prior to
that, he had worked in the information systems field.
When he paroles, he hopes to again find employment in
the retail business with family members who own retail
outlets.

## IX.   SUBSTANCE ABUSE HISTORY:

Inmate Brodsky denied that he ever used illegal drugs.
He acknowledged drinking wine and beer, but stated that
he never had a significant alcohol problem.   He
attended Alcoholics Anonymous briefly, and has also
attended Millati Islami, which is the Muslim substance
abuse program.   In the past, while at other
institutions, he also attended Addiction Recovery class
and a class on Codependency and Addiction.

BRODSKY, C.
CDC NUMBER:   H-07665
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Brodsky's most significant medical problem has
been removal of a cyst on his leg and a history of
colitis.  He currently does not have any significant
medical problems and does not take any current
medication.  He denies a history of serious accidents
or head injuries, a history of suicidal behavior, or a
history of seizures or other neurological conditions.

XI.   PLANS IF GRANTED RELEASE:

When he paroles, he plans to live with his daughter.
Given the information he provided to me (especially his
significant work history and good family support), his
prognosis for community living is very positive.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Brodsky appeared his stated age.  He was
appropriately dressed and groomed.  He was coherent,
cooperative, calm and alert.  His speech, flow of
thought and affect were all within the normal range.
His intellectual functioning was estimated to be above
normal.  He showed no evidence of a mood or thought
disorder.  His judgment appeared to be sound.  He
showed very good insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    Adult Antisocial Behavior.
AXIS II:   No Contributory Personality Disorder.
AXIS V:    GAF = 90.

His prognosis is extremely positive for being able to
maintain his current mental state in the community upon
parole.

XIII. REVIEW OF LIFE CRIME:

Inmate Brodsky essentially agreed with the account of
his crime found in his Central file.  He stated that he
takes responsibility for his involvement in this crime,
stating, "I blame myself.  I should have walked away

BRODSKY, C.
CDC NUMBER:  H-07665
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

from this, but I didn't.  I am responsible.  I believed
I should be punished for this."  He acknowledges the
harm that he has caused the victim's family, as well as
his own family, due to his actions.  He displayed
appropriate and genuine remorse for this crime.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  In consideration of several factors, including his
    lack of any criminal history (either as a juvenile
    or as an adult), his lack of any violent criminal
    history, his lack of any CDC-115 violations or
    CDC-128 violations, and his lack of any violent
    CDC-115 violations, his violence potential within a
    controlled setting is estimated to be very
    significantly below average relative to this Level
    II inmate population.

B.  If released to the community, his violence
    potential is estimated to be no more than the
    average citizen in the community.

C.  There are no significant risk factors which would
    be considered precursors to violence for this
    inmate.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his
    behavior.  He has the capacity to abide by
    institutional standards and has done so during his
    incarceration period.

B.  This inmate does not have a mental health disorder
    which would necessitate treatment either during
    his incarceration period or following parole.

C.  It does not appear this man ever had a significant
    drug or alcohol problem, so there are no
    recommendations in this area.

D.  This man should be commended for remaining
    violation-free during his entire incarceration
    period.

BRODSKY, C.
CDC NUMBER:   H-07665
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

      E.   I believe this man is an excellent candidate for
          parole consideration.

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SJT/gmj

d:   04/20/00
t:   04/21/00

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
DOCUMENTATION HEARING/SEPTEMBER 1994

### IDENTIFICATION:

Mr. Brodsky is a 51-year-old, first-term Inmate, who is serving 15 years to life for conspiracy to commit murder. This is his first documentation hearing before the Board of Prison Terms. A clinical interview of 45 minutes duration and review of the central and medical files provided the basis for this report. The total time to prepare and complete this report was three hours.

### PROGRESS TO DATE:

Mr. Brodsky's classification score is 28. It is expected to be lower this term. Mr. Brodsky's description of his cellies has been that he has been fortunate to have cellies close to his own age. At present, his cellie has been physically sick though it is not contageous. The Inmate has earned a Master of Arts degree outside the prison system. Therefore, it has not been necessary for him to engage in additional educational pursuits. Mr. Brodsky has been a Laubach tutor and an instructor for life skills while at another CDC institution. He would like to continue to improve himself. Mr. Brodsky has worked as a clerk; other duties have been on the yard crew. Overwhelmingly, he has received above average and exceptional work chronos. Mr. Brodsky has not participated in AA or NA as he is close custody and has other activities during the evenings. Alcohol or substances have not been deemed to be factors related to the instant offense or to pose problems in his interpersonal functioning. He makes and receives telephone calls from his family and therefore, they don't write to each other. Generally he has visits from family members. It is difficult to accommodate them with scheduling so that it has been five to six months since the last visit.

Mr. Brodsky has not had any individual psychotherapy experiences while incarcerated. However, he has engaged in an ethics workshop, receiving excellent participation (2/13/93). Additionally, he had volunteered in the College for Convicts program (2/16/93). Other workshops that Mr. Brodsky has completed are Addiction Recovery workshop (4/7/93); Anger Control workshop which included coping strategies (6/29/93); and a Codependency and Addictions workshop (9/13/92).

### INMATE'S VERSION OF INSTANT OFFENSE:

Mr. Brodsky admits to the instant offense. He states that it was like playing a ball game in that he wanted to win. He attributes that he lost sight of what was reality and that he was too wrapped up in the game. Winning was more important. Thus, he was unaware that he had a considerable amount to lose. Mr. Brodsky reflects that he had nothing as a kid and he had grown up poor. He described this as a simple life. But today a simple life looks very attractive to him. Mr. Brodsky believes he should have stopped and made a self-assessment earlier in life. He and his wife consulted about the businesses; both agreed they were living well enough to stop growing. Mr. Brodsky attributes that he has always been competitive and would compete for advantage, yet recognizes that you don't destroy in the process.

According to the inmate, the instant offense began as Black Humor. Mr. Brodsky deliberately contacted two previous employees, both of whom had had a criminal history. He then admits that he lost the nerve to back out because money had been paid to others to complete this crime.   Mr. Brodsky in turn, was threatened by these crime partners and he feared for his life and his family's life.   Mr. Brodsky regrets that he did not go to the police at the time.   His values include a drive to succeed.   He admits that he does become annoyed by people who fail.   This is perhaps one of the pieces which explain his psychological functioning throughout life and prior to the instant offense.   Mr. Brodsky turns this value on himself also where there is a continued drive for success and might be annoyed with himself for   failure.   There is considerable remorsefulness in that Mr. Brodsky is pained by the effect that this has had on his wife and children.

## PAST PSYCHIATRIC HISTORY:

Mr. Brodsky denies any drug history but admits to occasional alcohol usage. Reflecting today, he recognizes that his father was perhaps in a state of depression later in his life (during the mid 1980's).   During the 1960's his mother had made past attempts to commit suicide.

Historically, Mr. Brodsky has displayed rigid thinking.   According to a psychological report (8/9/91) Mr. Brodsky was also depicted with rigid thinking.   Often his themes were of success and failure, loyalty and betrayal.   Mr. Brodsky is still relatively fixed on a success and failure theme.   He claims to be self-critical, analytical and extreme in his expectations.   Though the psychological report (8/9/91) carried a diagnosis of Post Traumatic Stress Disorder-delayed.   It is not believed that Mr. Brodsky is experiencing current symptoms of P.T.S.D.   However, given the intensity of his emotional expression related to the war and the instant offense, it is believed that Mr. Brodsky still has some psychological processing to complete.   Those being rigidity in thinking and little if any, integration of emotional experience.   Mr. Brodsky repeats themes of success and failure, loyalty and betrayal.   Mr. Brodsky would benefit by understanding how and why he maintains those themes so fixedly.

Today his family relationships with mother and father are estranged. Though his parents continue to correspond and communicate with his daughter, there has been no communication with them.

## PRESENT MENTAL STATUS EXAMINATION:

Mr. Brodsky was dressed casual with attention to grooming and hygiene.   He articulated himself well.   There was no evidence of thought disorder nor major mood disturbance.   Mr. Brodsky showed little range of emotion with blunted affect.   He does admit to mild feelings of depression which don't last too long.   He is able to problem solve on a daily basis.   He reports that he can sleep anytime, anywhere; and that he has a good appetite.   His short-term and long-term memory were good.   His intellect range is above average.   Insight is considered to be good and judgment, at present, is also good.

His goals are to do his time and to go back into society.   While here, he would "try to contribute what I can with these guys that leave."   Mr. Brodsky would like to continue to study the Hebrew language and Jewish faith, as well as to read and keep in shape.

BRODSKY, CLIFFORD H-07665   3B 01 140L BOARD OF PRISON TERMS CSP-CORCORAN

- 3 -

DSM IV IMPRESSION:

| | | | |
|---|---|---|---|
| AXIS | I | V71.01 | Adult antisocial behavior. |
| AXIS | II | V71.09 | None. |
| AXIS | V | | GAF; 80 (If symptoms present they are transient and expected reactions to psychosocial stresses; no more than slight impairment in social, occupational or school functioning). |

CONCLUSIONS/RECOMMENDATIONS:

1. Mr. Brodsky is competent and responsible for his behavior. He has the capacity to abide by institutional standards. He has remained incident free while incarcerated.

2. There is no evidence of major mental illness on AXIS I in that there is no major thought disorder nor mood disturbance. He has carried an AXIS I diagnosis of Post Traumatic Stress Disorder, by history. At present he exhibits no signs nor symptoms of this. It is believed that he could benefit from processing some of the psychological trauma that he has experienced. AXIS I diagnosis does carry adult anti-social behavior related to the instant offense. This would appear to be an isolated incident. There is no AXIS II personality disorder. Mr. Brodsky is believed to be functioning at a high level with minimum impairment or only expected reactions to stresses.

3. Violence potential is below average for this level of incarcerated inmate.

4. Mr. Brodsky seems to have explored the committed offense and has come to terms in part with its underlying causes. He would benefit by integrating his emotional experiences. It is recommended that he engage in any self-help reading related to this, and if possible engage in individual psychotherapy.

5. Mr. Brodsky has generally displayed good judgment, but again underlying personality traits have interfered with his continued success when his judgment became severely impaired related to the instant offense.

Elizabeth R. Gates, Ph.D.
Staff Psychologist

Reviewed by:

William O. Evans, Ph.D.
Senior Psychologist, Supervisor

ERG:ks

cc:  C-File
     Unit Health Record

Date Interviewed: 8/2/94

JEFFREY W. WHITING, PH.D.
CLINICAL PSYCHOLOGIST

2116 WILSHIRE BOULEVARD SUITE 208
SANTA MONICA CALIFORNIA 90403
TELEPHONE (213) 828-2550
FACSIMILE (213) 829-7932

PSYCHOLOGICAL ASSESSMENT

August 9, 1991

Identification    Name:             Clifford Brodsky
                           Address:         625 Esplanade #30
                                                  Redondo Beach, California 90277
                           Birthdate:      August 13, 1943
                           Age:              47
                           Education:       B.S. Education (Penn State)
                           Occupation:     Clothing Manufacturing, Owner
                           Marital Status:   Divorced for 8 Years after 14 Year
                                                  Marriage; Engaged
                           Children:        Stacy, 19; Nicholas, 2

#### Referral

Mr. Brodsky was referred for psychological evaluation by his attorney, Richard Chier. An elaboration of Mr. Brodsky's personality characteristics and a description of his current level of emotional functioning were requested. Mr. Brodsky is to be sentenced on August 15, 1991, for conspiracy to commit second degree murder.

#### Assessment Methods

Minnesota Multiphasic Personality Inventory - 2
Forer Structured Sentence Completion Test
Thematic Apperception Test
Clinical Interview

#### Observations

Mr. Brodsky appeared on time for all of his meetings with me. He cooperated fully with all procedures and there was evidence of above average effort devoted to the tasks that I asked him to complete. He was groomed and did not show any gross motor deficits. It was easy for him to establish eye contact and a working rapport rapidly developed. His mood was moderately anxious and his affect was sometimes blunted, although always appropriate to the content of the discussion. His memory was intact for immediate, recent and past events. There were no deficits noted in a screening of cognitive functioning. His judgment and insight were noted as being from average to above average depending on the subject. There were no symptoms of disorder in either thought content or thought processes.

#### Results

Mr. Brodsky was administered three personality tests. The first was a large

PSYCHOLOGICAL ASSESSMENT
Clifford Brodsky - Page 2
August 9, 1991

Results(Continued)

objective, criterion-validated instrument that is the most widely used
personality test in the world. Mr. Brodsky produced a valid profile in that
the markers for defensiveness or manipulation were not present in his
results. His clinical profile suggests a lifestyle of pressured
overactivity. He could be seen as euphoric, expansive, and optimistic when
things were going well in his life, but he would become intensely emotional
when under pressure. Some would describe him as being stubborn about "doing
things my way because it is the right way". His ego strength, however, is
above average, and this would predict effective functioning and practical
self-sufficiency in many areas. He could be seen by friends and associates
as being extremely competitive with himself and others. He would be an
extremely loyal cohort and a formidable foe. His emotional pattern would be
one of holding his feelings in until a threshold is surpassed and then
verbally expressing himself in an offensive manner. He does not possess a
pattern that would suggest that he would resort to physical violence. What
this means is that he would be prone to stew and brood and be quiet, and
then explode in a verbal tantrum. It is unlikely that he adequately
connects the fact that storing, instead of immediately expressing feelings
results in explosions. It is important to note that under peaceful
conditions, he would appear quite calm and controlled.

Mr. Brodsky was given two projective tests that allow the individual to
"project" their personality features onto ambiguous stimuli. This allows
not only for the revelation of information that could be directly expressed
by the testee, but also issues that might be normally denied or defended
against. On the more structured of the two instruments several themes
emerged. He has a good and straight-forward problem solving approach that
probably has assisted him in becoming successful. He reveals a very strong
drive for success and overcoming obstacles. His greatest fear is to become
a failure. He evidences grave concerns about being involved with people who
may betray him. On the other hand he feels great affinity toward people who
"play on his team". It was striking how most of his issues seemed to be
tied to success and failure, loyalty and betrayal. Most other people would
have an array of feeling states suggested on this test, but Mr. Brodsky
stays within a narrow range of experience. It is as if he would be
overwhelmed with feelings if he were to venture beyond this restrictive
calibration of his affective states. Trauma victims frequently have
fashioned this adaptive pattern to life stressors. Every response to stress
is processed in a rigid, unchangeable manner in the hope that feelings that
are analogous to the ones he felt about the trauma are never directly
experienced for fear of being overwhelmed.

On the second projective instrument Mr. Brodsky once again revealed this
narrow range of processing emotional material. Many themes tended to be
around success and failure, i.e., "if you try you will succeed, if you
don't, you will fail". Emotional upsets are to be fixed; there are

PSYCHOLOGICAL ASSESSMENT
Clifford Brodsky - Page 3
August 9, 1991

### Results (Continued)

rational solutions to all problems. He was able to assign feelings to
subjects in his stories that he told. What was remarkable was that there
were no interpersonal results or solutions. Someone was hurt, they might
tell someone else, then they would go away and the other person cries.
There were no stories about one person actively comforting or consoling
another. It appears that Mr. Brodsky does not expect that others will be
able to understand his emotional pain and so he either does not express it
or he denies that he is in distress. There was one point during this test
when I saw Mr. Brodsky directly express a feeling. He was presented a blank
card and asked to compose a story. His creation described his fiancee and
his children being happy with each other and enjoying a pleasant place.
When he was asked about the future of this story, he teared up and said
"they'll be a lot older when we are able to do it again".

During the Clinical Interview I learned about Mr. Brodsky's tough childhood
on the streets of South Philadelphia. His father was a career Navy man and
was only occasionally home. In his absence, Mr. Brodsky's mother "ruled
with a strap". He recounts that as a boy he learned to stay in his
neighborhood with his crowd of friends less he stray into another group's
territory and receive a severe beating. He recounted several times when he
was involved in such fights, sometimes as the victim, other times as one of
the victimizers. He reported that this was the "law of growing up in a bad
neighborhood". He does not believe that this background affected him during
adult life because "all of us in South Philly went through the same thing".
He reports that his father was stern, prone to temper outbursts, and was
physically intimidating. Evidently Mr. Brodsky's father was a boxer while
in the Navy and on a couple of occasions took a swing at his adolescent son
in order to emphasize a point. Mr. Brodsky's mother was described as being
capable and successful in setting limits with Mr. Brodsky and his sister.
However, she remained emotionally dependent on his father and was quite
upset most of the time because of his father's absence.

Mr. Brodsky successfully pursued his degree in education at Penn State. He
reports being relieved to leave the "mean streets" behind forever. While in
college he joined the Naval Reserves because he wanted to travel. When the
Vietnam War was in its early stages he completed Officer's Candidate School
and received his commission. He was greatly disappointed to learn that his
vision was to keep him out of Aviation School. He then got involved in a
conflict with the Navy because they had assured him of a place in air
intelligence and then did not send him for that training. He ended up
having to tell them that he would quit any other training they would send
him to, but then the War heated up and he was sent to the Fleet. He reports
that this struggle over his specialized training was aggravating but "then
events of the war solved all of this. There was no time for any more
training. I was needed."

PSYCHOLOGICAL ASSESSMENT
Clifford Brodsky - Page 4
August 9, 1991

Results(Continued)

There were two times in my interview when I saw a tremendous amount of
emotion registered in Mr. Brodsky. The first was when he described his war
experiences. He became rageful in his mannerisms and his language. This
display was not inconsistent with the events that he was describing. What
was surprising was how powerful the response has remained to events of 23 to
25 years ago. It was as if he was responding to something that was
currently happening. He described the horror of listening on the radio to
men being killed and not rescued because of red tape and political
harnessing of the military action. He felt responsible for participating in
the saving of men and instead he was forced to sit idly by and listen to
their screams of anguish. Sometimes he would listen helplessly when a
rescue operation was failing and the rescuers would be killed. He blamed
the deaths of his fellow soldiers on the corrupt bargain that the
politicians had made with the fighting men and women. He had joined the
service in order to serve his country and he thought that his country would
then not prohibit him from doing his job. He was mortified to experience
his country betraying him and his fellow soldiers, many who he heard die
because of this betrayal.

The other time I saw him express strong emotion in our meetings was when he
discussed the partner who betrayed him and ignored a commitment that he had
made to Mr. Brodsky. He described how important it was in business to
follow through with plans that were contractually agreed to and how
financial success would never be attained if partners did not remain loyal
to each other. He was visibly angry while he told me the story of how this
man blatantly rejected Mr. Brodsky's good faith efforts and openly flaunted
his contempt for the agreement with Mr. Brodsky that he was ignoring. Of
all the subjects we covered in a lengthy interview, the war and this
dishonest business partner were the only subjects that elicited a strong
show of emotion. The displays of pronounced emotion were striking in their
similarity.

Summary

Mr. Brodsky is a 47 year old clothing manufacturer who is currently
experiencing acute symptoms of anxiety and anticipatory loss. The results
of his personality evaluation reveal a man who does not express his
emotional distress in a manner that is adaptive but rather in one that
insures that he will have temper outbursts that will intimidate others.
This style guarantees that emotional material is never adequately addressed
and he rarely feels understood. His developmental history suggests that he
did not grow up in a home where talking about one's feelings was the thing
to do. On the streets he learned that one just accepts that certain
threats, pains and injuries come with the territory and one absolutely did
not complain about anything. Everyone was in the same boat; anyone who
resorted to telling an adult so the fighting would stop was summarily

PSYCHOLOGICAL ASSESSMENT
Clifford Brodsky - Page 5
August 9, 1991

### Summary (Continued)

beaten. Mr. Brodsky brought his coping strategies with him when he went to
Vietnam and there he experienced horrors that he had no means to cope with.
He felt horribly betrayed and there was no adequate means to express the
huge reservoir of feeling that filled to its brink as he suffered through
his war nightmare. He felt contempt toward the "politicians who had allowed
so many good trustworthy, committed soldiers die for no good reason". Mr.
Brodsky had listened to them die and he has not been able to remove their
screams for help from his mind.

My view is that since 1968 Mr. Brodsky has been a timebomb waiting to go
off. All that was necessary for him to reexperience some of those rageful
feelings that he had buried in the late 1960's was an analogous experience.
This is indeed what happened. Mr. Brodsky and a partner had made
commitments to each other. Mr. Brodsky believed that he had been faithful
but that this man had not only betrayed Mr. Brodsky's trust but that he also
had "rubbed my face in it". The anger that had been buried for 20 years
came to be focused on this traitorous partner. Not unlike the feelings he
had directed toward LBJ, Mr. Brodsky felt that this partner had taken his
good intention, trust and faith, that Mr. Brodsky had been willing to risk,
and had abandoned him.

### Diagnosis

DSM III  Axis 1    309.81    Post-traumatic Stress Disorder(PTSD), Delayed

### Recommendation

Like so many other Vietnam Veterans, Mr. Brodsky is a man who we did not
know was in terrible need of psychiatric intervention until he comes to our
attention in an unfortunate manner. That is, after his internalization of
his suffering and his adaptive style for his war experiences are blatantly
shown to be maladaptive, then we make the diagnosis that he needs help.  I
recommend that he receive psychotherapy for this stress disorder.  I believe
that Mr. Brodsky's experience of trauma, his inability to work through his
reaction to that trauma, and our society's delayed appreciation for and
awareness of the nature of that trauma, have resulted in his behavior for
which he is going to be punished.  Full recovery from PTSD is possible but
only when the patient receives intensive treatment.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Jeffrey W. Whiting, Ph.D.

Exhibit "F"

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | SEPTEMBER 13, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004628

In re,
CLIFFORD BRODSKY,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered the Petition for Writ of Habeas Corpus filed by Petitioner on April 25, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. See Cal. Code Regs., tit. 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

    Petitioner was received in the Department of Corrections on August 30, 1991 after a conviction for conspiracy to commit murder in the second degree. He was sentenced to a prison term of fifteen years to life. His minimum parole eligibility date is August 15, 2001.

    The record reflects that in March of 1989, Petitioner hired two men to kill his business associate, Robert Krugman. At the time, Petitioner was the chief executive of a clothing manufacturer, the Mary Jane Company. A business dispute arose between Petitioner and Krugman, the head of a women's sportswear company in which Mary Jane had invested, and Krugman stopped making payments on the $1.1 million his company owed to Petitioner's firm. Petitioner hired two men to kill Krugman so that Mary Jane could collect on the proceeds of a $1.25 million "key man" life insurance policy on Krugman. In furtherance of the conspiracy, Petitioner assisted in obtaining a car for the use of the prospective killers, provided Krugman's location to the prospective killers, and asked the prospective killers if the payment arrangements were satisfactory. The plot was reported to the police before it could be carried out.

    The Board found Petitioner unsuitable for parole after a subsequent parole consideration hearing held on November 6, 2006. Petitioner was denied parole for one year. The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The Board based its decision primarily on Petitioner's commitment offense.

    The Court finds that the record shows "some evidence," based upon the circumstances of the commitment offense, to support the determination that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole. The offense was carried out in a manner that shows an exceptionally callous disregard for human suffering. Petitioner hired two men to kill a business associate over a financial dispute. The murder was averted only because the plot was reported to the police before it could be carried out. Petitioner participated in the planning of the crime over a period of months. Although he

1

Minutes Entered
09-13-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | SEPTEMBER 13, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004628

In re,
CLIFFORD BRODSKY,
     Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

had ample time and opportunity to try to stop the murder-for-hire plot, he did not do so. He continued with his plans to have Robert Krugman murdered without consideration of the impact or consequences to Krugman's wife and children. The Court therefore finds there is some evidence that supports the determination that the commitment offense showed an exceptionally callous disregard for human suffering, a ground for finding petitioner unsuitable for parole under Cal. Code Regs., tit. 15, § 2402(c)(1)(D).

In supporting its finding of unsuitability, the Board also stated that the motive for the crime was "inexplicable and very trivial in relation to the offense." The motive cannot be both inexplicable and very trivial. However, based on its review of the record, the Court finds that the motive for the crime was very trivial in relation to the offense. Petitioner set into motion a scheme to kill a business associate so his company could collect on the $1.25 million life insurance policy on the victim. Greed or financial gain is a very trivial motive for deciding to take a human life. It is not reasonable to conclude that assassinating someone is the only way of resolving a business dispute. The record also indicates that Petitioner may have been motivated by a fear of failure or looking incompetent, again a very trivial reason for planning to take someone's life. The very trivial motive is a ground for finding that the offense was especially heinous, atrocious, or cruel, and supports the Board's determination that Petitioner is unsuitable for parole based on the circumstances of the commitment offense. Cal. Code Regs., tit. 15, § 2402(c)(1)(E).

The Court commends Petitioner's participation in vocational and self-help programming in prison. The fact that he has not incurred any disciplinary violations or warnings during the entire period of his incarceration is particularly noteworthy. The Board likewise credited his positive behavior and programming in prison. However, it found that Petitioner would benefit from additional self-help programming, particularly self-study and the preparation of book reports, and also needed to earn more laudatory chronos. The Board's decision is entitled to great deference. Accordingly, there is some evidence to support the Board's finding that Petitioner would benefit from additional self-help programming and further efforts to enhance his suitability for release on parole.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

2

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | SEPTEMBER 13, 2007 | | | |
|-------|--------------------|--|--|--|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004628

In re,
CLIFFORD BRODSKY,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Clifford Brodsky
H-07665
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

State of California- Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, California 92186-5266
Attn: Ms. Cynthia Lumely

3

Minutes Entered
09-13-07
County Clerk

Exhibit "G"

1           **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3      **DEPUTY COMMISSIONER YACONO:** We're back on, Sir.

4      **PRESIDING COMMISSIONER GARNER:** Okay, very good.

5 Thank you. All Parties previously in the room have

6 returned in the matter of Clifford Brodsky, CDC H,

7 Henry, 07665.

8      Mr. Brodsky, the Panel has reviewed all the

9 information received from the public and relied on the

10 following circumstances in concluding that you're not

11 yet suitable for parole, and would pose an unreasonable

12 risk of danger to society or a threat to public safety

13 if released from prison.

14      It's going to be a one-year denial. Certainly,

15 the denial is based on the commitment offense, but the

16 Panel also is not comfortable with the psychological

17 exams, and we'll get into that a little further when we

18 get to that section.

19      With respect to the commitment offense, the Panel

20 noted that it was carried out in an especially cruel and

21 callous manner in that between the period of March 1st,

22 1989 and July 11, 1989, you conspired to kill a

23 Mr. Robert Krugman.

24      The Panel noted that the offense was carried out

25 **CLIFFORD BRODSKY    H-07665    DECISION PAGE 1    11/5/07**

1    in a very dispassionate and calculated manner in that

2    this was planned, to the extent that you sought out an

3    individual that had the character that would allow him

4    to know and find an individual that would carry out this

5    dastardly deed.

6         Also noted that at the time of this offense,

7    oftentimes we're told, and I did it because I was young

8    and stupid, and this certainly isn't a category in

9    either place that you would fall into.  We took into

10   consideration your age, your prior military service, the

11   background and training you received while in the

12   military, your academic background, and the position of

13   trust that you entertained with Mr. Krugman.  And

14   essentially, the age and wisdom that you had certainly

15   would have afforded you the opportunity to seek a less

16   violent outcome.

17        The Panel noted that the motive for this crime,

18   it certainly involved anger, and this was anger over a

19   business dispute.  The conclusions were drawn from the

20   Statement of Facts that were contained in the probation

21   officer's report, which was completed on August of 1991.

22   It's been previously read into the record in detail and

23   at this point, will be adopted by reference.

24        The Panel did note and consider that you had no

25   **CLIFFORD BRODSKY      H-07665      DECISION PAGE 2    11/5/07**

1   record as a juvenile or as an adult up to the commitment

2   offense.  And so far as your institutional behavior, the

3   Panel noted the complete lack of any discipline reports,

4   and that your programming has been exemplary.

5        The psychological report, the one that we focused

6   on, was by Dr. Marek from August of 2006.  And the Panel

7   wasn't satisfied completely with the doctor's responses

8   to the specific information requested.

9        The Panel is also concerned that it didn't

10  utilize the current documents that are being used by the

11  Board now, that we're doing our own psychs.  And it's

12  this opinion, this Panel's opinion that we need to have

13  resolution on that issue.  That being said, we've asked

14  that a complete new exam be completed utilizing the new

15  format before your next hearing.

16        Parole plans, your parole plans are fine.  It's

17  obvious that you've got a very good support system

18  waiting for you on the outside.

19        So far as the 3042 notices, we noted the position

20  of the District Attorney's Office and we also did review

21  the Court sentencing proceedings.  We also took into

22  consideration a comment from the victim in this case.

23  And we also reviewed the transcripts from previous

24  hearings, particularly the last hearing, and noted and

25  CLIFFORD BRODSKY      H-07665      DECISION PAGE 3      11/5/07

1   considered the comments that were included in that

2   particular transcript.

3       Certainly, I want to commend you for not having

4   any disciplines.  That is something, as Ms. Hurst

5   indicates, that we find that it's a rarity, and that's

6   to your credit.

7       As indicated, we're going to deny you for the

8   year, and the request that we will make of you, and

9   recommendation, I should say, is that certainly that you

10  continue to remain disciplinary-free.  To the extent the

11  programs are available, that you continue to participate

12  in your self-help, in any means by which you can achieve

13  more chronos, it certainly would be helpful.  And of

14  importance, certainly get your letters updated from the

15  people.

16      I also did note and considered the document

17  Ms. Hurst provided to me, that upon the age of 62 and

18  also at the age of 65, the supplemental income that you

19  will have from the Social Security Administration.

20  Commissioner, any additional comments?

21      **DEPUTY COMMISSIONER YACONO:**  No, I don't think

22  so, Sir.  Thank you.

23      **PRESIDING COMMISSIONER GARNER:**  All right.  It is

24  now approximately 5:08 p.m., and that will conclude this

25  **CLIFFORD BRODSKY     H-07665     DECISION PAGE 4     11/5/07**

54

1   hearing.   Thank you, sir.   We'll see you next time.

2                              --oOo--

21  PAROLE DENIED ONE YEAR

22  THIS DECISION WILL BE FINAL ON: ___MAR 04 2008___

23  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED.

25  CLIFFORD BRODSKY    H-07665    DECISION PAGE 5    11/5/07

Exhibit "H"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

**COURT OF APPEAL - SECOND DIST.**

𝔽 𝕀 𝕃 𝔼 𝔻

DIVISION FOUR

DEC   7 2007

JOSEPH A. LANE          Clerk

Deputy Clerk

In re

CLIFFORD BRODSKY,

on Habeas Corpus.

) B 202907
)
) (Sup. Ct. No. BA000576, BH004628)
) (Peter Espinoza, Judge)
)
)      ORDER
)
)

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied for failure to state sufficient facts or to provide an adequate record or legal authority demonstrating entitlement to the relief requested. There is "some evidence" to support the findings of the Board of Parole Hearings. (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.) In addition, Petitioner raises arguments that have been rejected in a previous petition for writ of habeas corpus (B193409). (See *In re Clark* (1993) 5 Cal.4th 750, 769 [court will deny an application for habeas corpus which is based upon ground urged in a prior petition which has been denied, where petitioner has shown no change in the facts or the law substantially affecting his rights.].)

* WILLHITE, Acting P.J.,          MANELLA, J.,          SUZUKAWA, J.

Exhibit "I"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

COURT OF APPEAL - SECOND DIST.
𝔽 𝕀 𝕃 𝔼 𝔻

JUL 2 8 2005

JOSEPH A. LANE                Clerk

S. VEVERKA
                        Deputy Clerk

| | | |
|---|---|---|
| In re | ) | B183409 |
| | ) | |
| CLIFFORD BRODSKY, | ) | (Super.Ct.No. BA000576; |
| | ) | BH 002691) |
| on Habeas Corpus. | ) | (David S. Wesley, Judge) |
| | ) | |
| | ) | ORDER |
| | ) | |

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied.

Petitioner's allegation that his plea agreement contemplated he would be paroled at the expiration of the minimum term (10 years) is contrary to the record of the trial court proceedings. (Exh. "F, pp. 94-95; Exh. "G," pp. 119-120.) His allegation that the People breached the plea agreement by implicitly objecting to parole at the parole hearing of November 19, 2003, is contrary to the record of the parole hearing. (Exh. "G," pp. 76-77.) Further, under *In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071, 1077-1099, there is no merit to petitioner's contentions that the Board of Prison Terms' authority was constrained by the plea agreement, or that the Board abused its discretion in determining petitioner is unsuitable for parole.

* EPSTEIN, P.J.;      HASTINGS, J.,      WILLHITE, J.

Exhibit "J"

Court of Appeal, Second Appellate District, Div. 4 - No. B202907
**S159107**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CLIFFORD BRODSKY on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

FEB **2 0** 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

# CALIFORNIA APPELLATE COURTS



Case Information

| | |
|---|---|
| Supreme Court | **Supreme Court**                                                        Change court |
| Welcome | Court data last updated: 02/12/2008 09:53 AM |
| Search | **Case Summary   Docket   Briefs**<br>**Disposition   Parties and Attorneys   Lower Court** |
| E-mail | **Docket (Register of Actions)** |
| Calendar | |
| Help | **BRODSKY (CLIFFORD) ON H.C.**<br>**Case Number S159107** |

| Date | Description | Notes |
|---|---|---|
| 12/17/2007 | Petition for review filed | Clifford Brodsky, petitioner in pro per. |
| 12/17/2007 | Record requested | |
| 12/18/2007 | Received Court of Appeal record | |

**Click here to request automatic e-mail notifications about this case.**

© 2007 Judicial Council of California

Exhibit "K"

*Inmate Copy*

**LIFE PRISONER EVALUATION REPORT**
**PAROLE CONSIDERATION HEARING**
**AUGUST, 2006 CALENDAR**

**BRODSKY, CLIFFORD**                                             **#-H-07665**

## I. COMMITMENT FACTORS:

    **A.**    **Life Crime**:    PC187 (A) Conspiracy to Commit murder, Los Angeles County case #BA000576. Victim: Robert Krugman, age: unknown. Received by CDC on 8-30-91. Sentence: 15 years to Life. Life term started 8-30-91. MEPD: 8-5-01.

        **1.**    **Summary of Crime**:   All relevant documents from the previous hearing(s) have been considered, and that information appears valid. The writer has no further information to add.

        **2.**    **Prisoner's Version**: In an interview for this report, Inmate BRODSKY indicated that his version remains the same as stated in the previous hearing.

        **3.**    **Aggravating/Mitigating Circumstances**: Remain the same as stated in the previous hearing.

## II. PRECONVICTION FACTORS: Documents from the previous hearing have been considered, and that information appears valid. The writer has no further information to add.

## III. POSTCONVICTION FACTORS: Documents from the previous hearing have been considered, and the information remains valid. During the period of time since the last hearing, the prisoner's behavior has improved, in that he has obtained self help in the area of Anger management Courses and continued to remain disciplinary free. He attended a Subsequent #2 BPH hearing on 8-23-05, wherein the panel recommended that he Get self help, remain disciplinary free and earn positive chronos. He has complied with all recommendations. See Postconviction Progress Report for details.

## IV. FUTURE PLANS: Remain the same as indicated in the previous Board Report except that the address of his parole address has been changed. He will still parole to his daughter's residence and the address is 22703 Gaycrest Avenue, Torrance, CA. 90505, with telephone #(310) 540-2226. Updated letters will be sent.

    **A. Assessment:**  Brodsky continues to have solid residential and employment plans available. He has requested that two court documents be submitted with this report. They reflect that he had been released on bail after he was given his life sentence. Approximately two months later, BRODSKY reported for commitment as instructed. It is interesting to note that post sentence bail on a life term assessment is very unusual and would seem to lend itself towards his level of responsibility in this matter. With his

is interesting to note that post sentence bail on a life term assessment is very unusual and would seem to lend itself towards his level of responsibility in this matter. With his Parole plans, no prior criminal record and his accomplishments in education, military and business, it appears he would be able to succeed upon release to mainstream society. He has taken responsibility for his actions from the beginning.

## V.    **USINS Status:**  N/A

## VI.   **SUMMARY**:

**A.**    Prior to release, the prisoner could benefit from: Continuing to remain disciplinary free and attending self help groups.

**B.**    This report is based upon an interview with the prisoner on 6-12-06 and a Two hour review of the Central File

**C.**    BRODSKY was afforded an opportunity to review his Central File on 6-12-06, wherein he declined the review per CDC 128b dated 6-12-06.

**D.**    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS
STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING          **(Life term started 8-30-91)**

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-16-05 To 6-12-06 | | | **PLACEMENT**: Remained at CTF. <br> **CUSTODY**: MED A. <br> **VOCATION**: None this period. <br> **ACADEMIC**: None this period. <br> **WORK**: Assigned as a Unit Office clerk this period. <br> **GROUP ACTIVITIES**: Completed a 12 week Anger Management course per certificate and CDC 128b dated 11-19-95. Also completed a self help video series called "Healing for the Angry Heart" per laudatory chrono dated 2-23-06. He is currently attending a 16 week Cage Your rage course which just recently started at CTF. <br> **PSYCH TREATMENT**: None noted. <br> **PRISON BEHAVIOR**: BRODSKY has continued to remain on a positive path towards parole suitability in adhering to all institutiinal guidelines and departmental expectations. <br> **OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                DATE  6-12-06

| BRODSKY, C. | CDC# H-07665 | CTF-SOLEDAD | AUG/2006 |

BPT 1004 (REV 7/86)
Page _1_

LIFE PRISONER EVALUATIC... REPORT                                          3
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST, 2006 CALENDAR

_____  6·12·06

S. Martinez              Date
Correctional Counselor I


_____  6 -15-06

M. Arfa              Date
Correctional Counselor II


_____  6/21/06

E. A. Da Rosa         Date
Facility Captain (A)


_____  C&PR 6/26/06

D. S. Levorse         Date
Classification and Parole Representative

Exhibit "L"

July 1, 2006

Board of Prison Terms
Sacramento, CA 95814

Dear Board Member:

I am Anastasia D. Hasara, the 34 year old daughter of Clifford Brodsky (Inmate H07665). I have known and been extremely close to my Father all my life.

I want to take this opportunity to offer my Father any support that is required when he is released from prison. I am a stay-at-home Mother of a 2 year old , and I live in the Los Angeles area, we live in a two bedroom home. I want my Father to come live with me in the Torrance area after his release.

He will have a stable home to live in, and in the general Los Angeles area there are many members of his family and friends to assist in his acclimatizing himself back into society.

My Father and I have always had a close personal relationship and I know him very well. Over the past fifteen years he has reflected deeply and with remorse on his offense; having acknowledge his guilt and personal responsibility prior to his being incarcerated. He realizes the wrongs of his actions and I know it was temporary out of character for him resulting from unusual stress and cannot happen again.

Thank you for reading and considering this letter.

Respectfully,

*Anastasia Hasara*

Anastasia D. Hasara
22703 Gaycrest Ave.
Torrance, CA 90505

July 1, 2006

Board Of Prison Terms
Sacramento, CA 95814

Dear Board Members:

My name is Barbara Duffy. I am a Sister-in-Law of Clifford Brodsky (Inmate H07665) and have known him for over 30 years. I live in the Santa Monica area of Los Angeles County and am the owner of a retail apparel business.

Both myself and the rest of our family will provide Clifford with any necessary support to insure his smooth return and productive reentry into free society. I will provide him with employment helping to operate my retail business. One with which he is very familiar and that is in an industry that he has had considerable previous business experience. Clifford is very close to all members of his family and he has a warm relationship with all of our members. He has helped many of us in the past many times.

I know that Clifford committed an out of character offense, at an unusually and uniquely stressful time in his life. One that will not return again. He has repeatedly acknowledged and accepted his responsibility for his role mentioning it with great remorse and regret for the difficulties and pain that it has cause. I know that he will never repeat this or any other offense.

Sincerely,

Barbara Duffy
HOME:
1333 9th St.
Santa Monica, CA 90401
(310) 395-4238

BUSINESS:
Seahorse
801 Ocean Ave. # 13
Venice, CA 90401
(310) 392-6636

September 15, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

Dear Board Members:

I am the 17 year old son of Clifford Brodsky (Inmate H-07665), and a high school senior. I know that in 1989 my father committed an illegal act, and that when I was two years old he accepted responsibility for that act and pled guilty, and did so while he was at home, not in jail. My family (my mother, sister, and grandmother) explained to me what happened at that time and afterward. I know that my father regrets the mental suffering he has caused all concerned, and the suffering his absence has caused our family, including myself. Fortunately, no one was hurt during the commission of his offense. In recognition of that fact, my father's attitude toward accepting responsibility for what he did, and because of his background and family ties, the prosecutor and court allowed him to temporarily remain free after he was convicted and sentenced, and arranged for him to later surrender himself.

Nothing can change about what occurred years ago, except a person's attitude. My father has demonstrated his changed attitude, first by pleading guilty, and thereafter by what he has done while in prison. I know that given all these years, my father will never commit another crime. He has paid the required price in years for his crime and should be allowed to return home to his family.

Thank you for considering my letter.

Sincerely yours,

Nicholas A. Brodsky
28226 Bel Monte Court
Canyon Country, CA 91387

State of California                                           Department of Corrections

# Memorandum

Date    : May 21, 2005

To      : Parole Committee

Subject : C. Brodsky (H-07665)


Mr. Brodsky is one of those rare individuals in the correctional system who possesses genuine kindness, thoughtfulness, and personal growth, and I urge the Parole Board to discover these qualities in him for themselves. I have worked with thousands of inmates, but he is only one of two for whom I've felt compelled to write a recommendation for parole. Both in conversation and in action he demonstrates an unmistakably sincere sense of ethics and propriety that others look up to. As part of the correctional system, he is a model inmate with a perfect record who holds very responsible positions. Within the program I specifically coordinate, he has gone beyond the call of duty to help with challenging early-morning preparations for Chapel and Jewish events, and actively participates in the life of the congregation. Above all else, Mr. Brodsky has expressed great remorse for his past and has taken responsibility for his actions. There is little doubt that within the context of the CDCR, he is a model inmate who appears to be *de facto* rehabilitated, and who sustains an exemplary level of conduct. His parole, I believe, could demonstrate that our correctional and rehabilitative system is one of remarkable success and noteworthy justice.


Submitted by:


Rabbi Jon Sommer
Jewish Chaplain
Salinas Valley State Prison/Correctional Training Facility


cc:     Board Desk
        C&PR
        CC-1 Unit 2, S. Martinez
        Inmate

CDC 1617 (3/89)

September 15, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

To the Board Members:

My name is Andrew Hasara. I am married to Clifford Brodsky-s (Inmate H07665)
daughter Anastasia and we have a 2 year old daughter.  I have met Cliff and spoken
to him many times over the past 11 years. I am 35 years old, and have lived in the
Los Angeles area my entire life, and am employed as a Building Construction
Inspector.

Having met all members of Cliff-s immediate family living the Los Angeles area, I
know that he has a very close relationship with each of them. I know that he regrets
deeply the offense he committed and the problems he caused all the affected parties
and know that he will not repeat this or any other offense when he returns home.

Anastasia and I will actively assist his reintegration into free society by
providing him with a place to live after his release for as long as necessary.

Thank you,

Andrew Hasara

22703 Gaycrest Ave.
Torrance, CA 90505

September 20, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

Dear Board Member:

My name is Maureen McLaughlin and my relationship to Clifford Brodsky (Inmate H07665) is his former wife. Clifford and I were married for 12 years. I have known Clifford for 35 years. I currently reside in Torrance, CA, in the Los Angeles area. I am retired from Delta Air Lines after 18 years of service.

Clifford and I have been friends since 1968. He has been a wonderful father for our daughter Anastasia (age 34) giving her guidance and direction her entire life. He has been a good friend to me after our divorce assisting me with emotional and financial support.

Clifford has acknowledged and accepted his responsibility and guilt in this offense prior to going to prison. It occurred at a time of unusual stress in his life and was completely out of character for him, given the events and activities of his life prior to that time. He has continually reflected on its cause with deep remorse and I know that it will never occur again.

I and the rest of my family will provide him with any assistance and support necessary to insure his smooth return into society. He will live in an area wherein there are many members of his family and friends who can and will assist in his re-acclimatization.

Respectfully,

Maureen McLaughlin
22703 Gaycrest Ave.
Torrance, CA 90505
(310) 540-2226

25 August 2006

Board of Prison Terms
Sacramento, CA 95814

Board Members:

My name is Francis D. Duffy. I am the brother-in-law of Clifford Brodsky
(Inmate H07665) and have known him since June 1969, when I returned
from Vietnam. I live in Washington, DC, and am a writer/editor employed by
the U.S. Department of Defense.

I am a former marine (corporal; 1966-69, honorably discharged), and have
always respected that Cliff is a former Naval officer who served with
distinction during the Vietnam War. That and his years of college and
graduate school, in addition to his considerable business experience, impress
upon me the likelihood of his rapid integration into law-abiding society.

Cliff's behavior that lead to his conviction and incarceration seemed entirely
out of character, perhaps owing to the considerable stress he was under at
that time of his life. I gather from corresponding with Cliff that he has:

- accomplished significant rehabilitation;
- fully accepts the mistakes he made;
- has had sufficient years to reflect on his actions and their effects on
  others and society; and
- that he is rock-solid intent on becoming a law-abiding and productive
  member of society.

I stand ready to assist Clifford Brodsky in his positive goals.

Thank you for taking the time to read this testament.

Francis D. Duffy
11800 Old Georgetown Road
Windsor Villa #409
Bethesda, MD 20852

August 16, 2006

Board of Prison Terms
Sacramento, CA 95814

Board Members,

My name is Joan G. Roberts. I have known Clifford Brodsky (Inmate
H07665) for over 30 years and am a close personal friend of he and his
family. I currently live in the South Bay area of Los Angeles and have
worked for Trans World Airlines for the last 30 years.

My relationship with Cliff and his family is very close and goes back many
years. The offense that sent him to prison was completely out of character
for him and occurred during a period of significant stress in his life. He has
continually reflected remorsefully on it for many years, accepting
responsibility for his actions. I know it will never re-occur.

I will offer Cliff any support that is necessary to help him readjust and re-
acclimatize into society after his release from prison. I know with his
educational, professional, and business background and family and friends he
will be able to successfully return to society and be productive again.

Thank you for your time,

Joan G. Roberts
272 Via Linda Vista
Redondo Beach, CA 90277
(310) 373-1814

August 16, 2006

Board of Prison Terms
Sacramento, CA 95814

To whom it may concern:

My name is Richard Nutting. I have know Clifford Brodsky (Inmate H07665) for more than 30 years and am a close friend of his family. I live in Santa Monica, California and am presently retired from self-employment for many years in retail sales.

My relationship to Clifford and his family extends over a period of thirty years in which he always considered me a family member. I was shocked when I initially heard what he was involved in. Speaking with him in his years of confinement, I sense a feeling of regret and remorse on his part for the crime he committed. I feel that he would never go down that same path in the future.

I will support Clifford upon his release in any way that I can, knowing that he does have the capabilities of becoming a well-adjusted and successful person again.

With respect,

Richard A. Nutting
1333 9th St.
Santa Monica, CA 90401

(310) 434-9701

Board of Prisons                                17 August, 2006
Sacramento, CA 95814

Dear Board Members,

My name is Paul Grinkevich. I have known Clifford Brodsky (Inmate H07665) for over
ten years and am a close, personal friend of him and his family. I currently live in La
Quinta, California. I am a tax accountant, having a private practice in the Los
Angeles/Santa Monica area as well as being the officer manager and senior tax account at
a local firm in Palm Desert.

My relationship with Cliff and his family has been close, going back many years. I
should mention that he was a Naval Reserve officer for several years. I too was a Naval
Officer, having retired after serving twenty years. The offense that sent him to prison
was completely out of character for min, a man who had an exemplary career in both the
Navy and the civilian world. It was because of tremendous stress in his life that derailed
him from his moral and business way of life. He has reflected continually on his offense,
and I know he is remorseful for his misstep. He accepts complete responsibility for his
actions. I am sure it will never re-occur.

I will offer Cliff any support that is necessary to him him readjust and re-acclimatize nto
society after his release. I know that with his educational, professional and military
background and with the help of family and friends he will be able to return successfully
to society to be productive once more.

Respectfully,

Paul Grinkevich
78-188 Calle Norte
La Quinta, CA 92253
760-771-1691

September 18, 2006

Board of Prison Terms
1515 K Street
Sacramento, CA 95814

Board Commissioners:

RE: Clifford Brodsky (H07665)

My name is Mark McLaughlin and my relationship to Clifford Brodsky
(Inmate H07665) is that I am married to his ex wife Maureen.

I am writing this letter in support of Cliff s timely release from
prison. Clifford has a strong relationship with all his family members.
I know that he regrets very deeply the offense he committed and the
problems he caused all the affected family members, and I know he will
not repeat this or any other offense when he returns home to his family.

Maureen and I will actively assist his reintegration into a free society
by providing him with any assistance he may need.

Thank you for your time.

Mark McLaughlin
67673 N. Portales Dr.
Cathedral City, CA 92234

Exhibit "M"

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128B (8-87)

**Name   BRODSKY, C.**          **CDC #   H07665**          **Housing   YW-308L**

Inmate BRODSKY, C., H07665, has been actively participating in the Central Facility Veterans' Self Help Group (VGCTF), meetings during the quarter beginning , through , of . He has also been identified as a prior member of the United States Armed Forces verified by a copy of his DD-214 Report of Separation which is proof of his services.

**ORIG    C-File**
**Cc    Inmate**



Dr. J. Reed
Group Sponsor/Psychologist
Correctional Training Facility -- Central

Date: 8/17/06                    INFORMATINAL CHRONO                    CTF-C

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128 B (5-05)

**NAME and NUMBER**        **BRODSKY, C.**                    **H07665     YW-308L**

Inmate BRODSKY, H07665, has actively participated in the "**Cage Your Rage**" Anger Management program. This twelve (12) session program addressed four (4) stages: "Anger, Past and Present", "Anger and Aggression", "What Causes Anger?", and "How to Mange Anger". This inmate has been equipped with the knowledge and tools to understand that, (a) Anger is an emotion, (b) Anger is controllable, and (c) to this powerful emotion, there is a choice whether or not to give in to it. Mr. BRODSKY should be commended for his participation in this program.

ORIG  :  **CENTRAL FILE**
cc    :  Protestant Chapel
      :  Inmate

Reverend Judge C. Lindsay
Protestant Chaplain
CTF-Soledad

**DATE**  10/5/2006                    *LAUDATORY*                    GENERAL CHRONO

**Name and Number:**        Brodsky, C          H07665          YW-308L          **CDC-128B** (Rev.4/74)

Inmate Brodsky has successfully participated in and completed the Muslim Development Center's (Twelve-week) Anger Management Course. The course is based on principles rooted in Interfaith Religious Scripture and spiritual models of exemplary social behavior. Inmate Brodsky is commended for his outstanding participation and completion of the Interfaith based Anger Management Course and was awarded a Certificate of Completion.

Original: C-File
    cc: Chaplain File
       Inmate

Imam Antar Jannah
Muslim Chaplain
Correctional Training Facility - Central

**Date:** 11/19/2005        **(Anger Management Course Completion)**        **GENERAL CHRONO**



# Cage Your Rage Program

This is to certify that

## BRODSKY, CLIFFORD, H-07665

has successfully completed a

twelve-session course of Anger Management

in an "Inmate's Guide to Anger Control".

Presented this 5th day of October, 2006.

Chaplain Judge C. Lindsey
Correctional Training Facility - Central

# Certificate of Completion

Awarded to:

## Clifford Brodsky

On this 23rd day of February 2006 for faithfully completing
the "Healing For The Angry Heart" video series in:

# ANGER MANAGEMENT

He has acquired the skills through practical biblical insights
to deal with heart issues, discovered the secret to being heard,
learned to release guilt, trust again and break habit cycles.

Richard Niveles
Richard Niveles
Education Deacon
CTFF Central Chapel

Judge C. Lindsey
Judge C. Lindsey
Protestant Chaplain
CTFF Triplex Facility



# Certificate of Completion

*This document certifies that*

## Clifford Brodsky

*has successfully completed*

Anger Management/Fatherhood

*awarded this* 1 *day of* October 2005

(Instructor)

SOLEDAD CALIFORNIA · MUSLIM DEVELOPMENT CENTER · '61 · '95

$05.05

Clerk of the Court
United States District Court
Northern District of CALIFORNIA
P.O. Box 36060
San Francisco, CA 94102

Clifford Brodsky
HOV665 YW-388L
P.O. Box 689
Soledad, CA 93960-0689